UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11788-MLW

|  |  |
|---|---|
| JENNIFER PADELLARO, **Plaintiff** | ) ) ) ) |
| v. | ) ) |
| JAMES MCGRAVEY and CITY OF LAWRENCE, **Defendants** | ) ) ) ) |

## PLAINTIFF'S MOTION FOR LEAVE OF COURT
## TO AMEND PLAINTIFF'S COMPLAINT

Pursuant to Fed. R. Civ. P. 15, Plaintiff moves the Court for leave to amend her complaint to (1) add more specific facts and allegations; (2) add claims for negligent infliction of emotional distress, violation of the Massachusetts Torts Claims Act, M.G.L. c. 258, §§ 1 et seq., sexual harassment, based on a hostile work environment, pursuant to M.G.L. c. 151B, and retaliation, pursuant to M.G.L. c 151 B; and (3) renumber the claims set forth in Courts II through V to accommodate additional claims set forth in Counts II through XI of the Amended Complaint. *The City* of Lawrence *does not oppose* Plaintiff's motion.

Under Rule 15(a), a motion to amend shall be "freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay trial inconvenience, and will not prejudice the...parties." 6A Charles Wright and Arthur Miller, *Federal Practice*

*and Procedure* § 1504 (1990). "Liberality is the rule in permitting supplemental pleadings." *Structural Sys., Inc. v. Sulfaro*, 692 F. Supp. 34, 36 (D. Mass. 1988). A judge, therefore, should allow amendment "unless there appears some good reason for denying the motion." *All Seasons Serv., Inc. v. Commissioner of Health & Hosps. of Boston*, 416 Mass. 269, 272 (1993) (citing *Goulet v. Whitin Mach. Works, Inc.*, 399 Mass. 547, 549 (1987).

Rule 15(b) authorizes "[s]uch amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment." Fed. R. Civ. P. 15(b). In this case, Plaintiff seeks to conform her pleadings with the letter of presentment to the Mayor, pursuant to M.G.L. c. 258, § 4, of the Massachusetts Torts Claims Act, which her then attorney sent, and which placed the City on notice of claims for negligent infliction of emotional distress and violation of that Act.

Plaintiff seeks relief, under M.G.L. c. 151B, based on the same nexus of facts, which underpin her Title VII sexual harassment claims, to support these claims with both federal anti-discrimination law and state anti-discrimination law. *Rossiter v. International Bus. Mach. Corp.*, 2005 U.S. Dist. LEXIS 24543, *24 (D. Mass. 2005) (noting that Chapter 151B appears to be more friendly to plaintiffs than federal anti-discrimination law).

Finally, Plaintiff seeks to conform her complaint to the facts she alleged with specificity in both her MCAD charge and in her Complaint, which run from

late June 2004, when Plaintiff complained to the Mayor about McGravey's sexual harassment, to December 2, 2004, when Plaintiff was compelled to leave work on stress-related medical leave. While these facts and allegations comprise part of Plaintiff's hostile work environment, they constitute a separate and distinct claim of retaliation. The impetus for these hostile acts was retaliation for Plaintiff's protected activity of complaining about McGravey's unlawful conduct.

Rule 15(c) permits an amendment of pleadings to relate back to the original pleading when certain conditions are met. For the reasons set forth in Plaintiff's Memorandum in Support of this motion, the additional facts, allegations, and claims set forth in the Amended Complaint, which arose out of the same conduct alleged in Plaintiff's Complaint, relate back to the date of Plaintiff's original pleading.

Plaintiff's Amended Complaint more specifically and inclusively states her claims against the defendants, and granting Plaintiff's motion for leave to amend "will promote the economic and speedy disposition of the entire controversy between the parties... ." Fed. R. Civ. P. 15(a); 6A Charles Wright and Arthur Miller, *Federal Practice and Procedure* § 1504 (1990).

WHEREFORE, Plaintiff respectfully requests that this Court grant Plaintiff leave to file her Amended Complaint, which is attached hereto, as Exhibit 1, for the Court's convenience.

Respectfully submitted,


Jennifer Padellaro
By her Attorneys,


/s/ Linda Evans
Kevin G. Powers, BBO #405020
Linda Evans, BBO #635078
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

MotLeaveAmend

EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Civil Action No. 05-CV-11788-MLW**

| | |
|---|---|
| **JENNIFER PADELLARO,**<br>**Plaintiff** | )<br>)<br>) |
| | ) |
| **v.** | ) |
| | ) |
| **JAMES MCGRAVEY and**<br>**CITY OF LAWRENCE,**<br>**Defendants** | )<br>)<br>) |

## AMENDED COMPLAINT

### Nature of the Action

This is a suit in law and equity seeking redress, under Title VII and M.G.L.
c. 151B, for sexual harassment, based on a hostile work environment, and
retaliation; violation of the "Whistleblower" statute, M.G. L. c. 149, § 185;
violation of the Massachusetts Tort Claims Act, M.G.L. 258, §§ 1 et seq.; and the
common law claims of intentional infliction of emotional distress, negligent
infliction of emotional distress, and negligence. Jennifer Padellaro, Assistant City
Clerk, was sexually harassed by her supervisor, James McGravey, the City Clerk,
and repeatedly subjected to a hostile, harassing work environment, including
exposure to X-rated pornography on her computer. Subsequent to McGravey's
resignation, McGravey and/or the City retaliated against Plaintiff, causing her to
leave work with a total disability.

## Jurisdiction

The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343. Plaintiff's state law claims are brought in accordance with the Court's supplemental jurisdiction, 28 U.S.C. § 1367. All jurisdictional requisites to Plaintiff's Title VII and M.G.L. c. 151B claims have been met. In addition, these claims are based on the same factual nexus. The presentment requirement of M.G.L. c. 258, § 4, has been met.

## Parties to the Action

1. Jennifer Padellaro (hereinafter referred to as "Plaintiff" or "Padellaro") is a citizen of the Commonwealth of Massachusetts, who currently resides at 36 Hansom Drive, Merrimac, Essex County, Massachusetts 01860.

2. Defendant, James McGravey (hereinafter referred to as "McGravey") at all relevant times was the Clerk of the City of Lawrence, Essex County, Massachusetts, and Plaintiff's direct supervisor. McGravey resides at 14 Mount Vernon Circle, Lawrence, Essex County, Massachusetts 01843.

3. Defendant, City of Lawrence (hereinafter referred to as "the City"), is a municipality located in Essex County, Massachusetts, with its municipal building located at 200 Common Street, Lawrence, Essex County, Massachusetts 01840.

## Facts Common to All Claims

4. In or about July 1987, Padellaro began working in the City of Lawrence Clerk's Office under Charles Nyhan. At that time, McGravey was the Assistant City Clerk.

5.    In or about 1989, McGravey was appointed City Clerk for the City of Lawrence.

6.    In or about August 1993, Padellaro was appointed Assistant City Clerk for the City of Lawrence.

7.    At the commencement of Padellaro's employment with the City Clerk's Office, the Plaintiff enjoyed a good working relationship with McGravey.

8.    This good working relationship began to change in or about the Summer of 1995, when Padellaro informed McGravey that she was pregnant, at which time, McGravey's attitude and demeanor toward Padellaro became discriminatory and hostile.

9.    Plaintiff had a difficult pregnancy, which necessitated her being out of work prior to the delivery. In late December of 1995, McGravey refused to allow Padellaro to "borrow" sick time from co-workers, as well as from her husband, David Padellaro, then a Lawrence Police Officer, despite the fact that such a practice was commonplace.

10.    On March 2, 1996, Padellaro gave birth to a son. She returned to her job only six (6) weeks after giving birth, and not six (6) months later, provided by her contract, out of fear that she would lose her job.

11.    Padellaro was informed by her co-workers that she may lose her job if she did not return to work soon, because McGravey was upset that she was on maternity leave.

12.    In or about September 1996, Padellaro spent her lunch hour in the City Council's Office and would commonly eat with several of the female employees.

13.    McGravey often joined Padellaro and the other women during their lunch. He repeatedly told stories of a graphic, explicit sexual nature, which were unwanted by the women and extremely bothersome to the group.

14.    During this time, McGravey's wife, Carol Hajjar McGravey, then Attorney for the City, would occasionally join the group for lunch. When McGravey's wife was present, McGravey acted civilly and did not inject his usual crass, offensive, and sexually explicit stories into the conversation.

15.    Eventually, all the women, including Padellaro, stopped eating lunch in the City Council Office, out of fear that McGravey would continue to show up and harass them.

16.    In or about 1998, McGravey began to visit X-rated websites on the Internet. In particular, McGravey visited a site called "Flash Mountain," which posted pictures of women who would "flash" the camera, exposing their bare breasts, on the Splash Mountain ride at Disney World.

17.    McGravey stated that he believed that one of the women "flashing" the camera looked like Padellaro. McGravey commented how he liked "the Plaintiff's" breasts and showed the site to other employees in the Office.

18.    The next day, McGravey came into the Clerk's Office with a copy of the picture of the woman who resembled Plaintiff, which he had printed off his computer at home. McGravey showed the picture to employees in the Office and

4

then gave it to Padellaro, telling her to take the picture home and show it to her mother.

19.    Nearly a year later, in or about October 1999, Padellaro's brother, Gary, visited the Clerk's Office. During Padellaro's conversation with her brother, McGravey asked Padellaro's brother if he had the Internet at home. McGravey told Padellaro's brother that he should visit the website "Flash Mountain" to see the topless photograph of his sister, the Plaintiff.

20.    In or about September 1998, Padellaro was pregnant with her second child and was again ordered by her doctor to leave work early. Once again, McGravey refused to allow Padellaro to borrow sick time from co-workers.

21.    Prior to the time of McGravey's refusal to allow Padellaro to borrow sick time, McGravey personally contributed his sick days to another woman at City Hall.

22.    In or about early 1999, Padellaro noticed that McGravey had increased his use of the Internet, particularly his access to pornographic, sexually explicit, X-rated websites that had naked males and females performing sexual acts.

23.    In or about May 1999, Padellaro was working with a female co-worker when the website "Whitehouse," a pornographic website, popped up on Padellaro's computer. Padellaro's co-worker said, "What the heck is that?" McGravey went to Padellaro's desk and said, "Jenn, where have you been?" McGravey denied that it was his doing, notwithstanding the fact that McGravey

5

had mentioned this site many times in the past. Instead, throughout the day, McGravey stated that Plaintiff was to blame for the website.

24.    It was obvious to Padellaro that McGravey was using her computer to view pornographic websites in an attempt to make it appear as if Plaintiff had logged onto the computer and accessed the websites herself.

25.    Padellaro was so concerned about McGravey's use of her computer to visit pornographic sites that she made an appointment with an Assistant City Attorney to discuss the matter. There was no Personnel Director at the time; the City Attorney was McGravey's wife; and the Mayor, Patricia Dowling, was best friends with Carol Hajjar McGravey. Padellaro informed the Assistant City Attorney, Robert O'Sullivan, of the fact that McGravey was using her computer to access pornographic websites.

26.    Padellaro explained to Attorney O'Sullivan that she was reporting McGravey's conduct to him in an attempt to protect herself, because she feared that she would be blamed for McGravey's illicit activities on her computer. Attorney O'Sullivan agreed to keep the issue private, on account of Padellaro's fear of being terminated, if she filed a formal complaint. McGravey frequently told Plaintiff, "I don't wound; I kill."

27.    After discussing McGravey's conduct with the Assistant City Attorney, Padellaro went to the MIS Director and asked him to remove all Internet access from her computer so that she would not have to constantly fear that McGravey was accessing websites from her computer and/or subject her to the sites .

28.    The MIS Director, Rick Savage, denied Padellaro's request to remove the Internet from her computer, but he agreed to give Padellaro a password.

29.    While installing the password on Padellaro's computer, the MIS Director stated to Padellaro, "Jimmy has quite the little porno problem," referring to James McGravey.

30.    However, without Padellaro's knowledge or approval, the MIS Director gave McGravey the password to Plaintiff's computer. When Padellaro complained to the MIS Director and asked him why he released the password to McGravey, he answered, McGravey's "the boss." The MIS Director then refused to provide Padellaro with a private password.

31.    In Fall 1999, Padellaro became aware that McGravey was contacting "call girls" and "escort services" through her e-mail address and under her name. McGravey was also visiting such websites as "Daddy's Little Girls" and the "Best Fu—Transsexuals on the Net."

32.    At about this time, a co-worker told Padellaro that McGravey was showing employees a picture on the Internet of a "well endowed" man. This co-worker warned Padellaro that McGravey intended to show the picture to Padellaro. Plaintiff heard McGravey tell other employees in the Clerk's Office to help him relocate this picture on the Internet, because he had lost the website, and he wanted Padellaro to view the picture. When McGravey relocated the website, he pestered Padellaro to view the site, which she declined to do.

7

33.     In or about March 2000, the Personnel Department issued a memorandum, which was similar to an e-mail employees received in or about 1999, concerning the City's computer use policy.  The memorandum stated that any employee in violation of the Internet and/or e-mail policy could be terminated.  Each employee was required to sign at the bottom acknowledgment that s/he had read and understood the policy.  Plaintiff knew that an employee in another department, who forwarded chain letters and had received unsolicited "dirty" e-mails, had been reprimanded by the Personnel Department earlier that day.

34.     Padellaro refused to sign this policy, along with some other women in the Office, because she feared that she would be subject to discipline as a result of McGravey's pornographic and illicit activities on her computer.  Padellaro was aware that McGravey was constantly on her computer visiting X-rated websites, which was much more egregious conduct than receiving unsolicited "dirty" e-mails, and she feared McGravey's conduct would be wrongfully attributed to her.

35.     Despite Padellaro's numerous complaints to McGravey, he continued to use her password, shared with him by the MIS Director over Plaintiff's objection, to access filthy, explicit, and gross sexual images.

36.     McGravey continued his pattern of making inappropriate sexual remarks and viewing pornographic websites after he signed the City's computer use policy in March 2000.

37.     The Personnel Director for the City, in 2000, was Lawrence LeFebre, who was a former Mayor of the City.

8

38.     McGravey had served as Mayor LeFebre's Mayoral Aide in the late
1970's-early 1980's, and Mayor LeFebre had appointed McGravey as the
Assistant City Clerk in or about 1983.

39.     Padellaro was suffering from insomnia and headaches, as the result of
McGravey's conduct, and she felt intimidated at work.  Padellaro was afraid to
complain to LeFebre because of his close ties with McGravey, and she feared that
doing so would place her job in jeopardy.

40.     Padellaro requested a copy of the City's sexual harassment policy from
Personnel Director LeFabre.  When he asked her why she wanted a copy of the
policy, Plaintiff said that she wanted to seek legal counsel about whether her
Office and McGravey were in compliance with the policy.  LeFabre then called
Plaintiff several times on the telephone and twice had her come to his office for
the purpose of trying to dissuade her from contacting legal counsel about sexual
harassment in the City Clerk's Office.

41.     Plaintiff contacted Attorney Richard Sullivan.  On April 12, Attorney
Sullivan sent a letter to Personnel Director LeFebre, in which he detailed the
actions of McGravey, including McGravey's viewing of pornographic websites
from Padellaro's computer, as well as arranging for meetings with "call girls" and
"escort services" through Plaintiff's e-mail.

42.     At this time, LeFebre informed both Mayor Dowling's Office and the City
Attorney's Office about McGravey's sexually harassing conduct towards Plaintiff
and other female City employees.

9

43.    On April 23, 2000, eleven (11) days after the City was put on notice, and McGravey knew Padellaro was upset about his pornographic computer use, McGravey called up "jobs" in a search and then called over Plaintiff to see the various "blow job" titles that came up.  That entire week McGravey talked about Pamela Anderson's breast surgery and Pamela Anderson's and her ex's sex video.

44.    On May 8, 2000, LeFebre responded to Attorney Sullivan's letter and stated that he "agreed with the charges and allegations made against" McGravey by Padellaro.  LeFebre further wrote that McGravey would be required to write a letter of apology to Padellaro and to enroll in a course, which included one-on-one counseling about sexual harassment and hostile work environments.

45.    Despite assurances from the City, whatever training, if any, McGravey received on sexual harassment was not effective.  Upon information and belief, *if* McGravey received any training on sexual harassment and/or hostile work environments, it was limited to one (1) session.

46.    To date, Padellaro has never received an apology letter from McGravey.

47.    LeFebre indicated that he placed a letter in Padellaro's file stating that the City determined that Plaintiff had not violated the City's policies concerning e-mail/Internet access and that any contacts made to pornographic websites or e-mails were not authorized by Padellaro.

48.    On May 15, 2000, Padellaro's attorney, Richard Sullivan, responded to LeFebre's letter, in which LeFebre stated that the matter was closed, based on the

fact that he felt that Plaintiff could work with McGravey without worrying about a continued hostile work environment, which was completely false.

49.    Attorney Sullivan indicated to LeFebre that the matter was not closed, but rather, McGravey's conduct may change only temporarily.

50.    On May 26, 2000, LeFebre answered Attorney Sullivan's letter and agreed with Attorney Sullivan that he, too, did "not consider the matter closed because of a brief period of improved behavior," by McGravey.  LeFebre assured Attorney Sullivan that the City would "monitor" McGravey's conduct.

51.    Shortly after LeFebre assured Plaintiff's attorney that he understood that the McGravey matter was not "closed" and stated that the City would "monitor" McGravey, McGravey began an extramarital affair with a woman by the name of "Leslie." McGravey subjected female subordinates in his Office, including Plaintiff, and females in adjacent offices, to an unsolicited, unwanted running monologue about his affair and his mistress.  This unwanted monologue, extended throughout the 2-year affair and included graphic and explicit commentary about the affair relationship; his mistress' sexual prowess; the locations where their trysts took place; the gifts McGravey purchased for his mistress; his mistress' preferences in adult stores and "adult toys;" and the amount of money that McGravey was paying his mistress to stay home and not work.

52.    Both during the 2-year affair from 2000 to 2002 and after the affair ended, McGravey repeatedly asked Padellaro how much she earned per week and would then state that Plaintiff would enjoy staying home for the larger amount of money

11

that he would pay Plaintiff, tax free, as his mistress. McGravey also asked
Padellaro if she thought that Carole Morin, another subordinate of McGravey's,
would be interested in an arrangement similar to that of his mistress for making
money.

53.    In late 2003 and into 2004, McGravey asked Padellaro whether a third
female, 20-something-year-old employee, in the same building, would be willing
to become McGravey's mistress.

54.    McGravey's comments and overtures to Padellaro to become his mistress
continued to the time of McGravey's resignation in 2004.

55.    In or about 2004, Plaintiff unintentionally walked in on McGravey in his
office. McGravey appeared to have been doing something very private. He
immediately bent over and quickly closed the door on Padellaro. Padellaro was
sufficiently shaken by this incident to tell her girlfriend, Susan.

56.    On or about June 14, 2004, McGravey subjected Lillian Michaud, Secretary
to the City Council, whose office was next door, and Carole Morin, Plaintiff's
subordinate in the City Clerk's Office, to a website, "Showmywife.com," which
depicted sexually graphic, naked photographs of, according to McGravey,
McGravey and "Leslie," McGravey's former mistress. McGravey first showed the
website to Ms. Michaud, outside of Plaintiff's office, and then when Plaintiff went
to lunch, McGravey exposed Ms. Morin to the website in Plaintiff's office. When
Padellaro returned from lunch, Ms. Morin said to her, "Don't ever leave me alone
with him again!" Ms. Morin told Plaintiff, her supervisor, that she was

uncomfortable looking at the "Showmywife.com" website, but she was afraid to tell McGravey.

57.     The next day, on or about June 15, 2004, Padellaro sought the counsel of Attorney Peter Slipp in the City Attorney's Office. At that time, there was no Personnel Director, and a former administrative assistant was performing the duties of the office. Plaintiff told Attorney Slipp that her concern was two-fold: First the subjection of City employees to pornographic websites was gross and sexually harassing, and second, because Plaintiff was a supervisor, it was incumbent upon her to protect her employees.

58.     On or about June 17, 2004, McGravey kept trying to corner Padellaro to tell her about the "bad personal week" he had had. He told Plaintiff that "Leslie" had e-mailed a website to him with the two of them having sex, without heads. McGravey said, "Get it? Good memories." McGravey was talking fast, and he described opening his e-mail, "tic, tic, tic, down, little by little," as the headless pictures came into view. Plaintiff cut him off and said, "I get the picture, enough already." The phone rang, and Padellaro was able to get away from McGravey.

59.     At or about this same time period, Ms. Michaud, the City Council secretary, told MIS Director, Richard Savage, that McGravey was still using her computer for illicit purposes, and no investigation was initiated.

60.     Padellaro contacted her former attorney, Richard K. Sullivan, to discuss McGravey's continuing pornographic use of the computers in the City Clerk's Office.

13

61.    Pursuant to Attorney Sullivan's advice, Plaintiff met with the Mayor,

Michael Sullivan, on June 29, 2004, and she read aloud a letter written by her

attorney, which described McGravey's past and current sexually harassing, hostile

conduct.  At this meeting, Plaintiff told Mayor Sullivan that she was afraid to

return to work, because of retaliation by McGravey, until the work environment

had been addressed and corrected.  Mayor Sullivan advised Plaintiff that he would

"take care of everything."  He then informed Plaintiff that he would place her on

paid leave, retroactive to June 21, 2004, and that she could remain on paid leave

until she felt that she could return.

62.    On or about July 1, 2004, Mayor Sullivan contacted Padellaro and told her

to "sit tight."  He stated that he was investigating McGravey's actions, and he said

that McGravey's personnel file had been "purged;" that is, documents were

missing from the file.  The Mayor also said that he was having all involved

computers pulled and examined.

63.    On or about July 9, 2004, Mayor Sullivan called Padellaro and told her that

she needed to provide the letter that she had read to him at their meeting on June

29, 2004, to enable the City to move forward and confront McGravey.  Plaintiff

believed that she had no choice but to have Attorney Sullivan send the Mayor a

final version of the draft letter she had read to the Mayor.  The City had been

examining all of the computers in her Office, the Election Department, and the

City Council for the past two weeks, and it was evident that McGravey, who was

seeking Plaintiff's termination for "*abandonment of position,*" knew that Plaintiff

14

was the impetus for the investigation.  Attorney Sullivan sent a final version of his June 29, 2004 letter to the Mayor.

64.    On or about July 13, 2004, McGravey resigned from his position as City Clerk, by facsimile.

65.    Patrick Blanchette, President of the City Council, then called Padellaro, informed her that McGravey had resigned, and asked her when she would return to work.  Plaintiff said that she would return on Wednesday, July 14, 2004.

66.    Minutes later, Blanchette called Plaintiff back to inform her that the *Eagle Tribune* newspaper had the story on McGravey and had Padellaro's name. Blanchette expressed concern about whether his name would be "dragged in," how the publicity would affect him, and whether he would look "bad" in the press. Blanchette also falsely told Padellaro that the Council had decided not to make her Acting City Clerk, because it would "not look good" since she made the complaint against McGravey.  After learning about the leak to the press, Plaintiff agreed to delay her return to work until Monday, July 19, 2004.

67.    Padallaro returned to work on July 19, 2004 and performed the responsibilities of City Clerk.

68.    After McGravey resigned, Padellaro's work environment became infused with animosity towards her.  Upon information and belief, Patricia Cook, City Treasurer, who became cold and distant towards Plaintiff, opposed McGravey's resignation.  Sarah Conway, of the Tax Collector's Office, was a friend of Plaintiff's; she felt that Plaintiff's reporting of McGravey's conduct was a betrayal

15

of McGravey; and Conway became unfriendly and cold towards Plaintiff. City Councilor Parolisi told Padellaro that he did not want to accept McGravey's resignation and that McGravey was a "fixture" in City Hall and a wealth of information. Later, when Padellaro was forced to go out on a disability leave, as the result of the City's retaliation against her, Councilor Nickolas Kolofoles told Susan D'Agati, in the City Attorney's Office, that Plaintiff would have a hard time getting everyone at work to forgive her for what she did to McGravey.

69.    Shortly after Padellaro returned to work, Blanchette created an ad hoc committee to handle the City Council's search for a new Clerk.

70.    Co-workers informed Padellaro that Blanchette had been in communication with McGravey while Plaintiff was out on leave and that Blanchette continued to be in contact with McGravey – most recently about the Clerk's position.

71.    Padellaro advised Blanchette that the meetings of the ad hoc search committee for a new City Clerk were subject to the law of "open meetings," pursuant to M.G.L. c. 39, § 23A, which requires that the meetings be posted and open to the public, with minutes taken. As the result of Padellaro's "whistleblowing," Blanchette became visibly irate; he accused Plaintiff of trying to "start trouble;" and he told other Council members that Padellaro was questioning his decisions, which added to Plaintiff's hostile work environment.

72.    In July 2004, Plaintiff told Blanchette that she would like to be appointed Acting City Clerk, which would normally, pro formally be done. Blanchette first asked Padellaro to file a grievance with the City Council, which she declined to

do. Blachette then falsely stated that he would discuss Plaintiff's request with Councilors prior to the next full Council meeting.

73.    On the day the City Clerk position was posted, Plaintiff spoke with Blanchette about the absence of the usual "or equal work experience," in lieu of a college degree, from the qualifications section of the posting. McGravey, with whom Blanchette had been in contact, knew that Plaintiff was some credits short of her bachelor's degree. Plaintiff stated that she felt that she had been boxed out of applying for the job, based on information to which McGravey was privy, and that she had intentionally been rendered "disqualified" for the job she was already performing. During this discussion, Blanchette falsely denied that he had been in contact with McGravey subsequent to his resignation, and he ingenuously asked Plaintiff if she knew that McGravey had majored in theology.

74.    In August 2004, four City Councilors, with whom Plaintiff spoke, told her that they had no knowledge about any Council decision in July not to make Plaintiff the Acting City Clerk, and all four stated that Blanchette had not discussed Plaintiff's request to be appointed Acting Clerk with them.

75.    On or about August 19, 2004, Israel Reyes, Chair of the Council's Personnel Committee and a member of the ad hoc search committee, informed Padellaro that he and other Councilors were going to meet with Plaintiff's co-workers in the Clerk's Office, but he did not disclose the reason for such meetings. Reyes also said that, pursuant to orders from Blanchette, Padellaro could not be present.

76.     That same day, August 19, 2004, Blanchette came to Plaintiff's office and asked her why she was "*being a troublemaker again*" and "trying to start trouble *again*." Plaintiff had requested additional help for her short-staffed office. Blanchette then stated, "I'm not your boss – go see your friend, the Mayor."

77.     Padellaro was extremely upset by this meeting with Blanchette, his sarcastic, hostile reference to her "friend, the Mayor," and her poor treatment under the auspices of the City Council. She immediately reported the events of that day to Mayor Sullivan and his staff who were in attendance. Mayor Sullivan offered to provide Plaintiff with additional staff, and a job posting was created the next day.

78.     The following Monday, August 23, 2004, Plaintiff informed the Mayor's Office that she was leaving sick. Padellaro visited her doctor on August 25, 2004, who ordered Plaintiff to remain out of work.

79.     In or about late Summer 2004, a request was filed with the City Attorney's Office to revise the City Ordinance concerning the appointment of the Assistant City Clerk, Section 2.26.040, to make the City Council the hiring authority for the position, instead of the Mayor. This request was highly irregular, and given the evident retaliatory hostility of Blanchette and other Councilors towards Plaintiff, because of her complaint against McGravey, the proposed revision constituted an immediate and direct threat to Plaintiff's employment.

80.     On or about September 3, 2004, while Padellaro was out on sick leave, Blanchette distributed a letter to the entire Election Office staff, City Clerk Office

18

staff, and Election night staff, in which he claimed credit for work that had been done by Plaintiff concerning the upcoming election.

81.    On or about September 7, 2004, one week before Padellaro interviewed for the City Clerk position, Blanchette further attempted to discredit Plaintiff.  He left a memorandum on Plaintiff's desk, which he knew she would not see, and which he distributed to all City Councilors, in which he said that *he* had been advised by the State that Plaintiff was "seriously out of compliance" on reporting records to the State.  As Blanchette intended, Padellaro had no knowledge about this allegation when she was interviewed and, therefore, could not clarify the facts and correct Blanchette's false representation to the Councilors that she was derelict in the performance of her duties.

82.    On September 15, 2004, Padellaro interviewed with the Personnel Committee of the City Council for the position of City Clerk.  During her interview, both Blanchette and Gilbert Frechette, whom McGravey frequently referred to as "my neighbor," were openly hostile to Plaintiff.  Frechette questioned Plaintiff about her having been under a doctor's care that Summer, care that had been necessitated by McGravey's harassing and hostile conduct and Blanchette's hostile and retaliatory conduct.

83.    The selection process was rife with procedural irregularities, including interviews with the candidates conducted in Executive Session, and William Maloney, who had no experience in the Clerk's Office, was selected for the City Clerk position.

19

84.    Padellaro returned to her position as Assistant City Clerk on September 27, 2004. Within a month, she was seeing a therapist for work-related stress.

85.    On November 28, 2004, the *Eagle Tribune* newspaper ran a story on the cover of the Local News Section entitled, "City Deals with Aftermath of Former Clerk's Antics." In this article, Padellaro's attorney was quoted as stating that in 2000, when Plaintiff reported McGravey's sexually harassing conduct to Personnel Director LeFebre, both LeFebre and Mayor Dowling "conspired or turned a blind eye towards [McGravey's] activities... ."

86.    Four days after the article was published, LeFebre, who had repeatedly advised Plaintiff not to retain counsel in 2000, came into Padellaro's office, irate, and verbally assaulted her. LeFebre, who was a paid member of the Retirement Board, threatened Plaintiff, a 17-year employee of the City at that time, that he "had all the documents," and Plaintiff "would not get any money" from him.

87.    LeFebre's verbal assault and threat caused Padellaro acute anxiety, forcing her to leave work with chest pains and seek medical treatment. Plaintiff was hospitalized, kept overnight, and released on December 3, 2004.

88.    Pursuant to LeFebre's threat that Padellaro "would not get any money," the City opposed, unsuccessfully, Plaintiff's receipt of Worker's Compensation.

### COUNT I – Intentional Infliction of Emotional Distress
Against James McGravey

89.    Padellaro realleges, reaffirms, and incorporates by reference the facts and allegations set forth in paragraphs 1-88.

90.    Defendant McGravey acted in an extreme and outrageous manner towards Padellaro.

91.    McGravey intended to cause emotional distress to Padellaro or he knew or should have known that emotional distress was likely to occur.

92.    Padellaro's distress was severe and of a nature that no reasonable person could be expected to endure.

93.    McGravey's actions against Padellaro resulted directly in Padellaro's distress.

94.    On account of McGravey's intentional acts against Padellaro, Padellaro has suffered lost wages and a loss of future earning capacity, a loss of employment benefits both past and future, damage to her career, and physical and emotional distress, including but not limited to, major depression, anxiety, humiliation, intimidation, weight loss, headaches, insomnia, flare-ups of irritable bowel syndrome, and recurrences of lupus-related symptoms, including joint pain.

### COUNT II – Negligent Infliction of Emotional Distress
Against James McGravey

95.    Padellaro realleges, reaffirms, and incorporates by reference the facts and allegations set forth in paragraphs 1-94.

96.    Defendant McGravey, as City Clerk and Padellaro's direct supervisor, had a duty of reasonable care to ensure that Padellaro was not subjected to a hostile work environment, sexual harassment, and/or retaliation.

97.   McGravey breached his duty of care to Padellaro by engaging in sexually harassing conduct and commentary towards her, creating a hostile work environment, soliciting Padellaro to be his mistress, and then retaliating against Padellaro after she complained to the Mayor by trying to terminate her for *job abandonment* and conspiring with Blanchette to prevent Padellaro from being appointed Acting City Clerk and/or permanent City Clerk.

98.   McGravey's negligence caused Padellaro serious, sustained emotional distress, which manifested in anxiety, headaches, weight loss, insomnia, recurrences of lupus-related symptoms, flare-ups of irritable bowel syndrome, sleeplessness, the jitters, and major depression, for which Padellaro has had to seek medical treatment.

99.   Padellaro's emotional distress was foreseeable, and a reasonable person in Plaintiff's same circumstances would have suffered emotional distress.

100.   On account of McGravey's negligent infliction of emotional distress, Padellaro has suffered serious emotional distress, medically-related absences from work, lost wages and a loss of future earning capacity, a loss of employment benefits both past and future, and damage to her career.

**COUNT III – Massachusetts Tort Claims Act – M.G.L. c. 258, §§ 1 et seq.**
Against the City of Lawrence

101.    Padellaro realleges, reaffirms, and incorporates by reference the facts and allegations set forth in paragraphs 1-100.

102.    The City of Lawrence is a public employer and, at all relevant times, the City was the employer of McGravey and subject to liability, pursuant to M.G.L. c. 258, §§ 1 et seq.

103.    In letters, respectively dated September 30, 2004, Padellaro's attorney made presentments to the Mayor of the City and to McGravey of Padellaro's intention to file a civil suit against the City and McGravey, which would include claims for negligent infliction of emotional distress and intentional infliction of emotional distress.

104.    Padellaro filed this civil action eleven (11) months later, on August 30, 2005.

105.    As the public employer of McGravey, the City is liable for the emotional, physical, and/or monetary injuries, which McGravey, acting in his official capacity as City Clerk and Padellaro's supervisor, negligently and/or intentionally inflicted on Padellaro, his subordinate, by causing her serious emotional distress.

106.    The City is also liable for its negligence in failing to investigate, monitor, medically treat, sanction, and/or terminate McGravey after it had notice of McGravey's negligent and/or intentional infliction of emotional distress, in or

about 1999 via its City Attorney's Office and/or MIS director, and/or in 2000 via

Personnel Director LeFebre, Mayor Dowling, and/or the City Attorney's Office.

107.    On account of the City's violations of the Massachusetts Torts Claims Act,

Padellaro has suffered serious emotional distress with physical symptoms,

including but not limited to, anxiety, headaches, weight loss, insomnia,

recurrences of lupus-related symptoms, flare-ups of irritable bowel syndrome,

sleeplessness, the jitters, and major depression; medically-related absences from

work; lost wages and a loss of future earning capacity; a loss of employment

benefits both past and future; and damage to her career.

### COUNT IV -- Negligence
Against the City of Lawrence

108.    Padellaro realleges, reaffirms, and incorporates by reference the facts and

allegations set forth in paragraphs 1-107.

109.    The City of Lawrence, Padellaro's employer, owed Padellaro a duty of

reasonable care to ensure that Padellaro was not subjected to a hostile work

environment, sexual harassment, and/or retaliation by employees of the City.

110.    The City breached its duty of care to Padellaro by allowing sexually

harassing, hostile and/or retaliatory conduct towards Padellaro to continue, for

years prior to McGravey's resignation, and subsequent to his resignation, thereby

compelling Padellaro to leave her hostile work environment for stress-related,

medical reasons.

111.   As the direct and proximate result of the City's negligence, Padellaro has been harmed.

112.   On account of the City's negligence, Padellaro has suffered lost wages and a loss of future earning capacity, a loss of employment benefits both past and future, damage to her career, and physical and emotional distress, including but not limited to, major depression, anxiety, humiliation, intimidation, weight loss, headaches, insomnia, flare-ups of irritable bowel syndrome, and recurrences of lupus-related symptoms, including joint pain.

### COUNT V – Violation of Title VII, 42 U.S.C. § 2000e et seq.
Against James McGravey

113.   Padellaro realleges, reaffirms, and incorporates by reference the facts and allegations set forth in paragraphs 1-112.

114.   Padellaro belongs to the protected class of female.

115.   Defendant McGravey, by and through his actions and comments, subjected Padellaro to unwelcome sexual harassment, which was based on her sex.

116.   McGravey's sexual harassment of Padellaro caused her to perform her job responsibilities in a hostile work environment, permeated with discriminatory intimidation, insult, and humiliation.

117.   McGravey's intentional, continuous, and severe sexual harassment of Padellaro and/or his subjection of Padellaro to a hostile work environment were egregious and in violation of Padellaro's civil rights, pursuant to Title VII, 42 U.S.C. § 2000e et seq.

118.   On account of McGravey's violation of Title VII, Padellaro has suffered

lost wages and a loss of future earning capacity, a loss of employment benefits

both past and future, damage to her career, and physical and emotional distress,

including but not limited to, major depression, anxiety, humiliation, intimidation,

weight loss, headaches, insomnia, flare-ups of irritable bowel syndrome, and

recurrences of lupus-related symptoms, including joint pain.

### COUNT VI – Violation of Title VII, 42 U.S.C., § 2000e et seq.
Against the City of Lawrence

119.   Padellaro realleges, reaffirms, and incorporates by reference the facts and

allegations set forth in paragraphs 1-118.

120.   The City of Lawrence knew or should have known of McGravey's sexual

harassment of Padellaro and failed to take prompt remedial action.  McGravey was

an agent of the City and Padellaro's direct supervisor.  By and through its actions

and inactions, the City caused Padellaro to work in a sexually harassing, hostile

work environment.

121.   The City's sexual harassment of Padellaro and/or its subjection of Padellaro

to a hostile work environment were egregious and in violation of Padellaro's civil

rights, pursuant to Title VII, 42 U.S.C. § 2000e et seq.

122.   On account of the City's violation of Title VII, Padellaro has suffered lost

wages and a loss of future earning capacity, a loss of employment benefits both

past and future, damage to her career, and physical and emotional distress,

including but not limited to, major depression, anxiety, humiliation, intimidation,

weight loss, headaches, insomnia, flare-ups of irritable bowel syndrome, and recurrences of lupus-related symptoms, including joint pain.

### COUNT VII – Violation of M.G.L. c. 149, § 185 – "Whistleblower"
Against the City of Lawrence

123.    Padellaro realleges, reaffirms, and incorporates by reference the facts and allegations set forth in paragraphs 1-122.

124.    Part of Padellaro's job was to keep the City Council apprised of proper procedures. Padellaro advised Blanchette that the meetings of the ad hoc search committee for a new City Clerk were subject to the law of "open meetings," pursuant to M.G.L. c. 39, § 23A, which requires that meetings be posted and open to the public, with minutes taken. Padellaro reasonably believed that the committee's failure to hold open meetings was in violation of the law of "open meetings."

125.    Blanchette became irate and accused Padellaro of trying "to start trouble," and he told other Councilors that Padellaro was questioning his decisions.

126.    The City of Lawrence retaliated against Padellaro for her invocation of the "open meetings" law, including but not limited to, the Council failed to appoint Plaintiff as Acting City Clerk, contrary to custom and practice; the City "disqualified" Padellaro from the City Clerk position, a job she was already performing, by eliminating "or equal work experience," in lieu of a college degree, from the qualifications section of the job description, contrary to custom and practice; and failing to appoint Padellaro as City Clerk.

127.   On account of the City's unlawful retaliation against Padellaro, in violation of M.G.L. c. 149, § 185, Padellaro has suffered lost wages and a loss of future earning capacity, a loss of employment benefits, both past and future, and damage to her career.

### COUNT VIII – Violation of M.G.L. c. 151B – Sexual Harassment
Against James McGravey

128.   Padellaro realleges, reaffirms, and incorporates by reference the facts and allegations set forth in paragraphs 1-127.

129.   As Assistant City Clerk, Padellaro was subjected to conduct and comments of a sexual nature, which included her supervisor, James McGravey's (1) use of Padellaro's computer and other computers in the City Clerk's Office to view X-rated pornographic pictures on the internet and to solicit "call girls" and "escort services" through Padellaro's e-mail; (2) unsolicited and unwelcome comments of a sexual nature about himself and others, his extramarital affair, and the sexual proclivities of his mistress; and (3) solicitation of Padellaro, over a 4-year period, to become his mistress.

130.   McGravey's computer conduct, comments, and overtures were of a sexual nature, and they were unsolicited and unwelcome.

131.   McGravey's conduct and comments of a sexual nature had the purpose and/or effect of creating an intimidating, hostile, humiliating, and/or sexually offensive work environment for Padellaro.

28

132.    McGravey's unwelcome conduct of a sexual nature unreasonably interfered with Padellaro's job performance, causing her to avoid physical proximity to McGravey, her direct supervisor, within the Office, and to be absent from work and/or out on sick leave.

133.    McGravey's unwelcome conduct and comments of a sexual nature towards Padellaro were in violation of M.G.L. c. 151B, § 4(16A), which prohibits sexual harassment by the creation of a sexually hostile work environment.

134.    On account of Defendant McGravey's sexual harassment of Padellaro, based on a hostile work environment, Padellaro has suffered lost wages and a loss of future earning capacity, a loss of employment benefits both past and future, damage to her career, and physical and emotional distress, including but not limited to, major depression, anxiety, humiliation, intimidation, weight loss, headaches, insomnia, flare-ups of irritable bowel syndrome, and recurrences of lupus-related symptoms, including joint pain.

### COUNT IX – Violation of M.G.L. c. 151B – Sexual Harassment
Against the City of Lawrence

135.    Padellaro realleges, reaffirms, and incorporates by reference the facts and allegations set forth in paragraphs 1-134.

136.    The City of Lawrence was at all relevant times the employer of Padellaro's sexually harassing supervisor, Defendant McGravey.

137.   As McGravey's employer, the City is liable to Padellaro for Supervisor McGravey's sexual harassment of Padellaro and his creation of a hostile work environment.

138.   In addition to being strictly liable for Supervisor McGravey's sexual harassment of Padellaro, the City knew or should have known of the harassment, failed to take prompt remedial action, and aided, abetted, and facilitated McGravey's sexually harassing conduct and comments by (1) failing to provide Padellaro with a private password; (2) providing McGravey with Padellaro's password; (3) failing to instruct and train McGravey about sexual harassment; (4) failing to monitor McGravey's conduct, after assuring Padellaro that McGravey's conduct would be monitored; (5) attempting to dissuade Padellaro from seeking legal counsel to deal with her sexually harassing and hostile work environment; (6) failing to investigate a report from another employee about McGravey's sexually harassing use of her computer; and (7) failing to timely sanction or terminate McGravey for his unlawful conduct.

139.   The City's sexual harassment of Padellaro, based on a hostile work environment, and its aiding, abetting, and facilitation of McGravey's sexual harassment of Padellaro, were in violation of M.G.L. c. 151B, §§ 4(4) and 4 (5).

140.   On account of the City's sexual harassment of Padellaro, based on a hostile work environment, and/or its aiding, abetting, and facilitation of McGravey's sexual harassment, Padellaro has suffered lost wages and a loss of future earning capacity, a loss of employment benefits both past and future, damage to her career,

30

and physical and emotional distress, including but not limited to, major depression, anxiety, humiliation, intimidation, weight loss, headaches, insomnia, flare-ups of irritable bowel syndrome, and recurrences of lupus-related symptoms, including joint pain.

### COUNT X – Violation of M.G.L. c. 151B -- Retaliation
Against James McGravey

141.    Padellaro realleges, reaffirms, and incorporates by reference the facts and allegations set forth in paragraphs 1-140.

142.    On or about June 29, 2004, Padellaro reported McGravey's past and present sexually harassing conduct to the Mayor.  Padellaro's complaint to the Mayor about McGravey's sexual harassment and his creation of a hostile work environment was protected activity.

143.    The Mayor placed Padellaro on administrative leave in order to temporarily remove her from her work place during the conduct of an investigation.

144.    As the result of Padellaro's complaint, the computers in the Clerk's Office, the Elections Office, and the City Council Office were examined, and McGravey had knowledge that Padellaro had complained about his sexually harassing conduct.

145.    Mid-investigation, while Padellaro was out on leave, McGravey retaliated against Padellaro by attempting to terminate her for *"abandonment of position."*

31

146.    Before and after McGravey resigned, on or about July 13, 2004, McGravey was in communication with Blanchette, the President of the City Council, about the City Clerk position, which McGravey vacated.

147.    McGravey retaliated against Padellaro for reporting his sexually harassing conduct to the Mayor by conspiring with Blanchette to deny Padellaro the pro forma appointment as Acting City Clerk and to "disqualify" Padellaro from the permanent Clerk position, based on information about Padellaro's educational background, to which McGravey was privy.

148.    As the result of McGravey's retaliation against Padellaro, she was wrongly denied employment as Acting City Clerk and/or City Clerk, notwithstanding the facts that Padellaro had been Assistant City Clerk for eleven (11) years and was already performing the job responsibilities of the City Clerk.

149.    McGravey's retaliation against Padellaro for her engagement in the protected activity of reporting McGravey's sexual harassment to the Mayor was in violation of M.G.L. c. 151B, § 4(4).

150.    On account of McGravey's retaliation against Padellaro, Padellaro has suffered lost wages and a loss of future earning capacity, a loss of employment benefits both past and future, damage to her career, and physical and emotional distress, including but not limited to, major depression, anxiety, humiliation, intimidation, weight loss, headaches, insomnia, flare-ups of irritable bowel syndrome, and recurrences of lupus-related symptoms, including joint pain.

## COUNT XI – Violation of M.G.L. c. 151B -- Retaliation
Against the City of Lawrence

151.   Padellaro realleges, reaffirms, and incorporates by reference the facts and

allegations set forth in paragraphs 1-150.

152.   After McGravey resigned, as the result of Plaintiff's protected activity of

reporting McGravey's sexual harassment to the Mayor, Padellaro's work

environment became infused with animosity and retaliatory conduct towards her.

City agents, including the City Treasurer, regarded Padellaro's complaint against

McGravey as a betrayal of McGravey, and they became cold and distant towards

Padellaro, making her job more difficult to perform.

153.   Blanchette, who was in communication with McGravey, falsely told

Padellaro that the City Council had decided not to appoint her as Acting City

Clerk, as normally would be done, because she had complained about McGravey's

conduct.  Blanchette refused to discuss Padellaro's subsequent request for the

appointment with other Councilors.

154.   Blanchette, in collusion with McGravey, intentionally rendered Padellaro

"disqualified" for the Clerk's job she was already performing by omitting the

usual "or equal work experience," in lieu of a college degree, from the

qualifications section of the posting for the City Clerk position.

155.   When Padellaro requested additional staff for her overworked Office,

Blanchette accused her of *"being a troublemaker again"* and "trying to start

33

trouble *again*." Blanchette then stated that he was not Padellaro's boss and, with undisguised hostility, advised her to "go see your friend, the Mayor."

156.   The Mayor, in fact, was the appointing authority for the Assistant City Clerk. Subsequent to McGravey's resignation and Padellaro's "disqualification" for the Clerk's position, a request was filed with the City Attorney's Office to change the appointing authority of the Assistant City Clerk position from the Mayor to the City Council, under Blanchette's leadership. Given Blanchette's overt hostility towards Padellaro, this request put Plaintiff's job as Assistant Clerk in immediate peril.

157.   Padellaro's physician ordered her out of work after Blanchette accused her of "*being a trouble maker again*" and, with hostility, referred her to her "friend, the Mayor." As the result of the ensuing retaliation against Padellaro by City agents and employees, after McGravey's resignation, Padellaro suffered from weight loss, reduced motivation, difficulty concentrating, spastic colon, neck pain, and jitters.

158.   While Padellaro was out on leave, Blanchette took credit for work that she had performed and attempted to discredit her to the City Council as derelict in the performance of her duties, just prior to her interview for the Clerk position.

159.   During Padellaro's interview for the Clerk position, Blanchette and McGravey's "neighbor," Frechette were openly hostile towards Plaintiff.

160.   Shortly after Padellaro was wrongly denied promotion to Clerk, in retaliation for her complaint against McGravey, she returned to her Assistant Clerk

34

position. She soon had to enter into therapy for her work-related emotional distress, which was caused by her retaliatory work environment.

161.    Four days after a newspaper article appeared in the local newspaper about Padellaro's protected activity of filing a lawsuit against the City and the possible inclusion of LeFebre as a named defendant, Le Febre threatened Padellaro. Specifically, LeFebre, now a member of the Retirement Board, stormed into Padellaro's office, cornered her, threatened Padellaro, a 17-year employee, that he "had all the documents," and shouted that Padellaro "would not get any money" from him.

162.    As the result of these cumulative retaliatory actions by the City, through its agents and/or employees against Padellaro, Padellaro had to leave work on total disability.

163.    The retaliatory conduct of Blanchette, LeFebre, and other City agents and employees against Padellaro was in violation of M.G.L. c. 151B §§ 4(4), 4(4A), and 4(5).

164.    On account of the City's retaliation against Padellaro, Padellaro has suffered lost wages and a loss of future earning capacity, a loss of employment benefits both past and future, damage to her career, and physical and emotional distress, including but not limited to, major depression, anxiety, humiliation, intimidation, weight loss, headaches, insomnia, flare-ups of irritable bowel syndrome, and recurrences of lupus-related symptoms, including joint pain.

35

WHEREFORE, Plaintiff demands that this Court order:

a)  That the Defendants compensate Plaintiff for any loss of wages and/or benefits incurred as a result of their intentional infliction of emotional distress, negligence, sexual harassment, and/or retaliation against Plaintiff;

b)  that Plaintiff be awarded three times her lost wages and benefits for the City's violation of M.G.L. c. 149, § 185;

c)  that Plaintiff be awarded an amount of money which will fairly compensate her for her emotional and physical pain and suffering;

d)  that the Defendants be ordered to pay Plaintiff punitive damages;

e)  that the Defendants be ordered to pay Plaintiff exemplary damages;

f)  that the Defendants pay Plaintiff costs and attorney's fees resulting from this action;

g)  that the Defendants pay Plaintiff interest on any judgment entered, under Title VII and/or Chapter 151B, from the date of filing at the EEOC and/or the MCAD for sexual harassment, based on a hostile work environment;

h)  that the Defendants pay Plaintiff interest on any judgment entered on her common law, "Whistleblower," and/or Title VII and Chapter 151B retaliation claims, from the date of filing this Court action; and

i)  such relief as may be just and proper and/or which will make Plaintiff whole.

**Padellaro requests a Jury Trial on All Issues and Causes of Action Contained in this Complaint.**

Jennifer Padellaro
By her Attorneys,


/s/ Linda Evans_____
Kevin G. Powers, BBO #405020
Linda Evans, BBO #635078
Rodgers, Powers & Schwartz LLP

18 Tremont Street
Boston, MA 02108
(617) 742-7010

AmendedComplaint