UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

JENNIFER PADELLARO,                        .

                Plaintiff,        .        CIVIL ACTION NO. 05-11788-MLW

          v.                              .

JAMES MCGRAVEY and                         .
CITY OF LAWRENCE,                          .

             Defendants.        .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DEFENDANT CITY OF LAWRENCE'S MOTION TO COMPEL TESTIMONY OF RICHARD SULLIVAN AND FOR EXPENSES AND SANCTIONS, AND RENEWED MOTION FOR SANCTIONS RELATED TO PLAINTIFF AND SULLIVAN'S MOTION TO QUASH

### I. INTRODUCTION

On September 28, 2006, the parties were before this Court arguing whether Plaintiff Jennifer Padellaro's former attorney, Richard Sullivan, should be compelled to appear and testify at a deposition in this matter. Sullivan joined Padellaro in filing their Motion to Quash the subpoena compelling Sullivan's deposition, yet failed to appear for the oral arguments. After hearing arguments of the parties, the Court rejected Padellaro and Sullivan's Motion and ordered Sullivan to appear at his deposition. Unfortunately, Sullivan flouted the Court's ruling, necessitating this Motion.

Sullivan appeared for a deposition on December 1, 2006 but inexplicably refused to answer any substantive question on the grounds of attorney-client privilege. Sullivan refused to answer whether he had any documents in his possession that related to Padellaro. Sullivan refused to answer any questions about letters that he had sent to and received from the City

concerning Padellaro.  Sullivan even refused to answer any questions about conversations he might have had with third parties, including the City and media, about Padellaro.  It was as though Sullivan had not appeared for his deposition.

Sullivan's actions are nothing short of contemptuous.  He failed to abide by the Court's ruling after skipping the oral arguments, and summarily ignoring settled case law.  He also ignored Rule 45 *a second time*, after failing comply with its requirements prior to filing his Motion to Quash.  Instead, he showed up at the deposition and said nothing, and took it upon himself to act as though his Motion and his efforts to restrict his deposition had been ruled in his favor.

Sullivan's actions have forced the City to again appear in Court to enforce settled law, as well as the Court's ruling that Sullivan chose to ignore.  There is no excuse for his contemptuous actions that have cost the City thousands of dollars in trying to compel him to abide by the subpoena that was served on him nearly three and one-half months ago.  His actions have occasioned a colossal waste of time, energy and resources, and caused delays in discovery. As such, he should be compelled to appear, answer the questions from his deposition and any other non-privileged questions, provide a privilege log for any documents that he is refusing to produce, reimburse the City for the expense of having to file this Motion and redepose him, and reimburse the City for its expenses associated by the initial, frivolous Motion to Quash.

## II. <u>BACKGROUND FACTS</u>

Plaintiff has alleged in this case that she was subjected to a hostile work environment by her supervisor, Defendant James McGravey ("McGravey"), while she was an employee of the City.  Padellaro worked for McGravey from 1987 to 2004.  On April 12, 2000, Attorney Richard K. Sullivan ("Sullivan") sent a letter to the City's Personnel Director, Lawrence LeFebre

("LeFebre") indicating that he represented Padellaro and outlining Padellaro's complaints. <u>See</u> <u>Exhibit 1</u>, attached hereto. On May 8, 2000, LeFebre wrote to Sullivan outlining actions the City was taking in response to Padellaro's concerns. McGravey was ordered to write a letter of apology to Padellaro; McGravey was ordered to attend sexual harassment counseling through the Employee Assistance Program; a letter of discipline was placed in McGravey's personnel file; McGravey was warned to avoid any form of retaliation against Padellaro; McGravey was told in no uncertain terms that any recurrence of his behavior would result in immediate discharge; and a letter was placed in Padellaro's file indicating that "at no time has the City found she has violated the City's policies concerning 'E-Mail or Internet Access,'" pursuant to her request. <u>See</u> <u>Exhibit 2</u>, attached hereto.

Sullivan sent the City a second letter on May 15, 2000, indicating that he received LeFebre's May 8 letter and acknowledging the City's steps to resolve the issue. <u>See</u> <u>Exhibit 3</u>, attached hereto. Sullivan advised the City that he would be checking in with Padellaro periodically to ensure that her problems with McGravey had been permanently resolved. <u>Id.</u> LeFebre then responded to Sullivan in a letter dated May 26, 2000, assuring Sullivan that he would also continue to monitor the situation. <u>See</u> <u>Exhibit 4</u>, attached hereto.

Sullivan did not contact the City again for more than four years, during which time no additional incidents between Padellaro and McGravey were reported to or otherwise observed by the City. This despite the situation being actively monitored by Sullivan on behalf of Padellaro, and by LeFebre on behalf of the City.

By letter dated June 29, 2004, Sullivan informed the City of new allegations which he described as having occurred "recently." <u>See</u> <u>Exhibit 5</u>, attached hereto. Sullivan did not assert that any misconduct had occurred in the period between the spring of 2000 and the summer of

2004. On the contrary, after describing with some specificity the original incidents and the correspondence concerning same, Sullivan stated: "Unfortunately, **recently**, McGravey has reverted to his prior pattern of behavior." Id. at page 2 (emphasis added).

Sullivan thereafter ceased to represent Padellaro. To the City's knowledge, Sullivan never filed a court complaint or discrimination charge on behalf of Padellaro. A new attorney, Richard C. Bardi, filed Padellaro's charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") on December 15, 2004. See Exhibit 6, attached hereto. Bardi also filed the instant Complaint. During the course of this litigation, Bardi was replaced with Attorney Kevin G. Powers, current counsel for Padellaro.

Contrary to what Sullivan said in his 2000 and 2004 letters, and implied by his silence, Padellaro claims in her Complaint that between 2000 and 2004 she continued to be subjected to inappropriate behavior at the hands of McGravey. Thus, Padellaro asserts that the conduct in and before 2000, which would otherwise be untimely, is properly included in her MCAD case and the instant Complaint as a "continuing violation."

On August 31, 2006, the City served Padellaro with the Notice of Deposition of Richard Sullivan. See Exhibit 7, attached hereto. The City served a corresponding subpoena on Sullivan on September 1, 2006. See Exhibit 8, attached hereto. Attached to the Notice and Subpoena was Exhibit A, requesting that Sullivan produce bills, invoices, correspondence, diaries, appointment logs, phone logs, phone records, calendars and memoranda regarding Jennifer Padellaro. On September 20, 2006, without once conferring with the City beforehand, Plaintiff and Sullivan filed "Emergency Motion to Quash and Motion for Protective Order." See Exhibit 9, attached hereto.

The City opposed Plaintiff and Sullivan's Motion (Exhibit 10) and on September 28, 2006, Magistrate Judith Dein held oral arguments. Sullivan failed to appear. During the hearing, the Court reinforced some of the basic principles concerning the proper scope of questioning and the City's right to inquire about non-privileged communications:

> THE COURT: I'll be honest with you. I think they [City] can ask whatever he wants. I think you need to say it's privileged and then, if there's a dispute about it, somebody files a motion to compel.
>
> For example, it seems to me you can easily have a deposition that says: 'Did you attend any meetings with the City?' 'Yes.' 'How many meetings did you attend?' 'Ten.'
>
> Those aren't privileged. The contents of those are not privileged.
>
> 'Did you meet with Ms. Padellaro in the period between 2000 and 2004, yes or no?' 'Yes.' 'Was anybody else ever present during those meetings?' 'Yes, I met with her next door neighbor.' That's not privileged.

See Exhibit 11 at p. 7.

At the close of arguments, Magistrate Dein denied Plaintiff and Sullivan's Motion and ordered that Sullivan appear for his deposition. Id. at p. 18. Notwithstanding the Court's order, Sullivan appeared for his deposition on December 1, 2006, he refused to answer any substantive questions, asserting the attorney-client privilege as to questions that were clearly outside the scope of the privilege. For example, Sullivan asserted the privilege and refused to answer when asked:

- about his representational status of Padellaro:

> Q.    Now, can you tell me whether you represented Jennifer Padellaro as to a single matter or multiple matters?
>
> A.    No.
>
> Q.    Because it is privileged?
>
> A.    Yes.

. . .

Q.     Notwithstanding the fact that you revealed your representational status of Padellaro to the Mayor of the City of Lawrence in June of 2004, you are unwilling to reveal your representational status of her to me now?

A.     Correct.   (Exhibit 12, Tr. 24:16-21; 60:16-21);

- whether he ever spoke with Padellaro, and when:

Q.     If I were to ask you whether you spoke with Jennifer Padellaro on particular dates or times, not what you talked about but whether you spoke to her, would you take the position that those are privileged?

A.     Those are confidential communications, yes.

Q.     You are going to refuse to answer?

A.     I am.   (Id., Tr. 57:22-58:5)

- about the formation of his attorney-client relationship with Padellaro:

Q.     . . . Will you tell me anything about the formation of your attorney-client privileged relationship with Jennifer Padellaro?

A.     No.   (Id., Tr. 14:17-20)

- whether he ever sent a bill to or had any economic arrangement with Padellaro:

Q.     Have you ever sent an invoice or a bill to Jennifer Padellaro?

A.     That's privileged.

Q.     Did you have an economic arrangement, whether it's contingent fee, hourly, cash-based or otherwise, with Jennifer Padellaro?

A.     That's privileged.   (Id., Tr. 14:24-15:6)

- whether he had any documents, other than the four he produced, that were responsive to the subpoena:[1]

---

[1]  Sullivan explained that he produced those letters (two of which were sent to the City's Personnel Director and two of which were sent to the Mayor) because "there is no privilege as to communications to third parties." Exhibit 12, Tr. 8:8-11. Notwithstanding Sullivan's articulation concerning the limits of the privilege, he proceeded to refuse to answer questions about communications with third parties.

Q.    Now, the question I believe I had asked you that started this was whether you possessed any other documents responsive to the subpoena that you were withholding, and that is the question that you are refusing to answer?

A.    Correct.

Q.    So the existence of documents you are claiming to be privileged?

A.    Yes. (Id., Tr. 9:6-14)

- whether he spoke with any third parties, including the City Attorney or Mayor, about Padellaro:

Q.    So if you talked to a third party who you did not represent and was not an agent of Jennifer Padellaro, you are telling me the substance of that communication is privileged?

A.    Yes.

. . .

Q.    Would it be fair to say that you won't answer any questions that I am going to ask you today concerning the substance of your communications with independent third parties?

A.    Yes.

. . .

Q.    And again, just to try to cut through this to some degree. If I ask you questions about communications you may or may not have had with other agents of the City, like somebody from the City's Attorney's Office, the Mayor, other people in positions of authority on behalf of the City, Mr. McGravey, you are going to refuse to answer those questions as well?

A.    That's correct. (Id., Tr. 55:9-13; 55:23-56:3; 57:13-21)

- whether he followed up with or contacted the City's Personnel Director, City Attorney or other third parties, as he had warned the City he would, following his May 15, 2000 letter to the City:

Q.    I want to ask you about what, if anything you did to follow up on what you told Mr. LeFebre in that sentence you were doing. You said to Mr. LeFebre in this sentence, "I will be checking with Padellaro on an ongoing basis to ensure that McGravey behaves in a certain way." Will you tell me what, if anything, you did as promised in that sentence?

A.   I can't answer that question.

Q.   You are refusing to answer on the grounds of privilege?

A.   I am.

Q.   And even if hypothetically what you did included talking to Larry LeFebre talking to the Mayor, talking to someone in the City Attorney's Office, talking to independent third parties who were not agents of Padellaro, nonetheless you are not going to answer those questions?

A.   Correct.  (Id., Tr. 59:11-60:5)

- whether he spoke to the media about Padellaro:

Q.   Sir, at any point in time did you talk with any member of the medical about Ms. Padellaro or her case?

A.   I think that's privileged.  (Id., Tr. 63:21-24).

Sullivan also failed to comply with the requirements of Rule 45 pertaining to documents sought by his subpoena.  Only four documents were produced (Exhibit 13) and, as set forth above, he refused to confirm or deny the existence of other documents on the grounds of privilege.  He supplied none of the information required by Rule 45.

## III.  ARGUMENT

### A.   Sullivan Should Be Compelled to Answer the Questions Asked at His Deposition and Sanctioned for Failing to Comply with the Court's Ruling.

The Court's September 28, 2006 ruling rejected Plaintiff and Sullivan's assertion that Sullivan should not be compelled to testify due to his prior representation of Plaintiff.  According to the Court and settled federal precedent, his prior role as counsel does not shield him from questioning concerning matters falling outside the attorney-client privilege or for which the privilege was waived.  However, on December 1, 2006, Sullivan appeared for his deposition and refused to answer a single substantive question, citing the attorney-client privilege each time as a basis for his refusal.  Sullivan's appearance amounted to a sham, as he took the same position at

the deposition that he asserted in his papers before the Court -- that he not be compelled to answer *any* questions that concerned Padellaro and her claims. It was as though he had not appeared at all. Accordingly, Sullivan should be compelled to answer the questions asked at his deposition and sanctions should be awarded to the City.

       1.     <u>Sullivan must answer questions concerning non-privileged information.</u>

     Sullivan's repeated assertion of the privilege at his deposition was in bad faith. As an initial matter, the privilege has long been defined as applying only to "*communications made between a lawyer and client for purpose of* obtaining legal advice." <u>Carey v. Textron Inc.</u>, 224 F.R.D. 530, 531 (D. Mass. 2004) (plaintiff's motion for protective order to prevent the deposition of his former attorney denied) (emphasis added). While it is true that what constitutes such a communication will vary, courts have rejected any broad-sweeping presumption of confidentiality. <u>Winchester Capital Mgmt.</u>, 144 F.R.D. 170, 174 (D. Mass. 1992). In fact, courts have long recognized numerous categories of documents and areas of inquiry that are not shielded from discovery by the attorney-client privilege. <u>See, e.g.</u>, <u>Savoy v. Richard A. Carrier Trucking, Inc.</u>, 178 F.R.D. 346, 350 (D. Mass. 1998) ("the 'structural framework' surrounding the substance of the communications is discoverable. Accordingly, the fact of the attorney-client relationship and the dates on which services were performed are not necessarily privileged") (internal citations omitted); <u>In re Grand Jury Subpoenas (Zerendow)</u>, 925 F.Supp. 849, 855 (D. Mass. 1995), *citing* <u>In re Grand Jury Subpoenas (Anderson)</u>, 906 F.2d 1485, 1488 (10th Cir. 1990) ("It is well recognized in every circuit ... that the identity of an attorney's client and the source of payment for legal fees are not normally protected by the attorney-client privilege"); <u>Colonial Gas Co. v. Aetna Cas. & Sur. Co.</u>, 144 F.R.D. 600, 607 (D.Mass 1992) (documents regarding the payment of fees, billing and the time expended generally are not subject to the

attorney-client privilege); <u>see also</u> 6-26 Moore's Federal Practice - Civil § 26.49 ("the factual circumstances surrounding the attorney-client relationship itself are discoverable. Thus, privilege does not extend to the fact of consultation, or to the identity of the client or the attorney") (internal citations omitted).

<u>Carey v. Textron</u> and the settled law concerning the privilege instructs that the privilege only applies where (1) there is a communication (2) made between a lawyer and client (3) for the purpose of obtaining legal advice. <u>Carey v. Textron</u>, <u>supra</u>, 224 F.R.D. at 531. The Court reinforced this in its ruling at page 7. <u>Exhibit 11</u>, p. 7. The privilege *does not* apply in the absence of a communication. Thus, for example, Sullivan had no basis to refuse to answer questions about his representational status of Padellaro, the formation of his attorney-client relationship with Padellaro, his economic arrangement with Padellaro and whether he had documents responsive to the subpoena other than those produced. Even where a communication is at issue, the privilege *does not apply* unless it was between a lawyer and his client *and* for the purpose of obtaining legal advice. Thus, Sullivan had no basis to refuse to answer questions about his communications with third parties such as the City's Personnel Director, the City Attorney, other employees of the City, as well as the media. Moreover, Sullivan was required to answer questions about communications with Padellaro that were not for the purpose of obtaining legal advice.

Sullivan could not articulate a basis for his position that was remotely logical or plausible. For example, Sullivan had no answer when asked how it was that he could reveal to the City in 2000 the fact that he represented Padellaro, including the <u>substance of communications</u> that he had with Padellaro, but was refusing to answer questions as to the fact of his representation at his deposition.

Q.    I want to show you what's been marked as Exhibit 2.  This is one of the documents you produced this morning, correct?

A.    Yes.

Q.    And it is a letter that you sent to Larry LeFebre at the City of Lawrence, correct?

A.    Yes.

Q.    And in the first paragraph of the letter you reveal that you represent Jennifer Padellaro?

A.    Yes.

Q.    So that was not an attorney-client privileged fact on April 12, 2000, correct?

A.    It was a representation to Mr. LeFebre that I represented Jennifer Padellaro, is what it says.

Q.    This morning you told me that whether you currently represent her is privileged.

A.    Yes.

Q.    So what I am asking you is on April 12, 2000, it apparently wasn't privileged or, if it was you were waiving the privilege, right?

A.    It wasn't privileged when it was communicated to him on April 12, 2000, that's correct.

Q.    At what point did it become privileged?

A.    What?

Q.    Your representational status of Ms. Padellaro.

A.    It is privileged in terms of your inquiring into it, but it was not privileged, what I sent to him, if that makes sense to you.

See Exhibit 10, Tr. 47:3-48:8.

    In fact, nothing about Sullivan's attempt to contort the privilege to excuse him from answering questions makes sense.  His assertion of the privilege is preposterous and clearly

designed to avoid answering questions.  As another example, Sullivan denied possessing letters

to or from third parties, other than the four letters he produced at the start of his deposition.

Exhibit 12, Tr. 16:6-8.  Sullivan was then confronted with such a third party letter, addressed to

him from LeFebre, that bore his fax information along the top indicating the he had faxed it to

someone.  Id. at Tr. 16:11-19.  When asked about the letter, however, Sullivan asserted the

privilege to avoid having to explain the inconsistency in his testimony:

> Q:    Do you have a recollection of receiving this letter?
>
> A:    In my opinion, that's privileged.
>
> Q:    Whether you received a letter from Larry LeFebre at the City of Lawrence is
>       privileged?
>
> A:    Yes.
>
> Q:    Will you tell me whether or not you currently have a copy of Exhibit 6 in your
>       files?
>
> A:    No.  In my opinion, that's privileged.

Id. Tr. 16:20-17:4.  Sullivan's assertion of the privilege is indefensible, and in this particular

example, was clearly designed to excuse him from answering an uncomfortable question.  His

repeated, baseless assertion of the privilege constitutes an abuse of the discovery process and

makes a mockery of the Court's ruling.

As an attorney of some thirty-four years of experience, surely Sullivan was cognizant of

the bounds of the privilege.  If he was not, as a currently practicing attorney he should have been.

At a minimum, he was required to comply with the Court's ruling.  However, it is clear that

Sullivan had no intention to appear at his deposition and answer questions in good faith, subject

to the privilege.  His contempt for this Court's ruling, with which he was admittedly familiar

(Exhibit 12, Tr. 10:5-10), is inexcusable.  He should be ordered to appear and answer all

questions asked in his deposition, and should be sanctioned for the significant waste of time and resources occasioned by his nonfeasance.

**B.    Sullivan Should Be Ordered, Yet Again, to Comply with Rule 45 and Should Be Sanctioned for Failing to Abide by the Court's Order that he Comply with that Rule.**

Sullivan's refusal to comply with Rule 45 constituted a direct violation of the Court's ruling at hearing that Sullivan "does need to show up. . .and he does need to follow the rules for the production of documents and the claim of privilege of the documents." See Exhibit 11 at p. 18. The procedural requirements that Sullivan was obligated to follow are set forth clearly in Rule 45(d)(2) that instructs those asserting the privilege to couple that assertion with "a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim." Sullivan made no attempt to do so verbally, and even refused to answer whether he had responsive documents in his possession. See Exhibit 12, Tr. 9:6-14. Thus, *nothing has changed* since the last time the City was before this Court asking that Sullivan be ordered to abide by the Federal Rules. Not only are sanctions warranted, but sufficient grounds exist under Rule 37(b)(1) to hold Sullivan in contempt of court for his refusal to abide by Rule 45 and the Court's instruction that he "follow the rules". At a minimum, however, he should be required to pay the City's expenses and attorneys fees.

**C.    The Award of Attorney's Fees and Expenses is Warranted Under Rule 37.**

Rule 37(a)(2)(4) requires that "the party *or deponent* whose conduct necessitated the motion [to compel]. . .pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees" unless the objections raised were "substantially justified." Fed. R. Civ. Pro. 37(a)(2)(4) (emphasis added). As set forth above, there is no "substantial

justification" for Sullivan's repeated refusal to answer questions, provide documents and adhere to the Federal Rules of Civil Procedure, particularly where he was ordered to do so by this Court.[2] His contemptuous conduct is that much more egregious given that it was <u>his</u> Motion that was rejected on September 28.    Rule 37(a)(2)(4) has been repeatedly applied to require the payment of expenses and attorneys fees, and there is certainly no reason that it should not apply here. <u>See</u>, <u>e.g.</u>, <u>American Hangar, Inc. v. Basic Line, Inc.</u>, 105 F.R.D. 173 (D. Mass. 1985) (defendant liable for plaintiff's reasonable expenses where defendant's counsel acted improperly in instructing defendant's witnesses at their depositions not to answer questions which did not involve privileged information or trade secrets); <u>Mehr v. Starwood Hotels & Resorts Worldwide, Inc.</u>, 72 Fed. Appx. 276 (6th Cir. 2003) (affirming district court's order requiring plaintiff to pay defendant's attorney's fees based on defendant's successful motion to compel plaintiff to answer deposition questions); <u>Aetna Casualty & Surety Co. v. Rodco Autobody</u>, 130 F.R.D. 2 (D. Mass. 1990) (holding that "costs, including reasonable attorney's fees, incurred in obtaining an order compelling a non-party-deponent to appear for a deposition when the non-party has failed to do so are recoverable pursuant to Rule 37(a)(4)"); <u>Weigel v. Shapiro</u>, 608 F.2nd 268 (7th Cir. 1979) (affirming district court's award of expenses and attorneys fees to defendant because of the deponent's refusal to answer questions at his deposition); <u>See</u>, <u>also</u>, 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, <u>Federal Practice & Procedure</u> § 2288 (2d ed. 1994) ("The

---

[2] Sullivan attempted to suggest near the beginning of his deposition that he had been informed by the Office of Bar Counsel not to answer any questions without a waiver of the privilege. <u>Exhibit 12</u>, Tr. 7:5-18. Any such conversation does not amount to "substantial justification" for his actions.  Indeed, there is no reason to believe that Bar Counsel's advice was for Sullivan to refuse to answer questions that *were not privileged*.  It is difficult to believe that any competent bar counsel would have advised him to answer no substantive questions whatsoever, including questions pertaining to non-privileged information. Moreover, Sullivan knew the bounds of the privilege, and represented that knowledge to the Court in his initial papers when he sought to avoid appearing at all. Thus, he was capable of determining what questions he could properly answer and when the privilege legitimately applied. Accordingly, there is no reason to conclude that Sullivan's alleged conversation with Bar Counsel would constitute a "substantial justification" for his actions.

great operative principle of Rule 37(a)(4) is that the loser pays").  Moreover, Rule 37 contemplates the award of expenses and attorneys fees incurred in having to redepose a witness. See, Cobell v. Norton, 213 F.R.D. 16 (D. D.C. 2003) (imposing sanctions against counsel for instructing client to refuse to answer deposition questions where the assertion of attorney-client privilege was meritless).  Sullivan should be required to reimburse the City for those costs and fees as well.

Not only do Sullivan's actions at his deposition warrant the granting of this Motion, but his conduct viewed in totality thus far provides ample basis also to grant the City's request in its original opposition to Sullivan's Motion for Protective Order that sanctions be issued.  As argued by the City in its original Opposition, Plaintiff's and Sullivan's attempt to avoid having Sullivan appear was procedurally flawed and substantively vacant, and amounted to nothing less than a disingenuous, eleventh-hour attempt to avoid Sullivan's appearance at his deposition.  At that time, although the Court ruled in the City's favor, it did not impose any sanctions.  Now, Sullivan has placed the City right back where it was in September, as his failure to abide by the Court's Order has required the unnecessary expenditure of significant time and resources to compel him to comply.

## IV.  CONCLUSION

For all of the reasons discussed herein, the City's Motion should be granted, and Sullivan ordered to pay the City all requested attorneys' fees and costs.

CITY OF LAWRENCE

By its attorneys:


/s/ Scott C. Merrill
James W. Bucking, BBO #558800
Scott C. Merrill, BBO #631008
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  December 27, 2006

## Local Rule 7.1(A)(2) and Rule 37(a)(4)(A) Certification

I hereby certify that I contacted Richard Sullivan's office on multiple occasions and left multiple messages as a good faith attempt to obtain the disclosure of information sought by this Motion without court action and otherwise resolve the issues raised herein, and that a good faith attempt was made to contact Plaintiff's counsel via multiple messages prior to filing.  Neither Sullivan, nor Plaintiff's counsel, returned any messages.


/s/Scott C. Merrill


## Certificate of Service

I, Scott C. Merrill, hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 27, 2006, and that a true copy of the above document was sent to Richard Sullivan, via first class mail, at 300 East Main Street, Milford,  Massachusetts.


/s/ Scott Merrill

Exhibit 1

RICHARD K. SULLIVAN
ATTORNEY AT LAW
300 EAST MAIN STREET
MILFORD, MASSACHUSETTS 01757
——————
TELEPHONE (508) 482-9777
FAX (508) 482-9888

April 12, 2000
By Facsimile Transmission
and First Class Mail

Lawrence P. LeFebre
Personnel Director
City of Lawrence
City Hall - Room 302
200 Common Street
Boston, MA 01840



RE:  Jennifer F. Padellaro

Dear Mr. LeFebre:

Please be advised that the undersigned represents Jennifer F. Padellaro (hereafter "Padellaro"), an employee of the City of Lawrence (hereafter "City") employed in the capacity of Assistant City Clerk.  As you know, Padellaro's immediate supervisor is the City Clerk, James McGravey (hereafter "McGravey").

Padellaro has advised me that, for a period of time, she has been subjected to a hostile work environment.  More specifically, Padellaro has advised me that McGravey has utilized Padellaro's computer at work to visit pornographic web sites, arrange for meetings with "call girls" and "escort services," download sexually explicit jokes, etc.  In addition, McGravey has utilized computers of other employees in the City Clerk's office - of which Padellaro has a clear view - to visit pornographic web sites.  Padellaro further advised me that recently a computer in her office displayed a screen with the words "the Best F. . . Transsexuals On The Net."  When the screen appeared, McGravey responded: "Oh, that shouldn't be there."  Accordingly to Padellaro, McGravey has also shown pictures of naked women to employees in the City Clerk's office (including Padellaro), told "off color" jokes to those employees, made a variety of inappropriate sexual comments, etc.  Indeed, Padellaro advised me that recently McGravey showed a computer picture of a very well endowed male to a female office employee.

The conduct which Padellaro has described to me is a clear violation of the City's Work Environment Policy as well as the provisions of Massachusetts General Laws Chapter 151B.  In

Lawrence P. LeFebre
April 12, 2000
Page Two

addition, the conduct which Padellaro has attributed to McGravey
violates the City's policies concerning "E-Mail/ or Internet
access," violations of which may result in discipline, up to and
including discharge.

Some time ago, Padellaro informed as Assistant City Solicitor of
these problems.  Nonetheless, these problems persist.  Prior to
filing a Charge of Discrimination with the Massachusetts
Commission Against Discrimination, Padellaro wishes to afford the
City one final opportunity to correct these problems.  More
specifically, Padellaro wants her computer secured so that
McGravey cannot use it under any circumstances.  Padellaro wants
a written acknowledgment from the City that she has not violated
the City's "E-Mail/ or Internet access" policy and that contacts
made on her computer to pornographic web sites and the like were
unauthorized.  Padellaro wants an immediate end to the ongoing
hostile work environment with which she has had to contend.
Finally, Padellaro wants assurances from the City that she will
not be the subject of retaliation by McGravey or anyone else.

Kindly respond to the issues raised herein at your earliest
opportunity.  Please direct all future communications concerning
this matter to me as counsel for Padellaro.

Very truly yours,

Richard K. Sullivan

RKS:ng
cc: Jennifer F. Padellaro

# Exhibit 2

*Personnel Department, City of Lawrence, Massachusetts*

*Lawrence P. LeFebre*
*Personnel Director*



*Tel. (978) 794-5828*
*(978) 794-5827*

5/8/00

Richard V. Sullivan
Attorney at Law
300 East Main Street
Milford, MA 01757

Dear Attorney Sullivan:

I am in receipt of your letter in reference to your client Jennifer F. Padellaro. I had spoken to her on a number of occasions about the situation that happened in her department and her claim that she was subject to a hostile work environment. Your client stressed to me that at no time had she ever felt pressured or intimidation for sexual favors. She said was coming forward with these charges because she did not want to be accused of using her computer to view pornographic sites. She also mentioned to me that she had gone to an assistant city solicitor in the past about these charges. She commented to me that she preferred this matter be taken care of in an informal way and that she trusted me to take the necessary steps to resolve the problem.

Jennifer asked me to wait until I receive correspondence from you before I took action. I received your fax April 12, 2000 and immediately took the following steps. I contacted your client's department head to confront him with the allegations. I reminded him that he had signed a Work Environment Policy and consequently was aware of the city's policy against hostile work environment, and he was being accused of violating that policy. I then interviewed other personnel in the city clerk's department to gather information about what they might have seen or heard. I again met with Jennifer's department head, Mr. McGravey, informing him that I agreed with the charges and allegations made against him.

I then took the following steps:

- I have ordered Mr. McGravey to write a letter of apology to your client.
- I have ordered him to be enrolled in a course offered by our EAP provider that will consist of one on one counseling about sexual harassment and what constituted a hostile work environment.
- I also stated that his subordinates have a right to work in an environment free from harassment, and the right to legal protection against retaliation for this complaint.

Mr. McGravey has been told that the information compiled from this investigation and his letter of apology to your client will be placed in his personnel file from April 30, 2000 to April 30, 2001. Your letter to me will also be included in that file.

I informed him that your client did not want to meet with him for a face-to-face apology but would accept a letter of apology from him. She expected that the treatment and hostile work environment would cease immediately, and they would be able to continue working with each other on a professional level.

200 Common Street, Room 302 • Lawrence, MA 01840 • Fax (978) 794-1327 • LLefebre@cityoflawrence.com



CITY000562

I have taken the steps to secure your client's computer and have also complied with her wishes and had the Internet service eliminated from her workstation. I have also written a letter to Ms. Padellaro and put a letter in her file stating at no time has the City found she has violated the City's policies concerning "E-Mail/or Internet Access" and any contacts made on her computer to pornographic web sites were unauthorized by her.

Furthermore, I met with your client on additional occasions since my confrontation with her department head. I did this to ascertain if she felt comfortable about the present situation, and to ask if the hostile work environment had ceased. She has assured me that the work environment has definitely improved for the best, and that she feels comfortable with the situation.

I have also told Ms. Padellaro that I spoke to Mr. McGravey warning him against possible means of retaliation for offering this complaint. I have asked your client to contact me at any time to make me aware of any perceived retaliation from him.

Your client has indicated to me that she considers the matter closed and feels she can work in her office with Mr. McGravey without worrying about a continued hostile work environment.

Please be assured that I will be monitoring the situation in her department on an on-going basis.

Very truly yours,

Lawrence P. LeFebre

# Exhibit 1

RICHARD K. SULLIVAN

ATTORNEY AT LAW

300 EAST MAIN STREET
MILFORD. MASSACHUSETTS 01757

TELEPHONE (508) 482-9777
FAX (508) 482-9888

April 12, 2000
By Facsimile Transmission
and First Class Mail

Lawrence P. LeFebre
Personnel Director
City of Lawrence
City Hall - Room 302
200 Common Street
Boston, MA 01840



RE:  Jennifer F. Padellaro

Dear Mr. LeFebre:

Please be advised that the undersigned represents Jennifer F.
Padellaro (hereafter "Padellaro"), an employee of the City of
Lawrence (hereafter "City") employed in the capacity of Assistant
City Clerk.  As you know, Padellaro's immediate supervisor is the
City Clerk, James McGravey (hereafter "McGravey").

Padellaro has advised me that, for a period of time, she has been
subjected to a hostile work environment.  More specifically,
Padellaro has advised me that McGravey has utilized Padellaro's
computer at work to visit pornographic web sites, arrange for
meetings with "call girls" and "escort services," download
sexually explicit jokes, etc.  In addition, McGravey has
utilized computers of other employees in the City Clerk's office
- of which Padellaro has a clear view - to visit pornographic web
sites.  Padellaro further advised me that recently a computer in
her office displayed a screen with the words "the Best F. . .
Transsexuals On The Net."  When the screen appeared, McGravey
responded: "Oh, that shouldn't be there."  Accordingly to
Padellaro, McGravey has also shown pictures of naked women to
employees in the City Clerk's office (including Padellaro), told
"off color" jokes to those employees, made a variety of
inappropriate sexual comments, etc.  Indeed, Padellaro advised me
that recently McGravey showed a computer picture of a very well
endowed male to a female office employee.

The conduct which Padellaro has described to me is a clear
violation of the City's Work Environment Policy as well as the
provisions of Massachusetts General Laws Chapter 151B.  In

Lawrence P. LeFebre
April 12, 2000
Page Two


addition, the conduct which Padellaro has attributed to McGravey
violates the City's policies concerning "E-Mail/ or Internet
access," violations of which may result in discipline, up to and
including discharge.

Some time ago, Padellaro informed as Assistant City Solicitor of
these problems.  Nonetheless, these problems persist.  Prior to
filing a Charge of Discrimination with the Massachusetts
Commission Against Discrimination, Padellaro wishes to afford the
City one final opportunity to correct these problems.  More
specifically, Padellaro wants her computer secured so that
McGravey cannot use it under any circumstances.  Padellaro wants
a written acknowledgment from the City that she has not violated
the City's "E-Mail/ or Internet access" policy and that contacts
made on her computer to pornographic web sites and the like were
unauthorized.  Padellaro wants an immediate end to the ongoing
hostile work environment with which she has had to contend.
Finally, Padellaro wants assurances from the City that she will
not be the subject of retaliation by McGravey or anyone else.

Kindly respond to the issues raised herein at your earliest
opportunity.  Please direct all future communications concerning
this matter to me as counsel for Padellaro.

                              Very truly yours,



                              Richard K. Sullivan


RKS:ng
cc: Jennifer F. Padellaro

# Exhibit 2

*Personnel Department, City of Lawrence, Massachusetts*

*Lawrence P. LeFebre*
*Personnel Director*



5/8/00

*Tel.* (978) 794-5828
       (978) 794-5827

Richard V. Sullivan
Attorney at Law
300 East Main Street
Milford, MA 01757

Dear Attorney Sullivan:

I am in receipt of your letter in reference to your client Jennifer F. Padellaro. I had spoken to her on a number of occasions about the situation that happened in her department and her claim that she was subject to a hostile work environment. Your client stressed to me that at no time had she ever felt pressured or intimidation for sexual favors. She said was coming forward with these charges because she did not want to be accused of using her computer to view pornographic sites. She also mentioned to me that she had gone to an assistant city solicitor in the past about these charges. She commented to me that she preferred this matter be taken care of in an informal way and that she trusted me to take the necessary steps to resolve the problem.

Jennifer asked me to wait until I receive correspondence from you before I took action. I received your fax April 12, 2000 and immediately took the following steps. I contacted your client's department head to confront him with the allegations. I reminded him that he had signed a Work Environment Policy and consequently was aware of the city's policy against hostile work environment, and he was being accused of violating that policy. I then interviewed other personnel in the city clerk's department to gather information about what they might have seen or heard. I again met with Jennifer's department head, Mr. McGravey, informing him that I agreed with the charges and allegations made against him.

I then took the following steps:

- I have ordered Mr. McGravey to write a letter of apology to your client.
- I have ordered him to be enrolled in a course offered by our EAP provider that will consist of one on one counseling about sexual harassment and what constituted a hostile work environment.
- I also stated that his subordinates have a right to work in an environment free from harassment, and the right to legal protection against retaliation for this complaint.

Mr. McGravey has been told that the information compiled from this investigation and his letter of apology to your client will be placed in his personnel file from April 30, 2000 to April 30, 2001. Your letter to me will also be included in that file.

I informed him that your client did not want to meet with him for a face-to-face apology but would accept a letter of apology from him. She expected that the treatment and hostile work environment would cease immediately, and they would be able to continue working with each other on a professional level.

200 Common Street, Room 302 • Lawrence, MA 01840 • Fax (978) 794-1327 • L.lefebre@cityoflawrence.com



CITY000562

I have taken the steps to secure your client's computer and have also complied with her wishes and had the Internet service eliminated from her workstation. I have also written a letter to Ms. Padellaro and put a letter in her file stating at no time has the City found she has violated the City's policies concerning "E-Mail/or Internet Access" and any contacts made on her computer to pornographic web sites were unauthorized by her.

Furthermore, I met with your client on additional occasions since my confrontation with her department head. I did this to ascertain if she felt comfortable about the present situation, and to ask if the hostile work environment had ceased. She has assured me that the work environment has definitely improved for the best, and that she feels comfortable with the situation.

I have also told Ms. Padellaro that I spoke to Mr. McGravey warning him against possible means of retaliation for offering this complaint. I have asked your client to contact me at any time to make me aware of any perceived retaliation from him.

Your client has indicated to me that she considers the matter closed and feels she can work in her office with Mr. McGravey without worrying about a continued hostile work environment.

Please be assured that I will be monitoring the situation in her department on an on-going basis.

Very truly yours,

Lawrence P. LeFebre

Exhibit 3

### RICHARD K. SULLIVAN
ATTORNEY AT LAW

**300 EAST MAIN STREET**
**MILFORD, MASSACHUSETTS 01757**

TELEPHONE (508) 482-9777
FAX (508) 482-9888

May 15, 2000

Lawrence P. LeFebre
Personnel Director
City of Lawrence
City Hall - Room 302
200 Common Street
Lawrence, MA  01840



RE:  Jennifer E. Padellaro

Dear Mr. LeFebre:

As you know, I represent Jennifer E. Padellaro (hereafter "Padellaro"), an employee of the City of Lawrence (hereafter "City") employed in the capacity of Assistant City Clerk.

On April 12, 2000, I wrote to you advising that Padellaro had been subjected to a hostile work environment as a result of the actions of her immediate supervisor, City Clerk James McGravey (hereafter "McGravey").  In that correspondence, I set forth specific examples of McGravey's conduct which clearly violated both the City's Work Environment Policy as well as the provisions of Massachusetts General Laws Chapter 151B.  In addition, conduct attributed by Padellaro to McGravey violated the City's policies concerning "E-Mail/or Internet access."

On May 8, 2000, I received your fax letter to me of that date together with a copy of a letter from you to Padellaro, dated May 8, 2000.  In your May 8, 2000 letter to me, you indicated that, after an investigation, you informed McGravey that you " . . . agreed with the charges and allegations made against him."  In your May 8, 2000 letter to me, you also outlined the actions which you had taken in response to my letter of April 12, 2000. One of the actions which you took was to order " . . . Mr. McGravey to write a letter of apology to your client."  Since I have never been provided with a copy of McGravey's letter of apology, I would appreciate your providing the same to me at your earliest opportunity.

On May 9, 2000, Padellaro attended counseling with the City's EAP provider, the same EAP provider to whom McGravey was sent. Padellaro believes that the potential for a conflict of interest should strongly militate against such a practice.  Accordingly,

Lawrence P. LeFebre
May 15, 2000
Page Two


should Padellaro seek EAP assistance in the future, she would request that she be permitted to utilize another EAP provider.

Lastly, in your letter of May 8, 2000 to me, you state:  "Your client has indicated to me that she considers the matter closed and feels she can work in her office with Mr. McGravey without worrying about a continued hostile work environment."  Padellaro has advised me that she never made any such statement.  The mere fact that McGravey's behavior has improved temporarily does not mean that this matter is "closed."  I will be checking with Padellaro on an ongoing basis to insure that McGravey's conduct continues to comport with the requirements of the City's Work Environment Policy and Massachusetts General Laws Chapter 151B.

                        Very truly yours,


                        Richard K. Sullivan

RKS:ng
cc: Jennifer E. Padellaro

# Exhibit 4

*Personnel Department, City of Lawrence, Massachusetts*

*Lawrence P. LeFebre*
*Personnel Director*



Tel. (978) 794-5828
(978) 794-5827

May 26, 2000



RECEIVED
MAY 30 2000

Richard K. Sullivan
Attorney At Law
300 East Main Street
Milford, Massachusetts 01757

Dear Attorney Sullivan,

I am in receipt of your letter regarding Jennifer E. Padellaro. I apologize for the delay in responding to you. My schedule has been demanding, my clerk has been transferred to another department and my office has been attempting to respond to a backlog of work.

Enclosed please find a copy of the letter of apology that you referred to. Frankly, the letter should have been included in my last correspondence to you. I did offer your client an opportunity to read the letter of apology, but she decided against it.

As I stated in my letter, and in discussion with your client, I will be monitoring the situation in the City Clerks department on an on-going basis to insure that this matter does not occur again.

I too do not consider the matter closed because of a brief period of improved behavior by Ms. Padellaro. Mr. McGravey has been told in clear and strong terms that the City intends to demand compliance with the requirements of our Work Environment Policy and Massachusetts General Laws Chapter 151 B. In fact Mr. McGravey has also been required to attend a recent Supervisor's workshop on Sexual Harassment that was conducted at the Lawrence City Hall. This attendance was above and beyond the one-on-one counseling in this matter that he received at Family Services.

Finally, I would like to assure you, as I have assured your client, that although Mr. McGravey may have been sent to the same EAP provider, he does not see the same counselor.

Yours truly,

*Lawrence P. LeFebre*

Lawrence P. LeFebre
Personnel Director
City of Lawrence



Enclosure (1)
ec

CITY000173

Exhibit 5

# RICHARD K. SULLIVAN

### ATTORNEY AT LAW

### 300 EAST MAIN STREET
### MILFORD, MASSACHUSETTS 01757

---

TELEPHONE (508) 482-9777
FAX (508) 482-9888

June 29, 2004

Michael J. Sullivan, Mayor
City Hall
200 Common Street
Lawrence, MA 01840



RE:  Jennifer E. Padellaro

Dear Mayor Sullivan:

Please be advised that the undersigned represents Jennifer E.
Padellaro (hereafter "Padellaro"), an employee of the City of
Lawrence (hereafter "City") employed in the capacity of Assistant
City Clerk.  As you know, Padellaro's immediate supervisor is
City Clerk James McGravey (hereafter "McGravey").

On April 12, 2000, I wrote to Lawrence P. LeFebre (hereafter
"LeFebre"), the then Personnel Director of the City.  In that
correspondence, I advised LeFebre that Padellaro had been
subjected to a hostile work environment for a considerable period
of time.  More specifically, at that time, Padellaro advised me
that McGravey had utilized her computer in the City Clerk's
office to visit pornographic web sites, arrange for meetings with
"call girls" and "escort services," download sexually explicit
jokes, etc.  In addition, Padellaro advised me that McGravey had
utilized computers of other employees in the City Clerk's office
- of which Padellaro had a clear view - to visit pornographic web
sites.  Padellaro further advised me that a computer in her
office displayed a screen with the words "the Best F . . .
Transsexuals on the Net."  Finally, Padellaro informed me that
McGravey had shown pictures of naked women to employees in the
City Clerk's office (including Padellaro), told off-color jokes
to those employees and made a variety of inappropriate sexual
comments.

The conduct which Padellaro described to me in early 2000 was a
clear violation of the City's Work Environment Policy as well as
the provisions of Massachusetts General Laws Chapter 151B.

Michael J. Sullivan, Mayor
June 29, 2004
Page Two

Moreover, the conduct which Padellaro had attributed to McGravey
violated the City's policies concerning "E-Mail/or Internet
access," violations of which could result in discipline, up to
and including discharge.  In April, 2000, I offered the City an
opportunity to correct this problem prior to Padellaro filing a
Charge of Discrimination with the Massachusetts Commission
Against Discrimination (hereafter "MCAD").

After multiple discussions with LeFebre, he provided me
assurances that McGravey's inappropriate conduct would not occur
again.  By letter dated May 8, 2000, LeFebre wrote to me and
stated:

>       I again met with Jennifer's (Padellaro's) department
>       head, Mr. McGravey, informing him that I agreed with
>       the charges and allegations made against him.
>
>       I then took the following steps:
>
>       .   I have ordered Mr. McGravey to write a letter of
>           apology to your client.
>
>       .   I have ordered him to be enrolled in a course
>           offered by our EAP provider that will consist of one
>           on one counseling about sexual harassment and what
>           constituted a hostile work environment.
>
>       .   I also stated that his subordinates have a right to
>           work in an environment free from harassment, and the
>           right to legal protection against retaliation for
>           this complaint.

Padellaro had hoped McGravey's conduct would not be repeated
again.  Unfortunately, recently, McGravey has reverted to
his prior pattern of behavior.

More specifically, McGravey has advised female employees of
the City Clerk's office that they should visit a web site on
which he and his mistress performed pornographic sexually
explicit acts.  Indeed, McGravey actually logged onto that
web site so that employees of the City Clerk's office could
view these acts.  McGravey also informed Padellaro of the
existence of this web site.  The employees in the City
Clerk's office who were advised by McGravey of the web site
informed Padellaro of McGravey's actions.

Michael J. Sullivan, Mayor
June 29, 2004
Page Three

Padellaro cannot and will not continue her employment with
the City in this hostile work environment, nor can the other
female employees in her office.  Since June 21, 2004,
Padellaro has either called in sick or requested to be
placed on vacation leave because of the actions of McGravey.

Padellaro has requested that I write to you concerning
McGravey's continued and outrageous conduct in the
workplace.  Quite frankly, it is time for the City to take
all actions appropriate against McGravey, since it is  clear
that this individual cannot function in a workplace with
female employees.  Moreover, since Padellaro is fearful of
retaliation by McGravey, she has requested that, at the
present time, you keep her involvement in this matter
confidential.

Prior to filing an action against the City with the MCAD, I
will afford the City a final opportunity to deal with
McGravey.  Until the City does so, Padellaro will not be
able to return to work in her capacity as Assistant City
Clerk.  In the interim, Padellaro requests that you recredit
her sick leave and vacation leave accounts with all leave
utilized by her on or after June 21, 2004.  (I would suggest
that Padellaro be granted administrative leave with pay
pending her return to work.)  If, in the very near future, I
have not been advised by Padellaro that the City has taken
all appropriate actions against McGravey, I will have no
alternative other than to file a Charge of Discrimination
with the MCAD.

Very truly yours,

Richard K. Sullivan

RKS/em
cc: Jennifer E. Padellaro

# Exhibit 6

LAW OFFICE
OF

# RICHARD C. BARDI

6 BEACON STREET
SUITE 410
BOSTON, MASSACHUSETTS 02108
Telephone 617-227-4040
Facsimile 617-227-3388



RECEIVED
DEC 1 5 2004
COMMISSION AGAINST
DISCRIMINATION

*Richard C. Bardi*
*Admitted to Practice in*
*Massachusetts and New York*

*December 15, 2004*

*Michael P. Judge*

### VIA HAND DELIVERY

*Massachusetts Commission Against Discrimination*
*Attn: Abigail Solo-Colon, Intake Supervisor*
*One Ashburton Place, Room 601*
*Boston, Massachusetts 02108*

Re: <u>Jennifer Padellaro, Petitioner – City of Lawrence, Massachusetts and</u>
<u>James McGravey, Former City Clerk, City of Lawrence, Respondents</u>

*Dear Commissioner Sullivan:*

 *Please be advised that I represent the interest of the Complainant, Jennifer Padellaro.*

 *Enclosed please find Ms. Padellaro's Charge of Discrimination against the City of Lawrence, Massachusetts and its former Clerk, James McGravey, along with my Appearance of Counsel.*

 *Kindly provide a charge or docket number to this matter and advise my office of such. Additionally, kindly file a copy of this Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).*

 *Thank you for your attention to this matter.*

 *If you have any questions, please do not hesitate to contact my office.*

     *Very truly yours,*

     *Richard C. Bardi*

*RCB/mpj*
*Enclosure*

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☐ EEOC | |

## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

*State or local Agency, if any*                                                                 and EEOC

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Jennifer Padellaro | (978) 682-7089 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 7 South Bowdoin Street, Lawrence, Massachusetts 01843 | | 1/25/63 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| City of Lawrence | 100+ employees | (978) 794-5803 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 200 Common Street, Lawrence, Massachusetts 01843 | | Essex |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| James A. McGravey | unknown |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 14 Mount Vernon Circle, Lawrence, Massachusetts 01843 | | Essex |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ AGE
☐ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☒ OTHER *(Specify)* (Sexual Harrassment & Hostile Work Environment)

DATE DISCRIMINATION TOOK PLACE
*EARLIEST (ADEA/EPA)*     *LATEST (ALL)*
April 1996 to July 12, 2004 and continuing.

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

&ast; See Attachment &ast;

DEC 15 2004

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |
| Date              Charging Party *(Signature)* | |

EEOC FORM 5 (Test 10/94)

## ATTACHMENT TO CHARGE OF DISCRIMINATION

RECEIVED
DEC 27 2004
PERSONNEL

Complainant:  Jennifer Padellaro

Respondent:   City of Lawrence, Massachusetts and
James McGravey, Former City Clerk, City of Lawrence, Massachusetts

In or about July 1987, I began working in the City of Lawrence Clerk's office under Charles Nyhan. James McGravey (hereinafter "McGravey") was the Assistant City Clerk. McGravey was appointed City Clerk in or about 1989 and I was appointed Assistant City Clerk in August of 1993.

In or about April of 1996, I spent my lunch hour in the City Council's Office. Commonly, I would eat with several of the female employees. During this time, McGravey would join our group for lunch. However, it was extremely bothersome to our group, as McGravey would repeatedly tell stories of a graphic explicit sexual nature. During this time, McGravey's wife, Carol Hajjar McGravey, the City Attorney for the City of Lawrence, would occasionally join our group for lunch. During these times, McGravey would act civilly and would not inject his normal crass, offensive and sexually explicit stories into our conversations. Eventually, all the women stopped going to lunch in the City Council Office, in fear that McGravey would continue to show up and harass us.

In or about 1998, McGravey began to visit X-rated websites on the Internet. In particular, McGravey visited a site called "Flash Mountain", which posted pictures of women who would "flash" the camera, exposing their bare breasts, on the Splash Mountain ride at Disney World. McGravey stated that he believed that one of the women "flashing" looked like me. He commented how he liked "my breasts" and began showing the site to employees in the office. The next morning McGravey came into the office with a copy of the picture he had printed off his computer at home and after he finished showing the picture around he gave it to me and told me to go home and show my mother. In October of 1999, my brother, Gary, visited me in the office. During a conversation with my brother, McGravey asked him if he had the Internet at home. When he responded "yes" McGravey told him he should visit the web site "Flash Mountain" to see the photograph of myself, which McGravey believed to me although it was not, topless.

By late 1998 and early 1999, I began to notice increased use of the Internet by McGravey, in particular, on pornographic, sexually explicit, X-rated web sites that had naked males and females performing sexual acts. At or about this time, I was working with a female co-worker when the web site "Whitehouse", a pornographic website, popped up on my computer. When the co-worker stated "what the heck is that" McGravey came over to my desk and said, "Jenn, where have you been?" He denied that it was his doing, but this was a site he had mentioned many times. It was obvious to me that he was using my computer to view pornographic websites in an attempt to make it appear as if I had logged on to the computer and accessed the websites myself.

By May of 1999, I was so concerned with McGravey using my computer to visit pornographic sites that I made an appointment with an Assistant City Attorney regarding the matter. At this time, McGravey's wife was the City Attorney, their very good friend was the sitting Mayor and there was no Personnel Director. I informed the Assistant City Attorney that McGravey was using my computer to undertake such activities. I explained that I was reporting this to him in an attempt to protect myself, as I was fearful that such activities would be blamed on me. The Assistant City Attorney agreed to keep the issue private, as I was fearful of disrupting the office and/or being terminated from my position.

At this time, I asked the MIS Director to remove all Internet access from my computer so that I would not have to be constantly fearful that such websites were being accessed from my computer. The MIS Director denied my request to remove the Internet from my computer. However, he agreed to give me a password. Upon installing the password, the MIS Director stated "Jimmy has quite the little porno problem". As a result of McGravey's actions, I was being sexually harassed and humiliated. Without my knowledge or approval, the MIS Director gave McGravey my password. When I questioned him why he would release the password to McGravey he stated "Jim's the boss". When I asked him for a private password, he refused.

In the fall of 1999, I became aware that McGravey was contacting "call girls" and "escort services" under my e-mail address and my name. McGravey was also visiting websites such as "daddy's little girls" and the "Best F… Transsexuals On The Net". At or about this time, I was informed by a co-worker that McGravey was showing employees a picture on the Internet of a "well endowed" man. This co-worker advised me of such to warn me of McGravey's intention to show me the picture. It was common for the women in the office to do so.

In or about March 2000, a memorandum was issued by the Personnel Department, which repeated that each employee was informed of the City's policy regarding e-mail use and use of the Internet and that anyone found to violate these policies could be reprimanded up to termination. This memorandum required each employee sign at the bottom acknowledging he/she read and understood the policy. I refused to sign this policy, along with a number of other women in the office, as I was fearful that I would be subject to discipline as a result of McGravey's actions on my computer. I was aware that McGravey was constantly on my computer visiting such websites, which I felt would be wrongfully attributed to me. Despite my complaints to McGravey, he would continue to use my password, which as explained earlier, he obtained from the City of Lawrence, over my objection, to access filthy, explicit and gross sexual images.

McGravey continued his conduct of making inappropriate sexual remarks and viewing pornographic images after he signed the City's policy in March of 2000.

The Personnel Director at this time was Lawrence P. Lefebre. Mr. Lefebre was a former Mayor of the City of Lawrence, Massachusetts. McGravey had been employed as

Mayor Lefebre's Mayoral Aide in the late 1970's into the early 1980's and Mayor Lefebre appointed McGravey as the Assistant City Clerk in or about 1983.

It was at this time that I contacted Attorney Richard K. Sullivan.

On April 12, 2000, my then Attorney Richard K. Sullivan, sent a letter to Lawrence P. Lefebre, Personnel Director for the City of Lawrence, in which he detailed the actions of McGravey, which included visiting pornographic websites from my computer, as well as arranging for meetings with "call girls" and "escort services". I was losing sleep over this and I felt intimidated at work. However, I felt that I could not complain anymore than I did, as my job would be placed in jeopardy.

On May 8, 2000, Mr. Lefebre responded to my Attorney's letter and stated that he "agreed with the charges and allegations made against him" by me and that McGravey would be required to write a letter of apology to me, ordered McGravey to enroll in a course which included one on one counseling about sexual harassment and hostile work environments. Despite assurances from the City of Lawrence, McGravey continued to cause me to feel sexually harassed and to work in a hostile work environment.

To date, I have never received an apology letter from McGravey and upon information and belief, I believe that McGravey did not attend such a course in sexual harassment or hostile work environments. At the City's insistence

Mr. Lefebre also indicated that he placed a letter in my file stating that the City of Lawrence determined that I had not violated the City's policies concerning e-mail/Internet access policy and that any such contacts which were made to pornographic websites or e-mails were not authorized by me.

On May 15, 2000, my then attorney Richard K. Sullivan, responded to Mr. Lefebre's letter in which Mr. Lefebre indicated that the matter was closed based on the fact that I felt that I could work with mcGravey without worrying about a continued hostile work environment, which was completely false. Mr. Sullivan indicated to Mr. Lefebre that this matter was <u>not closed,</u> but rather, only that McGravey's behavior may change temporarily. Unfortunately, this behavior did not change.

Shortly after this, McGravey began an extramarital affair which the entire office was privy to. This affair lasted until McGravey's father's death in 2002. During this time, McGravey would state how sexually liberal his mistress was, how they would shop at sex stores together, and would frequently ask for my and others opinions on Internet purchases he was contemplating for her and his wife at the same time.

McGravey would frequently ask me how much I made a week. He would then say how much he was paying his mistress a week and imply that I too could have such a deal with him. That I could be sitting home making more money, tax free. There was another woman in the office about whom McGravey would ask me whether I thought she would be interested in making that kind of money.

These comments continued until the time of his of resignation on or about July 12, 2004.

On or about June 14, 2004, McGravey showed two women co-workers sexually graphic, naked photographs of him and a woman named "Leslie", who was allegedly his mistress. I am the immediate supervisor of one of these women. McGravey had showed this employee the pictures of himself on a computer in our office while I was at lunch. Upon my return, her first words to me were, "don't ever leave me alone with him again".

Several days later, McGravey told me about the sexual pictures that his "ex-mistress" had placed on a website called "Show My Wife.com.", but he couldn't show the pictures to me because the web server had replaced the pictures with new ones.

At that time, I contacted my former attorney Richard K. Sullivan. Upon his advice, I informed the Mayor of the City of Lawrence, Michael J. Sullivan, of McGravey's actions. During the Mayor's two (2) week investigation arising from my complaints about McGravey, the Mayor's office allowed me to take a paid leave of absence, as I was unable to work because of the anxiety I was suffering from as a result of my fear of retaliation by McGravey. McGravey continued to harass me during my period of leave, by attempting to have me terminated for abandonment of my position, which was reported to me by the Acting Personnel Director, Elie Bernabel.

As a result of these actions by McGravey, which have created an extremely hostile work environment, I have been subject to gross sexual harassment. McGravey's actions and the City of Lawrence's refusal to address these actions by McGravey have caused me to suffer greatly, both physically and emotionally. McGravey has always had a volatile temper. He would become enraged without provocation, scream, and throw things such as computers. He intimidated me by telling me "he does not wound those that cross him, he kills".

I have experienced weight loss, loss of appetite, and headaches as a result of the fear and anxiety which I suffer from at work. McGravey's actions and the City's lack of remedial action have also caused me to seek treatment for the emotional trauma that I have suffered.

Since my recent complaints were addressed by my attorney, Richard C. Bardi, I have been the subject of a hostile work environment created by City Council President Patrick Blanchette. I feel as if my complaints and disclosure of McGravey's violation of the City's Internet policy have resulted in others turning against me and causing me to work under difficult situations and in a hostile work environment.

McGravey resigned on or about July 12, 2004. That evening I received a phone call from Blanchette informing me of McGravey's resignation at that the City Council had decided that under the circumstances they felt it was better to not name me "Acting City Clerk", as would be common practice, because it might appear that I had reported McGravey's actions as a way to be promoted to his job. In later conversations with

4

Councilors, all denied any knowledge of this and stated that President Blanchette had made that decision on his own.

Council President Blanchette was considered my supervisor after McGravey's resignation. The day I returned to work, July 19, 2004, I was made aware that Blanchette continued to communicate with McGravey through e-mails after McGravey's resignation. When I asked Blanchette if he had any contact with McGravey he responded that he had not had any communication with McGravey except for McGravey's faxed resignation. Blanchette informed me that he was setting up a committee to bring the process of appointing a new City Clerk. At that time, I informed Blanchette that the committee must hold public hearings and keep minutes of the meetings. He became very annoyed with me and the discussion ended. The following night's meeting, Blanchette continually referred to me as "Madame Assistant Clerk". Throughout my years performing this duty with Blanchette he had always referred to me as "Madame Clerk". On July 26, 2004, I again asked Blanchette if he had been in communication with McGravey. At this time, he changed his earlier statement to me and said that he had received one e-mail from McGravey.

On July 27, 2004, at a City Council meeting, I was again informed Blanchette of the proper procedure regarding the Open Meeting Law requirements for the Ad Hoc Committee he had created in order to process applications for the City Clerk's position. He became greatly annoyed at me and informed other Councilors that I had concerns with the process.

On July 30, 2004, I informed Blanchette that I would like the Council to name me "Acting City Clerk". Blanchette asked me to file a grievance process with my union so that he could explain this to his fellow Councilors. I stated that I would rather have him present my request to the councilors.

Throughout the month of August, I spoke with several Councilors who all denied any knowledge of my request to be appointed Acting Clerk.

On or about August 19, 2004 I was told by City Councilor Israel Reyes that my office would be "toured" by City Councilors and that my staff would be interviewed regarding the operations of the office. Reyes informed me that I could not be present as this was a "conflict". Reyes stated that he had been ordered to make these arrangements by Blanchette during the Ad Hoc meeting.

On August 19, 2004, Blanchette came to see me in my office because he felt I was trying to "cause waves" with the process of appointing a new clerk. I stated that I certainly would not want to annoy those responsible for a position I was interested in, rather it was my job to insure that the Council is informed of the proper process. I told Blanchette that I felt that he had been increasing hostile towards me since McGravey's resignation. Throughout the entire months of July and August, Blanchette repeatedly expressed his sympathies for McGravey to me. I stated I was very uncomfortable with the fact that he had lied to me about his continued communication with McGravey. He first

5

denied contacting McGravey, then later said he had not been in contact with McGravey when I last asked, just since then. My conversation with Blanchette resulted in my being ordered out of work by my physician for several weeks.

On September 15, 2004 the Personnel Committee, a sub-committee of the City Council arranged for four candidates for the City Clerk's position to be interviewed in Executive Session, but I was not so advised before my arrival for my interview. During my interview, two Councilors were openly hostile to me, Councilors Blanchette and Gilbert Frechette. Prior to the beginning of the interview I was informed that the executive session had nothing to do with the McGravey situation and that all candidates would be asked the same questions. At one point, Frechette questioned my being under doctor's care during the summer months.

On September 18, 2004, I received a letter from the Blanchette informing me that I had not been chosen for the position of City Clerk. Blanchette is not a member of the personnel committee, and the process is not actually complete until the full council chooses a candidate by a majority vote. This did not take place until September 21, 2004.

On December 2, 2004, Lawrence P. Lefebre, former Personnel Director of the City of Lawrence and former Mayor for the City of Lawrence, entered my office uninvited, stood before my desk and verbally attacked me regarding my complaint against the City. He was yelling that "[I] would not get any money out of [him]" that "[I] didn't get the job for other reasons" and that "[he] have all the documents". I was extremely frightened and felt completely trapped as he had me in a corner of the office. Upon my repeated requests for him to leave, he finally did. This incident resulted in my being admitted to the hospital form chest pains and I have been ordered by my physician to not return to work.

# Exhibit 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

JENNIFER PADELLARO,                     .

                 Plaintiff     .     CIVIL ACTION NO. 05-CV-11788-MLW

             v.                    .

JAMES MCGRAVEY and                      .
CITY OF LAWRENCE,                       .

              Defendants   .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## NOTICE OF DEPOSITION OF RICHARD SULLIVAN

To:    Kevin G. Powers, Esq.
        Rodgers, Powers & Schwartz LLP
        18 Tremont Street
        Boston, MA 02108

PLEASE TAKE NOTICE THAT, pursuant to Rules 30 and 45 of the Federal Rules of

Civil Procedure, defendant City of Lawrence, by its attorneys, will take the deposition upon oral

examination of non-party Richard Sullivan on Thursday, September 28, 2006 at 10:00 a.m. at the

offices of Foley Hoag LLP, World Trade Center West, Boston, Massachusetts 02110, before a

person qualified to administer oaths. The oral examination will continue from day to day until

completed.

The deponent will be required to bring all documents referred to on the attached

Schedule A.

B3247632.1

You are invited to attend and cross-examine.

CITY OF LAWRENCE,

By its attorneys:

James W. Bucking, BBO #558800
Scott C. Merrill, BBO #631008
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  August 31, 2006

B3247632.1                                    - 2 -

## **EXHIBIT A**

Any and all documents and records concerning and/or related to Jennifer Padellaro including, without limitation, all notes, bills, invoices, correspondence, diaries, appointment logs, phone logs, phone records, calendars and memoranda, whether in electronic or hard copy form.

Exhibit 8

Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF _____ MASSACHUSETTS

| | |
|---|---|
| **JENNIFER PADELLARO,**<br>Plaintiff,<br><br>v.<br><br>**JAMES MCGRAVEY and**<br>**CITY OF LAWRENCE,**<br>Defendants. | **SUBPOENA IN A CIVIL CASE**<br><br>CASE NUMBER: 05-CV-11788-MLW |

TO:    Richard Sullivan, 300 East Main Street, Milford, MA  01757

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>**Foley Hoag, LLP**<br>**World Trade Center West**<br>**55 Seaport Blvd.**<br>**Boston, MA  02110** | DATE AND TIME<br>**Thursday, September 28, 2006 at 10:00 AM** |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**See attached Exhibit A.**

| PLACE<br>**Foley Hoag, LLP**<br>**World Trade Center West**<br>**155 Seaport Blvd.**<br>**Boston, MA  02110** | DATE AND TIME<br>**Thursday, September 28, 2006 at 10:00 AM** |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>_____ , Attorney for the Defendant | DATE<br>August 31, 2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Scott C. Merrill
**Foley Hoag LLP**
**155 Seaport Boulevard**
**Boston, MA 02210-2600  (617)832-1000**

See Rule 45, Federal Rules of Civil Procedure (Parts C & D on Reverse)

AO 88 (1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | | PLACE | |
|---|---|---|---|---|

| SERVED | | | | |
|---|---|---|---|---|

| SERVED ON (PRINT NAME) | | MANNER OF SERVICE | |
|---|---|---|---|

| SERVED BY (PRINT NAME) | | TITLE | |
|---|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the following information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## EXHIBIT A

Any and all documents and records concerning and/or related to Jennifer Padellaro including, without limitation, all notes, bills, invoices, correspondence, diaries, appointment logs, phone logs, phone records, calendars and memoranda, whether in electronic or hard copy form.

# AFFIDAVIT OF SERVICE

| | | |
|---|---|---|
| **State of Massachusetts** | **County of Suffolk** | **U.S.D. Court** |

Case Number: 05-CV-11788-MLW

Plaintiff:
**Jennifer Padellaro**

vs.

Defendant:
**James McGravey and City of Lawrence**

For:
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA  02210

Received by STOKES & LEVIN on the 1st day of September, 2006 at 10:29 am to be served on **Law Offices of Richard Sullivan., 300 East Main Street Milford, MA 01757.**

I, Wendell Davison, being duly sworn, depose and say that on the **1st day of September, 2006** at **3:03 pm, I:**

Served the within named corporation by delivering a true copy of the **Subpoena in a Civil Case** with the date and hour of service endorsed thereon by me to Robin Lewis as office assistant authorized to accept service on behalf of within named corporation and compliance with state statutes.

**Description** of Person Served:  Age: 45,  Sex: F,  Race/Skin Color: White,  Height: 5'5,  Weight: 140, Hair: Brown,  Glasses: N

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served.

Subscribed and Sworn to before me on the 11th day of September, 2006 by the affiant who is personally known to me.

_Wendell Davison_
**Wendell Davison**
Civil Process Division

NOTARY PUBLIC   MARIA BARROS
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 21, 2010

**STOKES & LEVIN**
**27 Glen Street**
**Stoughton, MA  02072**
**(781) 341-8390**

Our Job Serial Number: 2006002715
Ref: Scott Merrill

Copyright © 1992-2001 Database Services, Inc. - Process Server's Toolbox V5.5f

Exhibit 9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-CV-11788-MLW

```
_____
                              )
JENNIFER PADELLARO,           )
                 Plaintiff,   )
                              )
v.                            )
                              )
JAMES A. MCGRAVEY and         )
CITY OF LAWRENCE,             )
                 Defendants.  )
_____      )
```

THE PLAINTIFF AND ATTORNEY RICHARD SULLIVAN'S
MEMORANDUM IN SUPPORT OF AN EMERGENCY MOTION
TO QUASH THE DEFENDANT'S SUBPOENA SERVED ON
PLAINTIFF'S PREVIOUS ATTORNEY RICHARD SULLIVAN,
AND MOTION FOR A PROTECTIVE ORDER

## I. INTRODUCTION

Attorney Richard Sullivan represented the Plaintiff in her claim of

sexual harassment against the present Defendants.  During his

representation, Attorney Sullivan wrote to the City of Lawrence clearly

informing the City that he represented the Plaintiff in this case.  Attorney

Sullivan no longer represents the Plaintiff.

On or about August 31, 2006 the Defendant James McGravey's

attorneys served on Attorney Sullivan a depositional subpoena with an

attachment "A" requesting that Attorney Sullivan produce, among other

documents; **"any and all documents and records concerning and related**

to Jennifer Padellaro..." The Plaintiff and Attorney Sullivan both oppose

this outrageously broad subpoena. The objection is based on both attorney-

client privilege and the work product doctrine.

## II. THE LAW

### A. ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS

Where a person, as a client or prospective client,
consults a member of the bar in his or her capacity as
such, the communication in confidence of matters that
are (or that the client reasonably supposes to be)
necessary to the proper conduct of legal business is
privileged at the option of the client. See *In the Matter
of a John Doe Grand Jury Investigation*, 408 Mass
480, 482, 562 NE2d 69 (1990); *Panell v. Rosa*, 228
Mass (12 Pick) 89 (1831). The purpose of the
privilege is "to encourage full and frank
communication between attorneys and their clients and
thereby promote broader public interests in the
observance of law and administration of justice. The
privilege recognizes that sound legal advice or
advocacy serves public ends and that such advice or
advocacy depends upon the lawyer being fully
informed by the client." *Upjohn Co. v. United States*,
449 US 383, 389 (1981).

The Supreme Judicial Court has assigned
"extraordinarily high value" on "the right of every
citizen to obtain the thoughtful advice of a fully
informed attorney concerning legal matters." *In the
Matter of a John Doe Grand Jury Investigation*, supra,
408 Mass at 485, 562 NE2d.

The privilege is reinforced by an attorney's ethical
duty to preserve the confidences and secrets of the
client. See SJC Rule 3:07, Rules of Prof. Conduct,
Rule 1.6 (formerly DR 4-101, Canons of Ethics and
Disciplinary Rules Regulation the Practice of Law,
SJC Rule 3:07, 382 Mass 768, 778-779 (1981)).

> The privilege of course applies even after the relation
> of attorney and client has ceased. *Hatton v. Robinson*,
> 31 Mass (14 Pick) 416, 421-422 (1833) ("the mouth of
> the attorney shall be for ever sealed."); *Foster v. Hall*,
> supra 29 Mass at 93 (communications subject to
> privilege "cannot be disclosed at any future time").

PAUL J. LIACOS ET AL., HANDBOOK OF MASSACHUSETTS EVIDENCE.
777-780. (Michael Avery & Mark S. Brodin eds., 7th ed. 1999).
(footnote omitted)

The attorney-client privilege protects communications between a

client and her attorney from disclosure, and "applies only when the client's

communication was for the purpose of facilitating the rendition of legal

services." *Purcell v. District Att. for the Suffolk District*, 424 Mass. 109,

115 (1997). The privilege is:

> founded upon the necessity, in the administration of
> justice, of aid of persons having knowledge of the law
> and skilled in its practice, which assistance can only be
> safely and readily availed of when free from
> the consequences or the apprehension of disclosure. *Id.*
> at 116.

The attorney-client privilege cannot be overcome by a showing of

need. *Guevara v. Medical Professional Mut. Ins. Co.,* 2003 Mass. Super.

LEXIS at *18-19. The burden of showing that an attorney-client privilege

applies lies with the party asserting the privilege, who must show:

(1) the existence of an attorney-client relationship;

3

   (2)  the communications were received from a client in the course of

the client's search for legal advice from the attorney in his or

her capacity as such;

   (3)  the communications were made in confidence; and

   (4)  the privilege as to these communications has not been

waived.

Communications that are intended to be conveyed to third parties do not fall within the privilege. *Refuse and Envtl. Sys., Inc. v. Industrial Servs. Of Am.*, 120 F.R.D. 8, 11 (D. Mass. 1988).

## B.  WORK PRODUCT DOCTRINE

The work product privilege protects "written statements and mental impressions contained in the mind of the attorney." *Hickman v. Taylor*, 329 U.S. 495, 519 (1947). It is intended "to enhance the vitality of an adversary system of litigation by insulating counsel's work from intrusions, interferences, or borrowings by other parties as he prepares for the contest." *Ward v. Peabody*, 380 Mass. 805, 817 (1980), citing *Hickman v. Taylor*.

The Court in *Hickman* stated:

> The general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to the orderly working of our system of legal procedure that the burden rests on one who would invade that privacy to establish adequate reasons to justify production. *Id.* at 512.

In *Guevara v. Medical Professional Mut. Ins. Co.*, 2003 Mass.

Super. LEXIS 268, *11 (2003), the court stated that "[t]he burden is upon

the party resisting discovery…to demonstrate that the materials sought are

in fact work product within the scope of Mass. R. Civ. P. 26(b)(3)," but

went on to cite Rule 26(b)(c) to the effect that:

> The party seeking discovery must show (a) that
> he has substantial need of the materials to
> prepare his case and (b) he would sustain severe
> hardship were he forced to find the equivalent
> materials by other (discovery) means. *Id.* at *11 n. 5.

Even when the party seeking discovery meets the substantial need

test, the court "shall protect against disclosure of the mental impressions,

conclusions, opinions, or legal theories of an attorney…concerning

litigation." Mass. R. Civ. P. 26(b) (3).

The lawyer holds the work product privilege. *McMillan v. Westport*

*Ins. Corp.,* 2004 Mass. Super. LEXIS 657, *7 (2004).

**It is not necessary that litigation be pending at the time the

document was created – the doctrine only requires that litigation be

reasonably anticipated in the near future. *Dedham-Westwood Water Dist.*

*V. National Union Fire Ins. Co. of Pittsburgh*, 2000 Mass. Super LEXIS

29, *8 (2000).

## III. ARGUMENT

It cannot be denied that the document request contained in "Exhibit

A" is ridiculously broad in that it encompasses each and every

communication between the Plaintiff and her former attorney.  As an

example, the requests would encompass even a letter from Attorney

Sullivan to the Plaintiff in which Attorney Sullivan communicated his

opinion as to the strengths and weaknesses of the case and sets forth a

strategy and an economic goal for settling the case.

In the case of *Darius v. City of Boston,* 433 Mass. 274 (2001),

referred to, in *Federal Deposit Ins. Corp. v. R.W. Beck, Inc.,* 2004 U.S.

Dist. LEXIS 12128, *7 (2004) the Defendant city issued a similarly broad

subpoena to the Plaintiff's former attorney.  In the *Darius* case, the

Defendant argued that because there was a timeliness issue implicit in the

allegations of the complaint that the Plaintiff had waived the attorney-client

privilege.  The *Darius* court rejected the Defendant's argument stating:

> We need not attempt, in this case, to formulate
> an exact definition of the 'at issue' waiver doctrine under
> Massachusetts law, because we are satisfied that the
> discovery sought by the city falls well beyond whatever
> definition we might adopt.  We reach this conclusion for at
> least three reasons, which we explain below: (a) Marie
> Conserve's meeting with counsel occurred less than two years
> before the date of the letter pursuant to G. L. c. 258, § 4, that
> the city claims was untimely; (b) the city's deposition
> subpoena called for the wholesale disclosure of documents in
> counsel's possession concerning the meeting with Conserve;
> and (c) it has not been established on this record that the
> requested documents are necessary to the city's position.
>
> We also conclude, conversely, that what the Plaintiffs
> communicated to their counsel in the spring of 1996 (or
> perhaps what counsel discovered) about their knowledge or
> reason to know of a causal connection is privileged, and that

the privilege has not been waived. The only reason we can see for the city's attempting to obtain that information from present counsel is to test the credibility of the Plaintiffs -- in other words, to see whether the Plaintiffs confided in their counsel anything that contradicted their assertion that they did not know of a causal connection before being informed of it by counsel. We shall not allow the city to pit counsel against their clients in that fashion. To permit that kind of inquiry would pry open the attorney-client [**57] relationship and strike at the very core of the privilege. In virtually every case in which the statute of limitations (or lack of timely presentment, as here) is pleaded as a defense and the client relies on the discovery rule to overcome the limitation period, the opposing party would be able to inquire of the client's counsel: "Did your client tell you anything in confidence [*281] about what he or she knew that differs from or contradicts [***15] what he or she stated in responses to discovery?" *Id.* at 279-280.

Like the deposition subpoena in *Darius*, the Defendants' subpoena in this case is extraordinarily broad – even broader than the one in *Darius*, and they have not shown any need for the documents or established that the information they seek cannot be obtained from any other means of discovery (e.g., they have not even deposed Padellaro prior to trying to invade her attorney's documents pertaining to his communications with Padellaro).

Similar to the attorney-client argument above, the Defendants have not, and we assert, cannot, articulate any valid reason for this Court to find that the Plaintiff or her former counsel have waived the Work Product Doctrine.

7

## IV. CONCLUSION

For all of the above reasons the Plaintiff and her former counsel,

who joins in on this memorandum, request that the court;

1)  Quash the subpoena issued by the Defendant.

2)  Enter an order that the deposition of Attorney Sullivan may not

    proceed.

3)  Award attorney fees to the Plaintiff for her attorney's work

    preparing this motion and memorandum.

Respectfully submitted,

Jennifer Padellaro
By her Attorneys,

Richard K. Sullivan, BBO # 487680
300 East Main Street
Milford, MA 01757
(508) 482-9777

Kevin G. Powers, BBO #405020
Linda Evans, BBO #635078
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

Padallarro/memo.support.quash.atty.client

# Exhibit 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

JENNIFER PADELLARO,

                Plaintiff,

          v.

JAMES MCGRAVEY and
CITY OF LAWRENCE,

              Defendants.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

CIVIL ACTION NO. 05-11788-MLW

## DEFENDANT CITY OF LAWRENCE'S OPPOSITION TO PLAINTIFF AND RICHARD SULLIVAN'S EMERGENCY MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER

### I. INTRODUCTION

Plaintiff and Richard Sullivan's Emergency Motion to Quash and Motion for Protective Order ("the Motion") is procedurally flawed and substantively vacant. As for process, Plaintiff and Sullivan allowed twenty days to pass after receiving the deposition notice at issue, then rushed to Court filing an "emergency" motion the week before the scheduled deposition without ever conferring with the City as required by the Federal Rules of Civil Procedure. The substance of the Motion fares no better. It is merely an amalgam of excerpts from treatises on the attorney-client and work-product privileges with no serious attempt to apply those generic principles to the facts of this case. Rather, Plaintiff and Sullivan suggest that the mere existence of these privileges means that the City is absolutely prohibited from deposing or obtaining documents from Sullivan. But black letter law is to the contrary; no such blanket privilege exists. Instead, it is well-settled that lawyers who are subpoenaed must appear for deposition, answer questions and produce documents - just like any other witness. If the lawyer believes that a particular

deposition question or a particular document request calls for privileged material, he may then assert the privilege, at which point he has the burden to prove that the privilege applies and has not been waived in each such case (assuming the proponent of the question or request persists after facing the objection, following a conference among counsel). When the discovery dispute has been perfected in this fashion, the Court can then engage in a particularized analysis of the privilege issues. None of that happened here.

Sullivan has refused to appear for deposition at all, even to answer unquestionably non-privileged questions (such as his communications with the City). Sullivan has refused to produce a single document, even those for which no privilege could arguably apply (such as his letters to the City). Sullivan and Plaintiff seek to quash the subpoena in its entirety, thereby excusing Sullivan from answering any questions or producing any documents. Finally, Sullivan and Plaintiff have taken these actions without even attempting to comply with Fed. R. Civ. P. 26(c), Fed. R. Civ. P. 45, Local Rule 7.1 or Local Rule 37.1 - thereby needlessly burdening the City and the Court with the cost and time of litigating over a dispute that is at best premature. As such, the Motion must be denied, with fees and costs being awarded to the City based on the frivolous nature of the Motion.

## II. BACKGROUND FACTS

Plaintiff has alleged in this case that she was subjected to a hostile work environment by her supervisor, Defendant James McGravey ("McGravey"), while she was an employee of the City. Padellaro worked for McGravey from 1987 to 2004. On April 12, 2000, Attorney Richard K. Sullivan ("Sullivan") sent a letter to the City's Personnel Director, Lawrence LeFebre ("LeFebre") indicating that he represented Padellaro and outlining Padellaro's complaints. See Exhibit 1, attached hereto. On May 8, 2000, LeFebre wrote to Sullivan outlining actions the City

was taking in response to Padellaro's concerns. McGravey was ordered to write a letter of

apology to Padellaro; McGravey was ordered to attend sexual harassment counseling through the

Employee Assistance Program; a letter of discipline was placed in McGravey's personnel file;

McGravey was warned to avoid any form of retaliation against Padellaro; McGravey was told in

no uncertain terms that any recurrence of his behavior would result in immediate discharge; and

a letter was placed in Padellaro's file indicating that "at no time has the City found she has

violated the City's policies concerning 'E-Mail or Internet Access,'" pursuant to her request.

See Exhibit 2, attached hereto.

Sullivan sent the City a second letter on May 15, 2000, indicating that he received

LeFebre's May 8 letter and acknowledging the City's steps to resolve the issue. See Exhibit 3,

attached hereto. Sullivan advised the City that he would be checking in with Padellaro

periodically to ensure that her problems with McGravey had been permanently resolved. Id.

LeFebre then responded to Sullivan in a letter dated May 26, 2000, assuring Sullivan that he

would also continue to monitor the situation. See Exhibit 4, attached hereto.

Sullivan did not contact the City again for more than four years, during which time no

additional incidents between Padellaro and McGravey were reported to or otherwise observed by

the City. This despite the situation being actively monitored by Sullivan on behalf of Padellaro,

and by LeFebre on behalf of the City.

By letter dated June 29, 2004, Sullivan informed the City of new allegations which he

described as having occurred "recently." See Exhibit 5, attached hereto. Sullivan did not assert

that any misconduct had occurred in the period between the spring of 2000 and the summer of

2004. On the contrary, after describing with some specificity the original incidents and the

correspondence concerning same, Sullivan stated: "Unfortunately, **recently**, McGravey has reverted to his prior pattern of behavior." Id. at page 2 (emphasis added).

Sullivan thereafter ceased to represent Padellaro. To the City's knowledge, Sullivan never filed a court complaint or discrimination charge on behalf of Padellaro. A new attorney, Richard C. Bardi, filed Padellaro's charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") on December 15, 2004. See Exhibit 6, attached hereto. Bardi also filed the instant Complaint. During the course of this litigation, Bardi was replaced with Attorney Kevin G. Powers, current counsel for Padellaro.

Contrary to what Sullivan said, and implied by his silence in his 2000 and 2004 letters, Padellaro claims in her Complaint that between 2000 and 2004 she continued to be constantly subjected to inappropriate behavior at the hands of McGravey. Thus, Padellaro asserts that the conduct in and before 2000, which would otherwise be untimely, is properly included in her MCAD charge and the instant Complaint as a "continuing violation."

On August 31, 2006, the City served Padellaro with the Notice of Deposition of Richard Sullivan. See Exhibit 7, attached hereto. The City served a corresponding subpoena on Sullivan on September 1, 2006. See Exhibit 8, attached hereto. Attached to the Notice and Subpoena was Exhibit A, requesting that Sullivan produce bills, invoices, correspondence, diaries, appointment logs, phone logs, phone records, calendars and memoranda regarding Jennifer Padellaro. On September 20, 2006, without once conferring with the City beforehand, Plaintiff and Sullivan filed the Emergency Motion to Quash and Motion for Protective Order.

### III.  ARGUMENT

**A.**  **Sullivan's Motion to Quash and Plaintiff's Motion for Protective Order Should Be Denied Because Plaintiff and Sullivan Failed to Comply with the Federal Rules in Filing Their Motions with the Court.**

1.  Plaintiff ignored the rules.

Plaintiff's Motion for a Protective Order should be denied because she ignored the multiple requirements set forth in the federal rules to confer with opposing counsel, and thereafter provide information to the Court, prior to filing her motion.  Federal Rule 26(c) requires parties seeking a protective order to confer or attempt to confer with "the other affected parties in an effort to resolve the dispute without court action. . .."  Local Rule 7.1 goes further, requiring that the parties actually confer prior to any motion being filed:

> *No motion shall be filed* unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue.

L. R. 7.1(A)(2) (emphasis added).  Local Rule 37.1 not only imposes an obligation to confer prior to filing a motion for a protective order, it requires counsel for the moving party to arrange the conference, and further provides that every motion "*shall include* a certificate in the margin of the last page that the provisions of this rule have been complied with" (emphasis added).  The reason for these requirements is clear:  courts do not wish to be burdened with disputes that could be resolved, or at least narrowed, by the parties.  See Converse Inc. v. Reebok Int'l Ltd., 328 F.Supp.2d 166, 170 (D. Mass. 2004) (the purpose of Rule 7.1 "is to conserve judicial resources by encouraging parties to narrow the contours of disagreement before bringing their dispute to the court").

In this case, Plaintiff did none of these things - despite being represented by competent and experienced counsel who surely knows the rules.  Plaintiff neither conferred nor attempted to confer with the City about the Motion, set up no conference, and included no certificate in the

Motion. Instead, Plaintiff rushed to court without ever attempting to determine whether all or some of the issues could be resolved. As a result, Plaintiff's Motion contains a host of assumptions and other speculation about the intentions of the City in seeking to take Sullivan's deposition, and questions the City <u>might</u> ask. The Motion goes on to assert generic objections to those hypothetical questions. This is precisely the kind of ill-defined, unperfected discovery dispute the rules were designed to prevent from reaching the Court. In counsel's experience, Rule 7.1 conferences almost always narrow, and usually eliminate, issues the parties thought were in dispute -- which is the purpose of the requirement. The Plaintiff's failure to adhere to these simple rules in this case has caused the City to incur significant expenses in responding to this frivolous Motion, warranting a denial of the Motion and the issuance of sanctions. <u>See</u> <u>Converse Inc. v. Reebok Int'l Ltd.</u>, *supra,* (imposing $15,000 in sanctions for violating Rule 7.1); <u>U.S. v. Kouri-Perez</u>, 8 F.Supp.2d 133, 139-40 (D.P.R. 1998) (counsel's failure to confer as required by Fed. R. Civ. P. 26(c) constituted evidence of "bad faith" and formed part of basis for issuing sanctions).

Moreover, Plaintiff failed to comply with Local Rule 37.1, which provides that the memorandum accompanying the Motion "shall state with particularity" certain basic information for the Court. Thus Plaintiff was required, and failed, to inform the Court: (1) whether a discovery conference was held and, if not, why; (2) the nature of the facts relevant to the matters at issue; (3) each discovery matter, such as deposition questions and interrogatories, that are at issue and Plaintiff's response; and, (4) Plaintiff's position as to "each contested issue," with supporting legal authority. <u>See</u> Rule 37.1(B). Plaintiff chose to ignore these requirements, just as she ignored Rule 7.1 and Rule 26(c). This is another basis for sanctions.

2.    <u>Sullivan ignored the rules</u>.

Like Plaintiff, Sullivan also chose to ignore the basic requirements in the federal rules

prior to filing his Motion to Quash.  As an initial matter, Sullivan failed to object to the subpoena

in writing within fourteen days after service as required by Rule 45(c)(2)(B).  The subpoena was

served on Sullivan on September 1, 2006.  <u>See</u> <u>Exhibit 8</u>.  Fourteen days from September 1st

came and went without any written objections having been served.  Yet now, twenty days later,

Sullivan seeks to have the subpoena quashed.  This comes too late.  <u>See</u> <u>Universal City Dev.</u>

<u>Ptnrs., Ltd. v. Ride & Show Eng'g, Inc.</u>, 230 F.R.D. 688, 697 (M.D. Fla. 2005) (objections to

subpoena deemed waived where not timely raised); <u>Creative Gifts, Inc. v. UFO</u>, 183 F.R.D. 568,

570 (D.N.M. 1998) (same); <u>In re Application of Sumar</u>, 123 F.R.D. 467, 472 (S.D.N.Y. 1988)

(same).

Because Sullivan failed to object at all, naturally he did not adhere to the requirement

in Rule 45(d)(2) to couple his assertion of privilege with "a description of the nature of the

documents, communications, or things not produced that is sufficient to enable the demanding

party to contest the claim."  Thus, the City and the Court are left to guess at what documents

Sullivan might have and how the attorney-client and work-product privileges might apply to

such hypothetical documents.  Perhaps this explains why Sullivan barely gets beyond generic

hornbook citations in his papers, because the absence of meaningful document descriptions

renders any more specific analysis impossible.  For this reason too, the Motion should be denied.

Sullivan also failed to comply with Local Rule 7.1.  Like Plaintiff, Sullivan never

contacted the City to confer prior to filing the Motion to seek to narrow the issues raised or to

otherwise explore whether an agreement could be reached on the scope of the deposition and

documents that needed to be produced.  Instead, Sullivan made the same assumptions Plaintiff

B3257752.1                                      - 7 -

made about the City's intentions with respect to the scope of questioning and the documents it

was seeking without first picking up the phone and having a conversation. Sullivan's failure to

confer with the City has needlessly resulted in significant time and expense on the part of the

City and the Court in addressing this Motion. Rule 7.1 is mandatory: no motion may be filed

without conferring with opposing counsel. Accordingly, the Motion should be denied.

**B.    The Motion Should Be Denied and Sanctions Issued Because Its Substance is Frivolous.**

Nowhere in their papers do Plaintiff or Sullivan cite a case saying that the attorney-client

privilege or work-product rule bars deposing a former attorney. In fact, it is well-settled that an

attorney-client relationship does not act as a bar to discovery. See Carey v. Textron Inc., 224

F.R.D. 530, 531 (D. Mass. 2004) (plaintiff's motion for protective order to prevent the deposition

of his former attorney denied). Rather, the attorney must submit to deposition and then assert

privilege as to particular communications. See Winchester Capital Mgmt. Co., Inc. v. Mfrs.

Hanover Trust Co., 144 F.R.D. 170, 174 (D. Mass. 1992).

In Carey, the Court specifically rejected the argument that the mere presence of an

attorney-client relationship protected "any and all information" the attorney held. According to

the Court, "[p]lainly, the privilege does not apply to 'all information' that . . . [the attorney] . . .

has concerning the matter." Id. Instead, the privilege applies to "*communications* made

between a lawyer and client for purpose of obtaining legal advice" (emphasis in original). Id.

The Court did not delve deeply into the issue of the appropriate application of the work-product

doctrine to the deposition of an attorney, because the deposition was permissible "under any

reasonable standard." Id. at 531. As in the instant case, the Carey court noted that since the

attorney was no longer representing the plaintiff, any concern over possible interference in the case occasioned by his deposition was not substantial. Id.

Indeed, in Winchester Capital Mgmt., the Court granted a motion to compel testimony of plaintiff's current attorneys, finding the subjects not to be privileged. In reaching its decision, the Court noted the "unquestioned rule that the mere relationship of attorney-client does not warrant a presumption of confidentiality." Winchester Capital Mgmt., supra, 144 F.R.D. at 174. The burden is on the proponent of the privilege, here Plaintiff and Sullivan, to prove that the privilege applies to each document withheld and each question unanswered. Id. at 173.

Plaintiff and Sullivan make no effort to address how they can assert a blanket rule precluding the deposition of a former attorney yet still meet their burden associated with asserting the privilege. In fact, they cannot meet that burden because a basic application of the required elements assumes a knowledge of the specific document or statement that the privilege concerns. See, e.g., Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1457 (1st Cir. 1992) (person claiming the privilege carries the burden of proving: (1) an attorney-client relationship; (2) that the attorney acted as attorney in connection with the document; (3) the document relates to facts communicated for the purpose of obtaining a legal opinion or legal services; and (4) the privilege has not been waived). Plaintiff and Sullivan engage in no such analysis because they make the broad assertion that everything Sullivan saw, heard or touched is privileged and, therefore, are unable to meet their burden before the Court because their Motion contains no discussion of how or why the privilege should be applied. Compare City of Springfield v. Rexnard Corp., 196 F.R.D. 7 (D. Mass 2000) (in which the Court considered different documents/communications separately to determine whether or not each one was privileged); Winchester Capital Mgmt., supra, 144 F.R.D. 170 (same). Thus, the settled case law

B3257752.1

definitively rejects the broad, sweeping theory Plaintiff and Sullivan assert in their papers: that

the mere fact that Sullivan was Padellaro's attorney bars his deposition and excuses him from

producing documents in his possession.

In fact, courts have long recognized numerous categories of documents and areas of

inquiry that are not shielded from discovery by the attorney-client privilege. See, e.g., Savoy v.

Richard A. Carrier Trucking, Inc., 178 F.R.D. 346, 350 (D. Mass. 1998) ("the 'structural

framework' surrounding the substance of the communications is discoverable. Accordingly, the

fact of the attorney-client relationship and the dates on which services were performed are not

necessarily privileged") (internal citations omitted); Universal City Dev. Ptnrs., Ltd., supra, 230

F.R.D. at 173 ("It is generally recognized that the communication of factual information is not

protected by the attorney-client privilege"); In re Grand Jury Subpoenas (Zerendow), 925

F.Supp. 849, 855 (D. Mass. 1995), citing In re Grand Jury Subpoenas (Anderson), 906 F.2d

1485, 1488 (10th Cir. 1990) ("It is well recognized in every circuit ... that the identity of an

attorney's client and the source of payment for legal fees are not normally protected by the

attorney-client privilege"); Colonial Gas Co. v. Aetna Cas. & Sur. Co., 144 F.R.D. 600, 607

(D.Mass 1992) (documents regarding the payment of fees, billing and the time expended

generally are not subject to the attorney-client privilege); see also 6-26 Moore's Federal Practice

- Civil § 26.49 ("the factual circumstances surrounding the attorney-client relationship itself are

discoverable. Thus, privilege does not extend to the fact of consultation, or to the identity of the

client or the attorney") (internal citations omitted).

Even the substance of communications between the attorney and the client are not

necessarily privileged.  Only if the communications are "made between a lawyer and client for

purpose of obtaining legal advice" does the privilege apply.  Carey v. Textron, Inc., supra, 224

F.R.D. at 531. Thus, for example, where discussions with an attorney are properly characterized as seeking and/or giving business advice rather than legal advice, there is no privilege and the attorney can be compelled to testify concerning their content. See Borase v. M/A COM, Inc., 171 F.R.D. 10 (D. Mass. 1997). Likewise, where an attorney acts as someone's spokesman or representative with another party, communications with the attorney relating to the attorney's discussions and interactions with the other party are not privileged. See Winchester Capital Mgmt. Co., Inc., supra, 144 F.R.D. 170. In each of these instances, the full range of surrounding facts and circumstances must be analyzed with specificity to determine whether a particular question or document request is objectionable on the grounds that it calls for privileged information. A blanket, preemptive protective order -- as Plaintiff and Sullivan seek -- is not appropriate.

The range of areas of possible inquiry is no less limited by the attorney-client privilege or work-product rule in this case. As an obvious example, Sullivan communicated several times with the City's Personnel Director, Lawrence LeFebre, about alleged harassment of Plaintiff. Documents in Sullivan's possession, and any testimony he might be called to give concerning these communications, is not even arguably privileged. Likewise, documents or testimony concerning the fact of communications (as distinguished from their content) between Sullivan and Padellaro also is clearly not privileged. Here, Sullivan's May 15, 2000 letter warns LeFebre that he will be "checking with Padellaro on an ongoing basis" concerning McGravey's conduct at work. Whether Sullivan and Padellaro spoke at all, and the frequency and timing of any such communications, between that letter and Sullivan's June 2004 letter is relevant to the question of whether and to what extent any behavior continued by McGravey. Sullivan's recollection, his

memos, his diaries, invoices, calendars and other documents are thus discoverable and not privileged.

Moreover, it may well be, as the courts in Borase and Winchester determined, that even the substance of Padellaro's discussions with Sullivan during this time period are outside the privilege and therefore properly discoverable. It is premature to make such a determination now, not only because Sullivan and Plaintiff failed to comply with the rules requiring consultation with opposing counsel before filing the Motion thereby eliminating any opportunity to narrow the potential issues, but also because no specific questions have been asked and objected to, and no specific documents have been identified, to allow for a proper inquiry. The case law makes clear that these issues require a highly particularized analysis, including what role (lawyer vs. non-lawyer businessman or representative) the attorney was filling under the circumstances of the specific question or document request. See, e.g. U.S. v. Wilson, 798 F.2d 509, 513 (1st Cir. 1986) (communications by a client to an attorney not acting in his role as a lawyer but as a negotiator or business advisor are not privileged); City of Springfield, supra, 196 F.R.D. at 9 (D. Mass 2000) ("lawyer may wear several other hats (e.g., business advisor, financial consultant) and because the distinctions are often hard to draw, the invocation of the attorney-client privilege may be questionable in many instances").

Finally, Plaintiff and Sullivan's proffered blanket rule is flawed because it would defeat the City's right to explore whether the privilege has been waived. See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003) ("the party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and that it has not been waived"). Even if Plaintiff and Sullivan could establish that a particular document or discussion was privileged, it would still be discoverable if the privilege

has been waived. The City must be given the opportunity to determine whether this has occurred. Plaintiff and Sullivan cannot preclude such inquiry by asserting a theory that blindly assumes the privilege has <u>not</u> been waived. Once again, the question of potential waiver demonstrates the need to conduct a specific inquiry rather than rely on a blanket rule.

As with Plaintiff and Sullivan's procedural deficiencies, the substantive issues herein are so clear and so well established that the Motion is frivolous. The City, as well as the Court, should have been spared the time and expense associated with responding to this motion. Plaintiff and Sullivan's failure to conduct even a cursory review of the relevant law, and instead simply regurgitate a hornbook discussion on the basics of the attorney-client and work-product doctrines as a basis for their motion, warrants sanctions.

## IV. <u>CONCLUSION</u>

For all of the reasons discussed herein, Plaintiff and Sullivan's Motion should be denied, with the City being awarded its attorneys' fees and costs.

CITY OF LAWRENCE

By its attorneys:

/s/ Scott C. Merrill
James W. Bucking, BBO #558800
Scott C. Merrill, BBO #631008
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: September 27, 2006

<u>CERTIFICATE OF SERVICE</u>

    I, Scott C. Merrill, hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 27, 2006.

_____s/ Scott Merrill_____

B3257752.1                                    - 14 -

# Exhibit 11

1

1 - 21

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


JENNIFER PADELLARO,               )
                     Plaintiff,   )
                                  )
-V-                               )    CIVIL DOCKET NO.
                                  )    05-11788-MLW
JAMES MCGRAVEY and                )
CITY OF LAWRENCE                  )
                     Defendant.   )


MOTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE


September 28, 2006

Boston, Massachusetts


Proceedings recorded by electronic sound recording,
transcript produced by Apex Reporting.

APPEARANCES ON PAGE 2



*APEX Reporting*
(617) 426-3077

2

APPEARANCES:

For the Plaintiff:

    KEVIN G. POWERS, ESQ.
    Rogers, Powers & Schwartz, LLP
    18 Tremont Street
    Boston, MA  02108
    (617) 742-7010

For Defendant McGravey:

    MICHAEL R. BERNARDO, ESQ.
    Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP
    Ten Post Office Square
    4th Floor
    Boston, MA  02109

For Defendant City of Lawrence:

    JAMES W. BUCKING, ESQ.
    SCOTT C. MERRILL, ESQ.
    Foley, Hoag, LLP
    155 Seaport Boulevard
    Boston, MA  02210
    (617) 832-1000

```
 1               P R O C E E D I N G S
 2                                          (3:16 p.m.)
 3          THE CLERK:  The United States District Court for
 4   the District of Massachusetts is now in session on September
 5   28th, 2006, in the matter of Padellaro v. McGravey, Civil
 6   Case No. 05-11788.  Would counsel please identify themselves
 7   for the record.
 8          MR. POWERS:  Good afternoon, your Honor.  My name
 9   is Kevin Powers and I represent the plaintiff and the moving
10   party.
11          MR. BUCKING: Good afternoon, your Honor.  James
12   Bucking and Scott Merrill from Foley Hoag for the defendant,
13   City of Lawrence.
14          MR. BERNARDO:  Good afternoon, your Honor.
15   Michael Bernardo from Conn Kavanaugh for defendant, James
16   McGravey.
17          THE COURT:  I think if they'll be nice to you,
18   you're allowed to sit at counsel table if you want.
19          Well, I guess it's the plaintiff's motion --
20          MR. POWERS:  Yes, thank you, your Honor.
21          Your Honor, this is a motion to quash a subpoena
22   and a protective order.  And this is because a very, very
23   broad subpoena was served on Attorney Richard Sullivan.
24          Richard Sullivan represented the plaintiff in the
25   case from 2000 to 2004.  There is no question that there was
```

4

1    attorney/client privilege.  If there's any question in your

2    mind, if you could look at --

3            THE COURT:  I don't think they're claiming that

4    there's no attorney/client privilege.

5            MR. POWERS:  No.

6            THE COURT:  I think the question becomes, -- I

7    don't want to short circuit this but -- as I understand it,

8    the question is:  Does the attorney need to respond and say,

9    this is what I'm producing and I'm claiming the privilege on

10   the rest.  Or can the attorney just sit back and say, you're

11   too broad and I don't need to respond at all.

12           MR. POWERS:  Well, I --

13           THE COURT:  Right?

14           MR. POWERS:  I think you've characterized it

15   fairly appropriately.

16           But our position is, the subpoena was far, far too

17   broad in this case.  If we assume -- and we all assume,

18   there's an attorney/client privilege -- to ask for any and

19   all documents, records concerning or related to Jennifer

20   Padellaro.  Including -- and it goes on and on.   And we

21   cite the Darius case, which the Court -- and it's not a

22   federal case, but it's a Supreme Court of Massachusetts --

23   said that that type of subpoena is far too broad for this

24   type of case.

25           THE COURT:  All right.  But why didn't you attempt

5

1    to negotiate it, or did you?

2         MR. POWERS:  Well, we did, in effect.  And let me

3    go back -- and I also have an affidavit that I can submit to

4    the Court on that very point.  This issue came up with

5    regard to the plaintiff's production of documents because

6    the same kind of request was made to plaintiff.  Now, we

7    took two positions: one is, we don't know exactly what

8    documents Sullivan and Bardi, the two previous attorneys

9    have.  But those -- that request is far too broad and it

10   invades the attorney/client privilege.  And in fact, there

11   was a letter to the attorneys saying, tell me why you want

12   this and specifically, what you want.

13        THE COURT:  How long was the representation?

14        MR. POWERS:  The representation of Sullivan was

15   2000 to 2004.  So, approximately four years.

16        THE COURT:  And as far as -- that was involved in

17   something with the city --

18        MR. POWERS:  Yes.

19        THE COURT:  -- and I understand that it was the

20   2000 period and then the 2004.

21        MR. POWERS:  Yes.

22        THE COURT:  And among the issue is what happened

23   in between?

24        MR. POWERS:  Yes.  And in the documents presented

25   to you by the defendant, there are three letters from

6

1    Sullivan, all three letters and they go from 2000 to 2004

2    saying, I represent her and here's the problem.

3           So what we did was we said to the defense

4    attorneys, we think that's far too broad, tell us what your

5    rationale for requesting this broad scope of documents are.

6    And there was no rationale and in fact, in the defendant's

7    submission, there's no rationale for why they're seeking

8    such a broad scope of documents.  To this date, I don't know

9    why it is.

10          THE COURT:  Let me ask you --

11          MR. POWERS:  I suspect --

12          THE COURT:  Yes, go ahead.

13          MR. POWERS:  I suspect that they recognize there

14   may be statute of limitations and a continuing violation

15   theory out there.  Because, of course you have the filing

16   before the MCAD in 2004 and you have events that occurred in

17   2000.  So I suspect -- although it hasn't been articulated

18   to me -- that there's a concern, are we going all the way

19   back to 2000 and if so, is there a continuing violation.

20          But that type -- that's the very type of argument

21   that was made in Darius, the Supreme Court case, where they

22   were looking at timeliness issues on a presentment letter.

23   And in Darius, they said, but you can't go over the attorney

24   that represents the plaintiff and seek to find out

25   information from that attorney that would either prove or

APEX Reporting
(617) 426-3077

1    disprove the timeliness issue.  And I specifically --

2            THE COURT:  But in this case, you have a letter

3    from Mr. Sullivan that says, and I'm going to monitor you on

4    my client's behalf for four years.

5            MR. POWERS:  But it doesn't matter.  Conceive of

6    this, what is the question -- what are the documents?  Are

7    they going to be allowed to ask Mr. Sullivan, what, if

8    anything, did Ms. Padellaro talk to you about during that

9    period of time?

10           THE COURT:  I'll be honest with you.  I think they

11   can ask whatever he wants.  I think you need to say it's

12   privileged and then, if there's a dispute about it, somebody

13   files a motion to compel.

14           For example, it seems to me you can easily have a

15   deposition that says: 'Did you attend any meetings with the

16   city?'  'Yes.'  'How many meetings did you attend?'  'Ten.'

17           Those aren't privileged.  The contents of those

18   are not privileged.

19           'Did you meet with Ms. Padellaro in the period

20   between 2000 and 2004, yes or no?'  'Yes.'  'Was anybody

21   else ever present during those meetings?'  'Yes, I met with

22   her next door neighbor.'  That's not privileged.

23           I mean, how do they find out of -- and then you

24   have a transcript, you have claimed a privilege if you think

25   a privilege is legitimate.  They have the burden of

1   establishing -- you have the burden of moving that it is

2   privileged but they would have to, in the deposition, set up

3   the parameters of why it was not.

4        MR. POWERS:  The problem with that is, it allows

5   the defendants to engage in a huge fishing expedition that

6   chills the representation of a client because if all

7   attorneys are subject to these types of subpoenas and

8   subject to being called in and deposed on a simple case like

9   this -- and we're not talking about if there's an issue of

10  attorney/client privilege -- that's a terrible burden on

11  anyone who represents plaintiffs.

12       And Mr. Sullivan, who no longer represents

13  Ms. Padellaro, is not going to be paid a fee for his time,

14  shouldn't -- unless there's a showing -- shouldn't have to

15  be subjected to that.  To give up hours of his billable time

16  without a showing and that's the problem here.  What is the

17  showing that says to the Court, this is why we want to

18  depose him, here's what we believe.  In most of the cases --

19       THE COURT:  Well, they have said in their memo

20  that there is a statute of limitations issue in this case.

21       MR. POWERS:  But they can't ask Sullivan.  They

22  could only ask him:  'Did you talk to Padellaro during this

23  time' yes or no?'

24       THE COURT:  But he can ask him if he had any

25  communications with the city during that time.

1      MR. POWERS:  Well, they would know, they are the

2 city.

3      THE COURT:  Whether they know or not doesn't

4 preclude them from asking him.

5      MR. POWERS:  But, I mean, what relevance is that

6 to the underlying claim?

7      THE COURT:  Well, it seems to me, and I know

8 nothing about the claim other than what you filed here in

9 connection with these papers.

10      MR. POWERS:  Well, we never --

11      THE COURT:  But it sounds to me, from just looking

12 at the correspondence, that the issue is -- or among the

13 issues is, their contention will be to Attorney Sullivan

14 that, sort of, the deal was, if there were ongoing problems,

15 you'd let us know and we intended to deal with it and that

16 there was no ongoing problem.  Or he had no further

17 communications within those four years and that the

18 plaintiff now contends that it was an ongoing problem.   I

19 would guess.

20      Where that falls out legally, I have no idea.

21      MR. POWERS:  If -- let me suggest something.

22 Rather than if it's limited to that type of questioning, why

23 not submit something in writing to Attorney Sullivan.

24 Simple, if they believe -- because we've never alleged

25 there's some other conversation or communication between

1  Sullivan and the city, that the city wasn't provided in

2  writing, because letters are, I think, the only

3  communication -- but if they have a suspicion that there's

4  some other communication, one; they should try to find out

5  -- in some other way, -- i.e., from my client in her

6  deposition.  And two; if they have a suspicion that there is

7  this communication, they should articulate that suspicion,

8  the basis of that suspicion to the Court.  We've never

9  alleged it.  And then, maybe it can be limited to submit an

10 interrogatory, under the pains and penalties of perjury.

11 Did you communicate with the city and if so, when?  Other

12 than in writing that we have, these three letters.  Fine.

13         MR. BUCKING:  Your honor, the first issue in the

14 case is, does Mr. Sullivan have the right not to show up for

15 his deposition?

16         It is black letter law that he has no such right.

17 And we submitted those cases to you, it is crystal clear.  I

18 had a case, myself, before Magistrate Judge Collings, which

19 we cited in the papers, Barassi v. MaComm, where the

20 plaintiff subpoenaed -- or noticed a deposition of my

21 client's attorney.  And the issue is resolved in that case

22 consistent with all the other cases.  This also comes up in

23 the Winchester Management case where current counsel,

24 current outside counsel, Nutter, McClennen & Fish in that

25 case, was forced to appear for a deposition.

1    Now, in both of those cases, the posture of the

2  case to the Court was that the companies voluntarily

3  produced the lawyers, they submitted to depositions and the

4  fighting in court was about whether questions going to the

5  content of the communications between the lawyer and the

6  client were privileged -- or rather, whether the instruction

7  not to answer that was given in each of those cases was

8  proper.  And the Courts in both of those cases, ruled that

9  the substance of the communications, were not in fact

10  privileged, based upon the contents.

11    Now, what does that tell us about this case?  It

12  tells us, we shouldn't even be in this courtroom.  I noticed

13  a deposition for this morning of Mr. Sullivan.  He should

14  have been there, he should have answered our questions.  If

15  there's a claim of -- as you point out, there are a host of

16  questions that are clearly not privileged.  I mean, it's not

17  even questionable.  Mr. Powers can't stand up and tell you

18  that a number of questions that we would have asked, which

19  you went over with him, are privileged, because they're not.

20  I mean, it's not even arguable.

21    Then there are questions that may be close --

22  maybe the privilege applies, maybe it doesn't.

23    THE COURT:  But what he is saying though, is that

24  you have a higher burden if you're going to depose a lawyer

25  as opposed to simply saying that you want the deposition.

12

1   That you need to articulate wy his testimony would be

2   relevant.

3          MR. BUCKING:  That's an interesting theory, your

4   Honor.  There's no case that actually says that.  All the

5   cases say the opposite of that.

6          The Darius case, which Mr. Powers relies upon, is

7   a waiver case and we're not even talking about waiver here.

8   So there's no such presumption, there's no such higher

9   standard.  It simply doesn't exist and the cases make clear

10  that it does not exist.

11         But let me submit this to your Honor and I will

12  represent this to the Court and Mr. Powers knows it to be

13  true.  There is no more significant issue, substantively in

14  this case, than what happened between 2000 and 2004.  There

15  is not a single, more important issue in this case and he

16  knows it because we said it in a position letter to the MCAD

17  and we've said it to him numerous times and it's clear on

18  discovery, there is no more important issue in this case

19  than what happened between May of 2000 when Mr. Sullivan

20  sent the city a letter that said: Okay, we've resolved this

21  stuff but it better not happen again and I'm going to be

22  watching you and I'm going to ask my client and if she tells

23  me anything else has happened, I'm all over you.  And June

24  of 2004 when he writes another letter that says:  Remember

25  all that stuff that happened in the late 90's and remember I

1    told you in 2000 that I'm going to be all over you if it

2    happens again?  Well, recently -- recently, my client has

3    informed me that it has happened again.

4          Now, Ms. Padellaro files a complaint that says,

5    constantly, from May of 2000 through June of 2004,

6    constantly, Mr. McGravey continued to sexually harass her

7    throughout.  And it seems to me -- by the way, the thing

8    that happened in June of 2004, was that a co-worker of

9    Ms. Padellaro allegedly told her that Mr. McGravey had shown

10   him some pornographic information on the internet.  That's

11   what happened in 2004.

12         Now, if the stuff from 2000 and prior doesn't come

13   in and if nothing happened before that, that doesn't even

14   come close to making out a sexual harassment case.  The only

15   way he makes out a sexual harassment case is if you have all

16   the stuff from the 90's, all the stuff from 2000 and all the

17   stuff from 2000 and 2004.  Without it, there's a statute of

18   limitations issue and if there's a statute of limitations

19   issue, it doesn't come close to establishing a hostile work

20   environment.

21         So, the plaintiff full well knows, that that is

22   the most important issue in the case and we have got to --

23   it's our first deposition -- I have never before, in my

24   career, noticed a deposition of an attorney and I do these

25   cases all the time.  And the only litigation I've been

1    involved in when the plaintiff has deposed an attorney on

2    our side.

3           We're not doing this to harass him, he was two

4    lawyers ago. I mean, he didn't file the MCAD charge, he

5    didn't file the complaint, he's not the current lawyer, I

6    have no intentions to harass the guy. In fact, before we

7    sent the notice of deposition, we called him up to say:

8    Look, Mr. Sullivan, we're really sorry to bother you about

9    this and if we can make this any -- we'll make this as

10   convenient for you as possible but this is a critically

11   important deposition.

12          And there's absolutely no question about that to

13   anybody who is involved in this case. We want this

14   deposition, we want it first, we want to find out whether

15   Ms. Padellaro talked to Sullivan and if so, when during that

16   time period. We want to find out whether Sullivan had any

17   conversations with the city. The fact is, the people he

18   dealt with in 2000, are gone. They're no longer working

19   with the city. When Mr. Powers says the city knows, the

20   city doesn't know. The records are poor, the people are

21   gone and we need to know this information and we need to

22   know it from Mr. Sullivan, it's critically important to the

23   case, your Honor. And there's no case law that remotely

24   suggests that he can't come to the deposition.

25          And the only question should be, as you point out,

1   after he comes to the deposition and after he produces

2   documents, then we have two sets of questions.

3          One set of questions is; has he withheld any

4   documents on the grounds of privilege that he shouldn't have

5   withheld.  Now, in order to perfect that claim, what he

6   needs to do is say: Here is a description of the documents

7   that I am withholding.  Rule 45 says he has to tell us that

8   and then we can know whether we challenge it.  Maybe we

9   won't.  Maybe it will be clear that it's privileged.

10         THE COURT:  But I'm not going to make him do a

11  privilege log on letter by letter of a communication with a

12  client for a five year period.

13         MR. BUCKING:  Your Honor, I suspect that you will

14  find, and if Mr. Sullivan suggests otherwise, I think he can

15  take it up then.  I suspect that you will find that he has

16  virtually no papers on this case.  I would be shocked if he

17  has more than a hundred pieces of paper on this case in

18  total.  And I'd be further shocked if ten percent of those

19  were privileged --  even asserted to be privilege.  But if

20  so, if he has a claim that says: Look, I've got a really

21  thick file, I'm not going to go through line by line and

22  give a privilege log.  Why don't we address it then, your

23  honor.  It seems to me that if he comes forward and makes

24  that assertion, then we can respond to that.

25         I think you'll find that's not the case and I

1    think you'll find that if he does what Rule 45 requires him

2    to do, which is describe in enough detail so that we know

3    that we're facing, that he'll be able to do it easily and

4    allow him to come in and say: No, that's not the case.

5           And the second thing, your Honor, is; if he is

6    instructed at his deposition not to answer questions, the

7    parties then need to establish the parameters of the

8    circumstances leading to that instruction and then maybe or

9    maybe not, we'll be back in this Court to fight about it.

10   I'm just -- I'm not at all clear that we will.

11          First of all, I'm not sure that there were any

12   communications during that time period.  In fact, I suspect

13   there weren't.  So as far as I know, there's not even a

14   communication, written or oral, that we need to worry about,

15   but we won't know that.  And if we find out, and it's

16   established -- no, you know, Jennifer Padellaro called

17   Attorney Sullivan in 2003 because she had a question -- some

18   legal question -- is clearly established, I don't think

19   you're going to see us here again, your Honor.

20          But we're light years removed from that, we don't

21   know any of that.

22          MR. POWERS:  Can I just respond quickly?

23          THE COURT:  Let me just ask if any of the other

24   defendants -- do you want to be heard?

25          MR. BERNARDO:  No.


                           *APEX Reporting*
                           (617) 426-3077

1  THE COURT:  Okay.

2  MR. POWERS:  Just briefly, your Honor.

3  In listening to Attorney Bucking, it's clear what

4  they want to do is bring in Sullivan and ask him what he

5  talk to Padellaro about and whether Padellaro made any

6  representations to him about the conditions at work.  And

7  that's what they're trying to do and that's the very type of

8  communication that the <u>Darius</u> case held that they couldn't

9  inquire into.

10  Let me just read a portion of the <u>Darius</u> case.  It

11  says:  "The only reason we can see for the city attempting

12  to obtain that information from present counsel is to test

13  the credibility of the plaintiff.  In other words, to see

14  whether the plaintiff confided in her counsel anything that

15  contradicted their assertion, plaintiff's assertion, that

16  they did not know the casual connection before being

17  informed of it by counsel.  We shall not allow the city to

18  pit counsel against their client in this fashion.  To permit

19  that kind of inquiry would pry open the attorney/client

20  relationship and strike at the very core of the privilege.

21  In virtually every case in which the statute of limitations

22  or lack of timely presentation as here, causal connection or

23  privilege is asserted."

24  So, that's exactly what <u>Darius</u> was addressing and

25  they held you couldn't make those (u).

18

1      THE COURT:  Okay.  From where I'm sitting, it

2  sounds to me like while he may be dying to ask that

3  question, he's not going to ask it unless he can establish

4  that the answer is not privileged and I think he has the

5  opportunity to do that.

6      The motion to quash is denied.

7      The attorney does need to show up at the

8  deposition and does need to claim a privilege where he

9  thinks it's appropriate and he does need to follow the rules

10  for the production of documents and the claim of privilege

11  of the documents.

12      I assume that either you will be back here on a

13  motion to compel from one side or the other or -- well, I

14  guess, one side or a motion that they harassed us and made

15  us totally insane from the other.  But right now, I agree

16  with counsel that it's -- I'm not going to rule in a vacuum

17  as to the scope of the questions that can be asked.

18      MR. POWERS:  Could you give us some parameters

19  because --

20      THE COURT:  No.  The parameters are this

21  relationship.  I mean, this is a relationship having to do

22  with dealing with the city on this claim.  I don't have any

23  indication from counsel that he's going beyond that and you

24  certainly have the opportunity, or whoever is going to

25  represent Mr. Sullivan at the deposition and I assume you'll

1    be there, to state that the matters are irrelevant or for

2    purposes of harassment or whatever.

3         I have no indication that counsel intends to go

4    beyond what's related to this litigation.

5         MR. POWERS:  When I said parameters, I meant

6    within the context of the time period, whether Mr. Sullivan

7    will be required to answer questions about conversations he

8    had --

9         THE COURT:  You're not hearing me.  I'm not ruling

10   ahead of time on what he's entitled to -- he needs to know

11   what his claim of attorney/client privilege is.  He needs to

12   assert the privilege as he contends is appropriate -- or his

13   counsel needs to assert it on his behalf, I don't know how

14   you're going to work it.

15        MR. BUCKING:  I think we'll both --

16        THE COURT:  I mean, I don't know.  I don't know

17   what will be privileged or what will not be privileged.

18   Counsel sounds to me like he knows and it sounds to me like

19   you know since you wrote me a brief that explains the

20   parameters.

21        So, we'll have to see what kind of communications

22   there were and whether or not there's a justifiable grounds

23   for asserting it.  You build your record and if there's an

24   objection, you'll come in.  I don't know how to work it any

25   other way and I think it makes the most sense.

20

1          MR. BUCKING:  No, I was just trying to say,

2    because my fear is that we'll be back here.

3          THE COURT:  There are worse places to be.

4          (Laughter.)

5          MR. BUCKING:  That's true.

6          THE COURT:  But at least we'll be back here in an

7    orderly fashion.

8          MR. BUCKING:  Okay.

9          THE COURT:  Do you need a date or can you work

10   that out?

11         MR. POWERS:  No, your Honor.  I'd be surprised if

12   we can't work that out.

13         MR. BUCKING:  I'm sure we can work that out.

14         THE COURT:  Thank you, very much.

15         THE CLERK:  Court is in recess.

16         (Whereupon, the hearing was concluded at 3:38

17   p.m.)

<u>CERTIFICATE OF TRANSCRIBER</u>

This is to certify that the attached proceedings

before: <u>U.S. DISTRICT COURT, DISTRICT OF MASSACHUSETTS</u>

in the Matter of:

| | | |
|---|---|---|
| JENNIFER PADELLARO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| -V- | ) | CIVIL DOCKET NO. |
| | ) | 05-11788-MLW |
| JAMES MCGRAVEY and | ) | |
| CITY OF LAWRENCE | ) | |
| Defendant. | ) | |

Place: Boston, Massachusetts

Date:  September 28, 2006

Were held as herein appears, and that this is the true,

accurate and complete transcript prepared from the

recordings taken  of the above entitled proceeding.

J. Mocanu                          12/04/06
Transcriber                        Date

*APEX Reporting*
(617) 426-3077

Exhibit 12

# In The Matter Of:

*Jennifer Padellaro v.*
*James McGravey and City of Lawrence*

---

*Richard K. Sullivan*
*December 1, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: (617) 426-2432*

Original File sullivan.v1, Pages 1-66

**Word Index included with this Min-U-Script®**

Jennifer Padellaro v.
James McGravey and City of Lawrence

Richard K. Sullivan
December 1, 2006

Page 1

Volume I
Pages 1 to 66
Exhibits 1 - 9
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - -x
JENNIFER PADELLARO,
    Plaintiff,       :
                   :
  vs.            :  Civil Action
                   :  No. 05-11788-MLW
JAMES MCGRAVEY and CITY OF
LAWRENCE,          :
    Defendants.    :
- - - - - - - - - - - - - - - -x
     DEPOSITION OF RICHARD K. SULLIVAN, a
witness called on behalf of the Defendant City of
Lawrence, taken pursuant to the Federal Rules of
Civil Procedure, before Daniel P. Wolfe, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Foley Hoag LLP, 155 Seaport Boulevard, Boston,
Massachusetts, on Friday, December 1, 2006,
commencing at 9:45 a.m.
PRESENT:
    Rodgers, Powers & Schwartz LLP
      (by Kevin G. Powers, Esq.)
      18 Tremont Street, Boston, MA 02108,
      for the Plaintiff.
    Foley Hoag LLP
      (by James W. Bucking, Esq.)
      155 Seaport Boulevard, Boston, MA 02210,
      for the Defendant City of Lawrence.
    Conn Kavanaugh Rosenthal Peisch & Ford, LLP
      (by Michael R. Bernardo, Esq.)
      Ten Post Office Square, Boston, MA 02109,
      for the Defendant James McGravey.
Also present:  Richard J. D'Agostino, Assistant City
          Attorney, City of Lawrence.

Page 2

I N D E X
WITNESS    DIRECT  CROSS  REDIRECT  RECROSS
RICHARD K. SULLIVAN
BY MR. BUCKING    3
             * * * *
E X H I B I T S
NO.    DESCRIPTION            PAGE

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Subpoena | 5 |
| 2 | Letter from Richard Sullivan to Lawrence LeFebre dated 4/12/00 | 6 |
| 3 | Letter from Richard Sullivan to Lawrence LeFebre dated 5/15/00 | 6 |
| 4 | Letter from Richard Sullivan to Mayor Michael J. Sullivan dated 6/29/04 | 6 |
| 5 | Letter from Richard Sullivan to Mayor Michael J. Sullivan dated 7/9/04 | 6 |
| 6 | Letter from Lawrence LeFebre to Richard Sullivan dated 5/8/00 | 16 |
| 7 | Letter from Lawrence LeFebre to Jennifer Padellaro dated 5/8/00 | 18 |
| 8 | Letter from Lawrence LeFebre to Richard Sullivan dated 5/26/00 | 21 |
| 9 | Letter from James McGravey to Lawrence LeFebre dated 4/14/00 | 21 |

Page 3

[1]           P R O C E E D I N G S
[2]     **MR. BUCKING:**  The parties have agreed that
[3]  objections, except as to the form of the question,
[4]  will be reserved until the time of trial or other
[5]  evidentiary use.
[6]     **MR. POWERS:**  Motions to strike --
[7]     **MR. BUCKING:**  And motions to strike.
[8]     **MR. POWERS:**  -- reserved till the time of
[9]  trial.  How about the notary?
[10]     **MR. BUCKING:**  Right.  The witness will read
[11]  and sign the deposition within 30 days but doesn't
[12]  need to do so in the presence of a notary.
[13]          RICHARD K. SULLIVAN
[14]  a witness called for examination by counsel for the
[15]  Defendant City of Lawrence, having been
[16]  satisfactorily identified by the production of his
[17]  driver's license and being first duly sworn by the
[18]  Notary Public, was examined and testified as
[19]  follows:
[20]         DIRECT EXAMINATION
[21]   **BY MR. BUCKING:**
[22]   **Q.**  Sir, state your full name, please.
[23]   **A.**  Richard K. Sullivan.
[24]   **Q.**  What is your residential address?

Page 4

[1]   **A.**  107 Dalton Road, Holliston, Massachusetts.
[2]   **Q.**  Have you lived there for some time?
[3]   **A.**  I have.
[4]   **Q.**  What is your business address?
[5]   **A.**  300 East Main Street, Milford,
[6]  Massachusetts.
[7]   **Q.**  How long have you had that?
[8]   **A.**  Since 1998.
[9]   **Q.**  Are you a practicing lawyer?
[10]   **A.**  I am.
[11]   **Q.**  Are you a member of the bar in good
[12]  standing?
[13]   **A.**  I am.
[14]   **Q.**  How long have you been a practicing lawyer
[15]  in Massachusetts?
[16]   **A.**  33 years, eleven months and one week.
[17]   **Q.**  Do you currently represent Jennifer
[18]  Padellaro?
[19]   **A.**  I cannot answer that question on the
[20]  grounds of privilege.
[21]   **Q.**  You can't answer the question of whether
[22]  you represent her?
[23]   **A.**  No.
[24]   **Q.**  Why is that privileged?

Page 5

[1]    **A.** I am not going to get into a debate with
[2] you, but I cannot answer that question absent
[3] waiving the privilege or an order of the court.
[4]    **Q.** Did you receive a subpoena to be here
[5] today?
[6]    **A.** I did.
[7]    **MR. BUCKING:** Could we mark that, please.
[8]        (Document marked as Sullivan
[9]        Exhibit 1 for identification)
[10]    **Q.** Sir, I am showing you what's been marked as
[11] Exhibit 1. Is that a copy or does it appear to be a
[12] copy of the subpoena that you received in this case?
[13]    **A.** Yes.
[14]    **Q.** Can you take a look at the third page of
[15] that document, please.
[16]    **A.** (Reviewing document)
[17]    **Q.** Do you see that?
[18]    **A.** I do.
[19]    **Q.** When you received Exhibit 1, was Exhibit A
[20] as reflected in this document part of it?
[21]    **A.** Yes.
[22]    **Q.** Have you searched your records in order to
[23] comply with the subpoena?
[24]    **A.** Yes.

Page 7

[1] based on Massachusetts Rule of Professional Conduct
[2] 1.6.
[3]    **Q.** Could you explain to me what you mean by
[4] that answer?
[5]    **A.** Prior to this deposition I contacted
[6] Jennifer Padellaro through her counsel, Kevin
[7] Powers, and inquired as to whether there were any
[8] matters that she would waive attorney-client
[9] privilege with regard to her case. I was informed
[10] that she would not waive attorney-client privilege
[11] as to any documents and/or communications. I then
[12] contacted the Office of Bar Counsel and spoke with
[13] Assistant Bar Counsel Linda Bauer. I inquired of
[14] her, based upon the circumstances, what would be
[15] appropriate for me to respond to at a deposition.
[16] The comment to me was absent a waiver of
[17] attorney-client privilege or a court order, I should
[18] respond to nothing.
[19]        I don't mean to be uncooperative, but I am
[20] put in a position of, absent a court order or waiver
[21] of attorney-client privilege, I just can't answer
[22] these questions because they are protected,
[23] confidential information of my client, Jennifer
[24] Padellaro.

Page 6

[1]    **Q.** Now, just before the hearing started today,
[2] you handed me, by my count, four documents. Do I
[3] have that right?
[4]    **A.** Yes, you do.
[5]    **MR. BUCKING:** I would like to mark those as
[6] Exhibits 2 through 5, please.
[7]        (Documents marked as Sullivan
[8]        Exhibits 2 through 5 for
[9]        identification)
[10]    **Q.** Sir, are Exhibits 2 through 5 the documents
[11] that you produced this morning pursuant to the
[12] subpoena?
[13]    **A.** Yes.
[14]    **Q.** Are they all the documents you produced
[15] this morning pursuant to --
[16]    **A.** Yes, they are.
[17]    **Q.** Let me finish the question just so the
[18] record is clear. Are they all the documents you
[19] produced this morning pursuant to the subpoena?
[20]    **A.** Yes.
[21]    **Q.** Would you agree with me that you are in
[22] possession of additional documents that are
[23] responsive to the subpoena?
[24]    **A.** I don't believe I can answer that question

Page 8

[1]    **Q.** I just want to try to understand that
[2] answer. I don't want to get into a legal debate
[3] with you any more than you want to get into a legal
[4] debate with me, so let's try to figure out what you
[5] are saying. Based on the answer you just gave, it
[6] makes me question why you produced Exhibits 2
[7] through 5.
[8]    **A.** 2 through 5 were communicated to a third
[9] party, either Mr. LeFebre, who is the personnel
[10] director, or to Mayor Michael Sullivan. So there is
[11] no privilege as to communications to third parties.
[12] So those documents I was happy to provide to you.
[13] But any other documents or communications, absent a
[14] waiver or a court order, I feel, based upon the
[15] Massachusetts Rules of Professional Conduct, that I
[16] simply cannot do that absent one of those two.
[17]    **Q.** And you said that the advice that you got from
[18] this person you spoke to was that you shouldn't
[19] answer any questions?
[20]    **A.** Should not answer any substantive questions
[21] as to communications, et cetera. I could state
[22] essentially I represented Jennifer Padellaro and
[23] that certain documents were sent to the City of
[24] Lawrence at that time. Other than that, I am bound

**Page 9**

[1] by Rule 1.6 absent a waiver or a court order.

[2] **Q.** Are you giving us advance notice that you
[3] intend to comply with that advice and not to answer
[4] any questions that go beyond that?

[5] **A.** Yes.

[6] **Q.** Now, the question I believe I had asked you
[7] that started this was whether you possessed any
[8] other documents responsive to the subpoena that you
[9] were withholding, and that is the question that you
[10] are refusing to answer?

[11] **A.** Correct.

[12] **Q.** So the existence of documents you are
[13] claiming to be privileged?

[14] **A.** Yes.

[15] **Q.** Now, you are aware that you, along with Ms.
[16] Padellaro, filed a motion for protective order with
[17] the court in this case, correct?

[18] **A.** Attorney Powers filed it.

[19] **Q.** I believe you joined in that. But in any
[20] event, you are aware of the motion, correct?

[21] **A.** I am.

[22] **Q.** Whether you joined in that motion or not --
[23] I believe you did. But whether you did or not, is
[24] there some other motion that you have filed to

**Page 10**

[1] protect against the subpoena other than that motion?

[2] **A.** No.

[3] **Q.** Are you planning to file such a motion?

[4] **A.** Not at this time.

[5] **Q.** Are you aware of what the court ruled and
[6] what the court said in connection with the motion
[7] that was filed both in terms of the nature of the
[8] testimony you may give and the nature of the
[9] documents you may be expected to produce?

[10] **A.** I believe I am.

[11] **Q.** What is your understanding?

[12] **A.** I was not present, as you know. My
[13] understanding is that the magistrate said, rather
[14] than allow the motion at that time, I should attend
[15] the deposition and the questions should be asked and
[16] at that point I could invoke privilege and
[17] subsequent to that a decision would then be made by
[18] the court. That's my understanding.

[19] **Q.** Did you get that understanding from Mr.
[20] Powers?

[21] **A.** I did.

[22] **Q.** Do you have any other understanding of what
[23] the court said or did?

[24] **A.** No, I do not.

**Page 11**

[1] **Q.** Tell me what kind of lawyer you are.

[2] **A.** A good one. I don't know what you mean.

[3] In what areas do I practice? I don't know what you
[4] mean.

[5] **Q.** Sure.

[6] **A.** I have primarily public sector labor law.

[7] **Q.** Which side of the aisle are you on in
[8] public sector labor law?

[9] **A.** The side opposite you. The employees' side
[10] and unions' side.

[11] **Q.** And as between the employees and the
[12] unions, what is the approximate breakdown of your
[13] clients?

[14] **A.** I would say unions predominantly are the
[15] clients that I represent.

[16] **Q.** Which unions do you represent?

[17] **A.** I can't answer that question.

[18] **Q.** You can't answer the question of what
[19] unions you represent?

[20] **A.** No. I don't think that is a permissible
[21] question absent a waiver by my clients.

[22] **Q.** Have you ever entered an appearance in a
[23] public proceeding on behalf of a union client?

[24] **A.** Yes, I have.

**Page 12**

[1] **Q.** Are you currently counsel of record for any
[2] union client?

[3] **A.** Yes, I am.

[4] **Q.** Which clients?

[5] **A.** I believe that is privileged information.
[6] If it's a matter of public record, which I can't
[7] recall at the current time, then there would be a
[8] docket number and case number. But do I know every
[9] one of those? No, I don't.

[10] **Q.** I am asking you the ones you do know.

[11] **A.** Local 378, International Brotherhood of
[12] Police Officers, is the pending matter in Superior
[13] Court. There are a number of administrative
[14] agencies, appearances that involve Local 378,
[15] International Brotherhood of Police Officers; Local
[16] 382, International Brotherhood of Police Officers;
[17] Local 504, International Brotherhood of Police
[18] Officers; Local 426, International Brotherhood of
[19] Police Officers, as I recall currently.

[20] **Q.** Is there a geographic area that you tend to
[21] focus on?

[22] **A.** I would say Eastern Massachusetts from
[23] Worcester and Shrewsbury towards Boston.

[24] **Q.** Milford is in the Worcester area?

Richard K. Sullivan
December 1, 2006

Page 13

[1]    **A.** It is.

[2]    **Q.** Do you have union clients in Lawrence?

[3]    **A.** Yes, I do.

[4]    **Q.** Do you currently have any clients that have
[5] collective bargaining relationships with the City of
[6] Lawrence?

[7]    **A.** No, I do not.

[8]    **Q.** Was there a time that you did?

[9]    **A.** No.

[10]    **Q.** Do you know any relatives of Jennifer
[11] Padellaro other than to the extent you may have met
[12] them through representing Jennifer Padellaro?

[13]    **A.** No.

[14]    **Q.** Do you know that her husband was a police
[15] officer for the City of Lawrence?

[16]    **A.** Yes.

[17]    **Q.** Did you know him before you knew her?

[18]    **A.** No.

[19]    **Q.** Were you aware that her brothers-in-law,
[20] two brothers-in-law, either are or were police
[21] officers for the City of Lawrence?

[22]    **A.** No.

[23]    **Q.** When did you begin representing Jennifer
[24] Padellaro?

Page 14

[1]    **A.** I believe I can't answer that question
[2] under Rule 1.6.

[3]    **Q.** I don't want to have an extensive
[4] back-and-forth all day about this. Can I assume
[5] that if I asked you a question and you say you can't
[6] answer it, that you are not answering on the grounds
[7] of privilege and in fact you are refusing to answer?
[8] In other words, I don't want to have to follow up
[9] every time you don't answer a question.

[10]        So could you please tell me, if there's
[11] some reason for not answering a question and you
[12] give an answer like the one you just gave, that
[13] unless you tell me otherwise, the basis for that is
[14] your understanding of the attorney-client privilege
[15] and that you are refusing to answer the question?

[16]    **A.** Yes.

[17]    **Q.** Okay. Fair enough. Will you tell me
[18] anything about the formation of your attorney-client
[19] privileged relationship with Jennifer Padellaro?

[20]    **A.** No.

[21]    **Q.** Did you know Jennifer Padellaro before you
[22] met her for the purpose of representing her?

[23]    **A.** No.

[24]    **Q.** Have you ever sent an invoice or a bill to

Page 15

[1] Jennifer Padellaro?

[2]    **A.** That's privileged.

[3]    **Q.** Did you have an economic arrangement,
[4] whether it's contingent fee, hourly, cash-based or
[5] otherwise, with Jennifer Padellaro?

[6]    **A.** That's privileged.

[7]    **Q.** Prior to meeting Ms. Padellaro for the
[8] purpose of representing her, did you know anything
[9] about the situation that, once you began
[10] representing her, you learned existed or she alleged
[11] existed at the City of Lawrence?

[12]    **A.** No.

[13]    **Q.** Did you know James McGravey at all --

[14]    **A.** No.

[15]    **Q.** -- other than -- let me just finish the
[16] question -- other than from what you learned after
[17] you began representing Jennifer?

[18]    **A.** No.

[19]    **Q.** Earlier you testified that you produced
[20] Exhibits 2 through 5 but no other documents because
[21] you believe that 2 through 5 are not privileged and
[22] the other ones are and in fact the existence of the
[23] other ones you believe is privileged. Is that fair
[24] to say?

Page 16

[1]    **A.** Yes.

[2]    **Q.** Can I draw from that the conclusion that
[3] you do not possess any other letters to or from
[4] third parties?

[5]    **A.** I don't know what conclusions you can draw.

[6]    **Q.** Do you possess letters to or from third
[7] parties other than Exhibits 2 through 5?

[8]    **A.** No.

[9]        (Document marked as Sullivan
[10]        Exhibit 6 for identification)

[11]    **Q.** Sir, take a look at Exhibit 6, please. Do
[12] you recognize Exhibit 6?

[13]    **A.** I do.

[14]    **Q.** You see that it is addressed to you, right?

[15]    **A.** Yes.

[16]    **Q.** In fact the top of the document seems to
[17] reflect that you faxed it to somebody else on May
[18] 10, 2000. Do you see that?

[19]    **A.** Yes.

[20]    **Q.** Do you have a recollection of receiving
[21] this letter?

[22]    **A.** In my opinion, that's privileged.

[23]    **Q.** Whether you received a letter from Larry
[24] LeFebre at the City of Lawrence is privileged?

Jennifer Padellaro v.
James McGravey and City of Lawrence

Richard K. Sullivan
December 1, 2006

---

Page 17

[1] **A.** Yes.

[2] **Q.** Will you tell me whether or not you

[3] currently have a copy of Exhibit 6 in your files?

[4] **A.** No. In my opinion, that's privileged.

[5] **Q.** I show you Exhibit 3 and in particular the

[6] first page, third paragraph that begins with, "On

[7] May 8, 2000." Do you see that?

[8] **A.** I do.

[9] **Q.** And it says that -- this is a letter you

[10] wrote, right?

[11] **A.** It is.

[12] **Q.** And it says that on May 8, 2000, you

[13] received a faxed letter from Larry LeFebre dated May

[14] 8, 2000, correct?

[15] **A.** Yes.

[16] **Q.** Now, can you tell me whether or not the

[17] letter which you tell Larry LeFebre there that you

[18] received is or is not Exhibit 6?

[19] **A.** I think that's privileged.

[20] **Q.** So you sent Larry LeFebre a letter that

[21] says you got a letter from him dated May 8, 2000,

[22] and you are telling me it's privileged whether or

[23] not the letter you told him you received is or is

[24] not Exhibit 6?

---

Page 18

[1] **MR. POWERS:** Objection to the form. It's

[2] argumentative.

[3] **Q.** You can answer.

[4] **A.** Yes, I think it's privileged.

[5] **Q.** The same sentence we were just looking at

[6] in Exhibit 3 goes on to say that you also received

[7] from Larry LeFebre a copy of a letter from him to

[8] Jennifer Padellaro dated May 8, 2000. Do you see

[9] that?

[10] **A.** You are referring to the first sentence?

[11] **Q.** The same sentence we were reading. The

[12] first sentence of the third paragraph in Exhibit 3.

[13] **A.** I see the sentence, yes.

[14] **Q.** My question to you now is not whether you

[15] see the sentence but whether you see the reference

[16] to also receiving from Larry LeFebre a copy of a

[17] letter from him to Jennifer Padellaro dated May 8,

[18] 2000.

[19] **A.** I see the reference, yes.

[20] **MR. BUCKING:** Mark that, please.

[21] (Document marked as Sullivan

[22] Exhibit 7 for identification)

[23] **Q.** Sir, can you look at Exhibit 7.

[24] **A.** (Reviewing document)

---

Page 19

[1] **Q.** You have looked at it?

[2] **A.** Yes, I have.

[3] **Q.** You see that it purports to be a letter

[4] from Larry LeFebre to Jennifer Padellaro?

[5] **A.** Yes.

[6] **Q.** And it is dated May 8 of 2000, correct?

[7] **A.** Yes, sir.

[8] **Q.** At the very top of the document it appears

[9] that you faxed it to somebody on May 10, 2000.

[10] **A.** It appears so.

[11] **Q.** Do you recognize Exhibit 7?

[12] **A.** I think that's privileged.

[13] **Q.** Is Exhibit 7 the document referenced at the

[14] end of that sentence we were looking at in Exhibit

[15] 3, the first sentence of Paragraph 3?

[16] **A.** In my opinion, that's privileged.

[17] **Q.** Sir, in terms of your assertion of

[18] privilege, are you being represented by Mr. Powers?

[19] **A.** No, I am not.

[20] **MR. BUCKING:** And, Mr. Powers, you are

[21] confirming that you do not represent this witness,

[22] correct?

[23] **MR. POWERS:** No, I don't.

[24] **Q.** And just to be clear, you are asserting the

---

Page 20

[1] privilege based upon your understanding of the

[2] privilege, in a sense representing yourself in this

[3] proceeding, not taking advice from Mr. Powers,

[4] correct?

[5] **A.** That is correct.

[6] **Q.** Would it be fair to say that you believe

[7] that when you send a letter to a third party, it's

[8] not privileged, but when a third party sends a

[9] letter to you, it is privileged?

[10] **A.** Yes.

[11] **MR. POWERS:** You meant to say whether the

[12] receipt of the letter is privileged?

[13] **MR. BUCKING:** Well, from what I understand,

[14] both.

[15] **MR. POWERS:** The witness doesn't know

[16] whether it was sent. All he can possibly testify to

[17] is whether he received it or not.

[18] **MR. BUCKING:** That may be a distinction

[19] that matters. In this case, as I understand, he is

[20] not even willing to disclose whether he received it.

[21] So it seems to me anything surrounding the letter he

[22] believes is privileged.

[23] **MR. POWERS:** No. I am making the

[24] distinction that he can't testify whether or not any

---

Page 21

[1] letter was sent to him. All he can testify possibly
[2] to is whether he received it and that that, he seems
[3] to be saying, he can't say.
[4]     MR. BUCKING: Okay.
[5]     MR. POWERS: I am just clarifying the
[6] record. I am not stating my opinion here.
[7]     MR. BUCKING: Mark that, please.
[8]         (Document marked as Sullivan
[9]         Exhibit 8 for identification)
[10]    Q. Sir, take a look at Exhibit 8, please.
[11]    A. (Reviewing document) Yes.
[12]    Q. Did you receive this letter from Lawrence
[13] LeFebre in or about May of 2000?
[14]    A. In my opinion, that's privileged.
[15]    MR. BUCKING: Mark that, please.
[16]        (Document marked as Sullivan
[17]        Exhibit 9 for identification)
[18]    MR. POWERS: Can I go off the record a
[19] second?
[20]    MR. BUCKING: Sure.
[21]    (Discussion off the record)
[22]    Q. Sir, take a look at Exhibit 9, please.
[23] Tell me when you have looked at it.
[24]    A. (Reviewing document) I have looked at it.

Page 22

[1]    Q. Do you recognize it?
[2]    A. In my opinion, that's privileged.
[3]    Q. Is Exhibit 9 the letter of apology
[4] referenced in Exhibit 8?
[5]    A. I don't know.
[6]    Q. If you knew, would you tell me or would you
[7] think it was privileged?
[8]    A. I would think it was privileged.
[9]    Q. Do you see the received stamp on Exhibit 8
[10] and Exhibit 9?
[11]    A. I do.
[12]    Q. Is it yours?
[13]    A. I'm not sure.
[14]    Q. In May of 2000 did you have a stamp that
[15] looked like that?
[16]    A. I don't recall.
[17]    Q. In May of 2000 did you have a received
[18] stamp?
[19]    A. I would think I did, yes.
[20]    Q. Do you have one now?
[21]    A. Yes.
[22]    Q. Do you regularly use it?
[23]    A. Yes.
[24]    Q. Did you regularly use one in May of 2000?

Page 23

[1]    A. Yes.
[2]    Q. If you recognized the received stamp, would
[3] you believe answering the question about whether it
[4] was yours is privileged; that is, as it appears on
[5] these two documents?
[6]    A. Would you rephrase the question. I'm not
[7] sure I understand what you are saying.
[8]    Q. My question is -- well, just as a
[9] background, you testified that you don't recognize
[10] the stamp on Exhibit 8 as being one you used in May
[11] of 2000. And what I want to know is if you did
[12] recognize it, would you assert that it was
[13] privileged whether that was your stamp?
[14]    A. Yes.
[15]    MR. POWERS: Objection.
[16]    Q. Does that look like the received stamp you
[17] use now?
[18]    A. Yes.
[19]        (Mr. D'Agostino entered)
[20]    MR. POWERS: We can pause for a second.
[21]    (Discussion off the record)
[22] BY MR. BUCKING:
[23]    Q. Do you have a recollection of replacing
[24] your received stamp in the last six years?

Page 24

[1]    A. Yes.
[2]    Q. Do you have a recollection of replacing it
[3] with something materially different than you used
[4] previously?
[5]    A. I don't know.
[6]    Q. I want to ask you a couple of questions
[7] about your practice as an attorney. Do you have a
[8] policy or practice as to how long you maintain
[9] client files?
[10]    A. Yes.
[11]    Q. What is that practice or policy?
[12]    A. Generally ten years unless the documents
[13] are irreplaceable, in which case I retain them
[14] longer than ten years. Basically the ABA
[15] guidelines.
[16]    Q. Now, can you tell me whether you
[17] represented Jennifer Padellaro as to a single matter
[18] or multiple matters?
[19]    A. No.
[20]    Q. Because it is privileged?
[21]    A. Yes.
[22]    Q. Let's say you represented a client, a
[23] hypothetical client, in three different matters,
[24] let's say an employment matter, maybe some personal

Jennifer Padellaro v.
James McGravey and City of Lawrence

---

Page 25

[1] matter that you decided to handle, a trust or an
[2] estate or some other such thing, and some third
[3] matter, a traffic ticket, let's say.  Do you have a
[4] policy or practice as to how you would maintain
[5] files in such a case?  That is, would you have a
[6] file called, let's say, "Jennifer Padellaro" in
[7] which you kept all documents relating to all matters
[8] or would you have separate files that you maintained
[9] for each matter?

[10]    A.  Since this is hypothetical, let's assume we
[11] are not going to say Jennifer Padellaro.  If it were
[12] the Smith case and I had three matters, I would
[13] maintain three separate files for Smith, the trust
[14] file, the employment file, the traffic ticket file.

[15]    Q.  Could you tell me as a general policy or
[16] practice what you would keep in such files?
[17] Specifically, if you were to send an engagement
[18] letter or billing policy letter or some other such
[19] matter at the outset of a representation, would that
[20] be maintained in one or more of the client files you
[21] just alluded to?

[22]    A.  In the Smith files, yes, it would be.
[23]    Q.  Would it also be maintained somewhere else?
[24]    A.  No.

---

Page 26

[1]    Q.  Let me just ask the general question, then.
[2] With respect to this hypothetical Smith client, one
[3] or three matters, either one or three files, would
[4] there be any document relating to that
[5] representation that would be maintained outside of
[6] the one or three files depending on how many matters
[7] you had?

[8]    A.  Physically outside the confines of a file
[9] folder?  Is that what you are asking?

[10]    Q.  Yes.
[11]    A.  Yes.
[12]    Q.  Tell me what documents would be maintained
[13] physically outside of the client folder.
[14]    A.  Certain billing documents.  The client
[15] ledger statement.
[16]    Q.  Anything else?
[17]    A.  Contact information.
[18]    Q.  Anything else?
[19]    A.  I don't think so.
[20]    Q.  Taking those backward, do you mean by
[21] "contact information" a Rolodex?
[22]    A.  The electronic equivalent, yes.
[23]    Q.  Would you also keep such information in the
[24] client file?

---

Page 27

[1]    A.  Yes.
[2]    Q.  And so in the case of contact information,
[3] there would be material outside of the file but it
[4] would be duplicative of the information inside the
[5] file?
[6]    A.  Yes.
[7]    Q.  What is a client ledger statement?
[8]    A.  It would reflect payments and charges to a
[9] client in a particular matter.
[10]    Q.  Explain to me how you maintain such
[11] records.  Do you do it client by client?  Is it one
[12] ledger for all clients?  How does that work?
[13]    A.  Client by client per matter, in our
[14] hypothetical example of three matters involving the
[15] Smith case, there would be three different ledger
[16] entries for each matter.  There would be three
[17] separate contact informations for that matter since
[18] the opposing party or counsel would differ.
[19]    Q.  Is that maintained electronically, in hard
[20] copy, or both?
[21]    A.  Both.
[22]    Q.  Would copies of the client ledger
[23] statements for this hypothetical Smith client also
[24] be maintained in the client files in addition to

---

Page 28

[1] being maintained outside of the client files?
[2]    A.  No.
[3]    Q.  Now, if a client were to pay a bill, that,
[4] I assume, would be reflected on the statement?
[5]    A.  Yes, it would.
[6]    Q.  Likewise for a disbursement?
[7]    A.  Yes, it would.
[8]    Q.  You mentioned payments you made to the
[9] client.  What would be an example of that?
[10]    A.  I don't think I said that.
[11]    Q.  Okay.  So would it be fair to say that it
[12] would only reflect payments the client made to you?
[13]    A.  No.
[14]    Q.  What else would be in there?
[15]    A.  Disbursements, charges, filing fees, for
[16] instance, in court.  Something along those lines.
[17]    Q.  I see.  This is a form whereby you keep
[18] track of things that you are paying on behalf of a
[19] client as well as payments the client makes
[20] chargeable to those things?
[21]    A.  Yes.
[22]    Q.  Would it also reflect your fees?
[23]    A.  Yes.
[24]    Q.  Now, you also said you maintain billing

---

---

Page 29

[1] records outside of the client files, right?
[2]   **A.** Yes.
[3]   **Q.** What do you mean by "billing records"?
[4]   **A.** Billing records are the ledger forms that
[5] reflect the charges, the receipts, disbursements, et
[6] cetera. I refer to that as client ledger outside
[7] the file.
[8]   **Q.** Are you telling me that billing documents
[9] are the same as the client ledger statement or
[10] different?
[11]   **A.** The client ledger statement reflects
[12] charges, billings and receipts. That's different
[13] from a contact type of file which lists individuals,
[14] actions, et cetera, conflict checks, those kinds of
[15] things.
[16]   **Q.** I was asking about billing, which I thought
[17] you had listed separately from the client ledger
[18] statement.
[19]   **A.** That is the client ledger statement. The
[20] billing is a client ledger statement --
[21]   **Q.** I see.
[22]   **A.** -- in my practice.
[23]   **Q.** Would there be two separate parts of it?
[24] In other words, one part might be hypothetically an

Page 30

[1] invoice you sent to a client, a copy of a check you
[2] wrote to the court for a filing fee and so on as
[3] sort of underlying documents and then a separate
[4] part which is sort of more of an accounting form
[5] where you are keeping track of the balance and how
[6] much the client owes you?
[7]   **A.** The ledger is more of the accounting form.
[8] There aren't physical documents attached to it.
[9] There are entries. But, for example, I wouldn't
[10] have a photocopy of a filing fee that I paid to the
[11] Superior Court. There would be an entry that
[12] reflects that, but there wouldn't be a check that
[13] was clipped to that. A copy of that would be in the
[14] file.
[15]   **Q.** Okay. I just want to be clear. So, then,
[16] the underlying documents for the client ledger
[17] statement, whether it was an invoice for fees, an
[18] invoice for disbursements, filing fee documentation,
[19] and so on, would all of that be in the client file?
[20]   **A.** Yes.
[21]   **Q.** I want to ask you about the subpoena in
[22] this case again.
[23]   **A.** Yes.
[24]   **Q.** Exhibit A.

Page 31

[1]   **A.** Yes.
[2]   **Q.** Again, I want to make it hypothetical
[3] because I don't want you to -- I don't want to
[4] address now your claim of privilege. But I would
[5] like you to look again at Exhibit A and assume
[6] hypothetically that the privilege didn't exist, Ms.
[7] Padellaro waived the privilege, anything you want to
[8] assume to allow you to answer the question since
[9] it's only hypothetical and therefore the privilege
[10] doesn't apply.
[11]     A subpoena like that subpoena calling for
[12] those documents for a client of yours in this
[13] timeframe, that is, somewhere from the mid-'90s
[14] until today, if we were to look for where in your
[15] office or somewhere else where you might keep these
[16] files, would it be fair to say that we would expect
[17] to see 99 percent of the subpoena documents in one
[18] or more client files with Jennifer Padellaro's name
[19] on it?
[20]   **MR. POWERS:** Objection to form. Go ahead.
[21]   **A.** Yes.
[22]   **Q.** And the only things we wouldn't find in
[23] those one or more client files would be -- strike
[24] that. In addition to those client files, there

Page 32

[1] might be maintained electronically some contact
[2] information, correct?
[3]   **MR. POWERS:** Objection to the form.
[4]   **A.** Yes.
[5]   **Q.** But that would also be in the client file?
[6]   **A.** Yes.
[7]   **Q.** And we would have a client ledger statement
[8] for that client, the underlying documentation of
[9] which would be in the client file but the ledger
[10] entries themselves would not be?
[11]   **A.** Yes.
[12]   **Q.** Did I leave anything out in sort of trying
[13] to figure out where these files on this client where
[14] no privilege exists would be?
[15]   **MR. POWERS:** Objection.
[16]   **A.** I don't know.
[17]   **Q.** I want you to tell me, because I want to
[18] know whether or not there's something we left out.
[19] So this client with these hypothetical Exhibit A
[20] records, 99 percent of the papers are in the client
[21] file or files. There would, in addition to that, be
[22] contact information electronically stored. There
[23] would be the ledger entries. Anything else where
[24] you would maintain records that would be responsive

Jennifer Padellaro v.
James McGravey and City of Lawrence

Richard K. Sullivan
December 1, 2006

---

**Page 33**

[1] to Exhibit A?

[2] **A.** I don't think so, no.

[3] **Q.** The files, are they physically maintained

[4] in your office in Milford?

[5] **A.** Yes.

[6] **Q.** And again, hypothetical client that let's

[7] say came to you sometime in the late '90s, early

[8] 2000s. Would it be fair to say that if you opened

[9] the file at that time, the file was continuously

[10] maintained at your office in Milford?

[11] **A.** No.

[12] **Q.** What happened in between that might have

[13] affected that?

[14] **A.** If a case was closed and I saw no further

[15] activity to be done on any particular matter, if it

[16] was something simple, it would be back to your Smith

[17] trust case. If the trust were drafted, executed,

[18] and the file were completed, at some point it would

[19] be shipped off to storage.

[20] **Q.** Where is the storage?

[21] **A.** Some storage is in my house. Other storage

[22] is off-site.

[23] **Q.** When you retrieved the documents you have

[24] produced this morning, Exhibits 2 through 5, where

---

**Page 34**

[1] did they come from?

[2] **A.** My office.

[3] **Q.** Did they come from a file or files with

[4] Jennifer Padellaro's name on it?

[5] **A.** I think that's privileged.

[6] **Q.** Did you have to retrieve them from storage?

[7] **A.** No.

[8] **Q.** At any point in time since you began

[9] representing Jennifer Padellaro, did her file or

[10] files go to storage?

[11] **A.** No.

[12] **Q.** Can you tell me in or about 2000 how you

[13] kept track of your calendar and schedule? So in

[14] other words, if you had to be at an LRC hearing on

[15] May 30, 2000, how would you have remembered that

[16] three weeks earlier? How would you have known?

[17] **A.** It would be entered usually in a computer

[18] program, docketing program, both on my computer and

[19] my secretary's computer, et cetera.

[20] **Q.** And you had that six years ago?

[21] **A.** Yes.

[22] **Q.** Did you maintain any paper calendar six

[23] years ago?

[24] **A.** No.

---

**Page 35**

[1] **Q.** Was it a Palm system?

[2] **A.** No.

[3] **Q.** Do you know what kind of a system?

[4] **A.** Lotus Organizer.

[5] **Q.** Do you use the same system today?

[6] **A.** Yes.

[7] **Q.** Do you know where your records of your

[8] whereabouts in 2000 are now?

[9] **A.** Relating to business work?

[10]      **MR. POWERS:** That's a good question.

[11] **A.** Could you narrow the scope of the question,

[12] I guess? My records relating to work?

[13] **Q.** You were just describing to me that you

[14] maintained your calendar on a computer Lotus system

[15] that both you and your secretary had access to and

[16] that you had that back in 2000. What I want to know

[17] as we sit here today, how would we go back and find,

[18] if we could, those entries for 2000?

[19] **A.** They may still exist. I'm not sure. Throw

[20] in a computer crash or two on the hard drive and I'm

[21] not sure that 2000 is still there.

[22] **Q.** Have you changed your computer system since

[23] then?

[24] **A.** Yes. I haven't changed the program.

---

**Page 36**

[1] **Q.** Do you have a policy or practice for --

[2] more to the point, did you in the 2000 timeframe

[3] have a policy or practice of maintaining in some

[4] hard copy file your calendar entries for a

[5] particular year?

[6] **A.** No, I didn't. You can print off -- if you

[7] are going to court on a motion and you want to know

[8] your schedule for the next two months, you can just

[9] print off the calendar for the next two months off

[10] of that. You mean did I carry a diary? No. I

[11] don't carry those things.

[12] **Q.** Do you see the thing on the corner in the

[13] table? Do you recognize that?

[14] **A.** I do.

[15] **Q.** Lots of people have that.

[16] **A.** Sure.

[17] **Q.** It's just a bound calendar, hard copy,

[18] old-fashioned calendar, right?

[19] **A.** Yes.

[20] **Q.** You might imagine that if you used such a

[21] thing, at the end of the year you would have a file

[22] for all your calendars and if we went back through

[23] your 30 years of practice we could find out what you

[24] did back in 1977. Hypothetical. Right?

---

Page 37

[1]    A. I don't think you could now, but I
[2] understand the concept.
[3]    Q. So at some point I assume you did have a
[4] calendar like that?
[5]    A. Years ago, yes.
[6]    Q. Did you have a practice as to what would
[7] happen to the calendars at the end of the year?
[8]    A. After a period of time, I'm sure they were
[9] destroyed.
[10]    Q. In any event, at some point you switched to
[11] a Lotus online computer-based system, right?
[12]    A. Yes.
[13]    Q. At the time you did that, did you give any
[14] thought to what you would do with the calendars when
[15] the year was over?
[16]    MR. POWERS: Which calendars?
[17]    A. Actually, strike that. Are these calendars
[18] maintained on a rolling basis such that they just
[19] exist and you don't think of them in terms of years;
[20] they are just month by month or week by week or day
[21] by day?
[22]    A. They are unlimited in terms of time. So
[23] they are just on there. They could be on there from
[24] 2000. It would be pre-docketed ahead for 2009.

Page 39

[1] generally a bill based upon those time entries and
[2] other factors that ought to be considered other than
[3] time.
[4]    Q. As you go through a particular day, do you
[5] keep notes about what time you are spending on
[6] particular cases?
[7]    A. Yes. Not all cases but most cases.
[8]    Q. How do you keep those notes? Do you do it
[9] on just a lined --
[10]    A. Initially, starting off on a little thing
[11] with peel-off strips for time entries.
[12]    Q. So it is sort of a preprinted form that is
[13] for this purpose?
[14]    A. Yes.
[15]    Q. Does your secretary then enter those into a
[16] computer?
[17]    A. Yes.
[18]    Q. Is that the same system you used back in
[19] 2000?
[20]    A. I believe so.
[21]    Q. Do you keep track of the time you spend on
[22] a matter regardless of the nature of your billing
[23] relationship with the client?
[24]    A. No.

Page 38

[1]    Q. Just hypothetically, if you had a meeting
[2] with Jennifer Padellaro on May 15 of 2000 and if
[3] such a meeting were on this Lotus calendar that you
[4] kept at the time, you can't tell us one way or
[5] another whether there is still a record in existence
[6] of that meeting?
[7]    A. On the Smith case, if we were talking about
[8] that, I cannot tell you currently whether there is a
[9] record of that meeting, that's correct.
[10]    Q. I want to ask you now about your practice
[11] or policy with respect to keeping track of time.
[12] Okay?
[13]    A. Mm-hmm.
[14]    Q. How, if at all, do you keep track of the
[15] time that you spend on different matters?
[16]    A. Generally, through time sheets.
[17]    Q. Now, do you do that currently through a
[18] paper diary or time sheet format or in an electronic
[19] format or otherwise?
[20]    A. Paper as well as dictation, I would say,
[21] electronically.
[22]    Q. Tell me how you do it.
[23]    A. Physically you make time entries. Once you
[24] have a number of time entries, those generate

Page 40

[1]    Q. Tell me which matters you would keep track
[2] of your time on.
[3]    A. I would keep track of time on individual
[4] cases for which I were billing that particular
[5] client always.
[6]    Q. I don't know what the "always" modified.
[7] Let me ask a specific question. Do you have clients
[8] that you send bills to where you incur hourly time
[9] charges and you pass those time charges on to the
[10] client?
[11]    A. Yes.
[12]    Q. So if you charge $150 an hour for every
[13] hour of time you spend, subject to writeoffs or
[14] other discounts you may choose to give, if you spend
[15] ten hours, you send a bill for $1,500 to the client?
[16] Typical hourly billing system?
[17]    A. Yes.
[18]    Q. So you have clients like that?
[19]    A. Yes.
[20]    Q. I take it for those you keep track of your
[21] time scrupulously?
[22]    A. Yes.
[23]    Q. Do you also do contingent work?
[24]    A. Very rarely.

---

Page 41

[1]  **Q.** If you have a contingent case, do you keep
[2]  track of your time entries?
[3]  **A.** Generally.
[4]  **Q.** Less scrupulously?
[5]  **A.** Yes.
[6]  **Q.** Do you do pro bono work?
[7]  **A.** Occasionally.
[8]  **Q.** Do you keep track of time entries for that?
[9]  **A.** Not necessarily.
[10]  **Q.** Do you occasionally do work as a favor for
[11]  somebody you know?
[12]  **A.** Yes.
[13]  **Q.** More than you want?
[14]  **A.** Could be.
[15]  **Q.** When you do that, do you keep track of your
[16]  time?
[17]  **A.** Not usually.
[18]  **Q.** I take it that Jennifer Padellaro was not a
[19]  pro bono client, was she?
[20]  **A.** That's privileged.
[21]  **Q.** Is the work that you did for her a favor?
[22]  **A.** That's privileged too.
[23]  **Q.** If you had a contingency case other than --
[24]  strike that. Other than cases where you are billing

---

Page 42

[1]  hourly, do you ever send out an invoice or any other
[2]  kind of billing paperwork to a client?
[3]  **A.** Yes.
[4]  **Q.** Tell me why and under what circumstances.
[5]  **A.** Certain clients for whom I am retained, I
[6]  would send a periodic bill based on a retainer.
[7]  **Q.** Any other example?
[8]  **A.** No. That's primarily it.
[9]  **Q.** Is a retainer a flat billing arrangement
[10]  the way you do it? In other words, you say it is
[11]  going to be $1,000 a month, $10,000 a month,
[12]  whatever it is. And whether you spend no time at
[13]  all or way more than that would be at your hourly
[14]  rate; you'd send a bill for that amount?
[15]  **A.** Yes.
[16]  **Q.** And so what you are describing in terms of
[17]  sending out paperwork or an invoice in that kind of
[18]  situation is one where you are keeping track of and
[19]  allowing the client to keep track of, by your
[20]  communication, the amount of time that you spent on
[21]  the matter even though they are not paying any more
[22]  or less than the retained amount? That was a long
[23]  question.
[24]  **A.** Yes, it was.

---

Page 43

[1]  **Q.** In other words, if someone is paying $1,000
[2]  a month as a retainer, they are paying $1,000 a
[3]  month whether you spend zero hours or a million
[4]  hours, right?
[5]  **A.** Yes.
[6]  **Q.** But you want to know in that case, because
[7]  it is good economics, I take it, whether you are
[8]  spending one hour or 20 hours or 100 hours, right?
[9]  **A.** Yes.
[10]  **Q.** So you keep track of it?
[11]  **A.** I do.
[12]  **Q.** And as a courtesy to your client or as good
[13]  client relations, you send them that information so
[14]  they can keep track of it as well, right?
[15]  **A.** No, I don't.
[16]  **Q.** Tell me what billing paperwork you send out
[17]  in connection with the sending of a retainer.
[18]  **A.** Flat fee retainers that I have for certain
[19]  clients.
[20]  **Q.** I see. So if it's $1,000 a month, you send
[21]  out a bill that says, "You owe me $1,000 this
[22]  month"?
[23]  **A.** "May 2006, $1,000."
[24]  **Q.** Do you ever do task-based billing?

---

Page 44

[1]  **A.** Not usually, no.
[2]  **Q.** But if you were going to write a will for
[3]  somebody, you might say, "I will write the bill for
[4]  1,500 bucks," that type of thing?
[5]  **A.** It's possible, yes.
[6]  **Q.** But the nature of your work doesn't call
[7]  for task-based billing; is that fair to say?
[8]  **A.** Except as it relates to specific cases, but
[9]  not generally task-based billing. I don't say, "If
[10]  I file a complaint, it's X, and if something else,
[11]  it's Y." Generally, no.
[12]  **Q.** Sir, where did you go to law school?
[13]  **A.** Boston College Law School.
[14]  **Q.** When did you graduate?
[15]  **A.** 1972. And Boston University School of Law
[16]  for a master's in taxation, 1976.
[17]  **Q.** What did you do out of law school?
[18]  **A.** What did I do?
[19]  **Q.** Right.
[20]  **A.** I went to work for a sole practitioner
[21]  initially for two years, went to work for a union
[22]  for three years, and have maintained private
[23]  practice since 1977.
[24]  **Q.** What was the union?

---

Page 45

[1]    A.  The National Association of Government
[2] Employees and its subdivisions.
[3]    Q.  Who was the practitioner you worked with
[4] initially?
[5]    A.  John Sullivan, no relation, in Braintree.
[6]    Q.  Where was the union based?
[7]    A.  It was based initially in South Boston and
[8] is now based in Quincy, Burgin Parkway.
[9]    Q.  When you began your practice, was it in
[10] Milford?
[11]    A.  No.  It was in Wellesley.  I was there from
[12] 1977 through 1997, December 31.
[13]    Q.  That's when you went to Milford?
[14]    A.  Yes.
[15]    Q.  Have you ever been disciplined?
[16]    A.  No.
[17]    MR. BUCKING:  Off the record.
[18]    (Recess taken)
[19]    BY MR. BUCKING:
[20]    Q.  Sir, did you do anything to prepare for
[21] today's deposition?
[22]    A.  Yes.
[23]    Q.  What did you do?
[24]    A.  I inquired of Jennifer Padellaro whether

Page 46

[1] she would waive any attorney-client privilege, and I
[2] called the Office of Bar Counsel.
[3]    Q.  Did you talk to Mr. Powers?
[4]    A.  Yes.
[5]    Q.  What did you talk to him about?
[6]    A.  You mean in terms of preparing for this?
[7] No, I did not.  I spoke to him in relation to
[8] whether his client would waive any attorney-client
[9] privilege.
[10]    Q.  Prior to the deposition this morning, did
[11] you speak with him?
[12]    A.  Yes.
[13]    Q.  Did it have anything to do with the
[14] deposition?
[15]    A.  No.
[16]    Q.  Anything else you did to prepare for the
[17] deposition?
[18]    A.  No.
[19]    Q.  Did you look at any documents?
[20]    A.  I reviewed the file and took those four
[21] documents out, yes.
[22]    Q.  Did you read the four documents that you
[23] produced?
[24]    A.  No.

Page 47

[1]    Q.  Did you read any of the other documents?
[2]    A.  No.
[3]    Q.  I want to show you what's been marked as
[4] Exhibit 2.  This is one of the documents you
[5] produced this morning, correct?
[6]    A.  Yes.
[7]    Q.  And it is a letter that you sent to Larry
[8] LeFebre at the City of Lawrence, correct?
[9]    A.  Yes.
[10]    Q.  And in the first paragraph of the letter
[11] you reveal that you represent Jennifer Padellaro?
[12]    A.  Yes.
[13]    Q.  So that was not an attorney-client
[14] privileged fact on April 12, 2000, correct?
[15]    A.  It was a representation to Mr. LeFebre that
[16] I represented Jennifer Padellaro, is what it says.
[17]    Q.  This morning you told me that whether you
[18] currently represent her is privileged.
[19]    A.  Yes.
[20]    Q.  So what I am asking you is on April 12,
[21] 2000, it apparently wasn't privileged or, if it was,
[22] you were waiving the privilege, right?
[23]    A.  It wasn't privileged when it was
[24] communicated to him on April 12, 2000, that's

Page 48

[1] correct.
[2]    Q.  At what point did it become privileged?
[3]    A.  What?
[4]    Q.  Your representational status of Ms.
[5] Padellaro.
[6]    A.  It is privileged in terms of your inquiring
[7] into it, but it was not privileged, what I sent to
[8] him, if that makes sense to you.
[9]    Q.  The assertion of the privilege doesn't make
[10] sense to me, but I am trying to understand its
[11] confines.  So I want to know why in April of 2000
[12] you were willing to communicate with the outside
[13] world that you represented Jennifer Padellaro but
[14] you are not willing to tell me today whether you
[15] represent Jennifer Padellaro.
[16]    A.  Because this is a communication to a third
[17] party which says that I represent Jennifer
[18] Padellaro.  Your inquiry of today, to my way of
[19] thinking, requires me to violate Rule 1.6, and I
[20] think that's confidential information as to today
[21] that I cannot respond to.
[22]    Q.  So you are not willing to tell me when it
[23] became privileged or when the waiver of the
[24] privilege ceased?

Page 49

[1]   **A.**  I don't think I understand that question.
[2]   **Q.**  On April 12, 2000, you revealed to Larry
[3]   LeFebre that you represent Jennifer Padellaro, which
[4]   says to me that it was either not privileged or you
[5]   were waiving the privilege at that time.  Now, today
[6]   you are not willing to tell me whether you represent
[7]   Jennifer Padellaro, and I want to know whether
[8]   that's because it at some point became privileged
[9]   or, if it was always privileged but you were waiving
[10]  it, when the waiver ceased.
[11]      **MR. POWERS:**  Objection to form.
[12]  **A.**  Because today that's prohibited, in my
[13]  opinion, under Rule 1.6 because that is confidential
[14]  information.
[15]  **Q.**  Now, take a look at the second paragraph of
[16]  Exhibit 2.  Do you see that?
[17]  **A.**  I do.
[18]  **Q.**  And it begins with, "Padellaro has advised
[19]  me that," and then it goes on to give a whole bunch
[20]  of information.  Do you see that?
[21]  **A.**  I do.
[22]  **Q.**  Is the letter truthful?  That is, did Ms.
[23]  Padellaro advise you of the things that follow in
[24]  that paragraph?

Page 50

[1]   **A.**  I don't think I can answer that question.
[2]   **Q.**  So let me ask you the same set of questions
[3]   I just asked you.  On April 12, 2000, you were
[4]   revealing communications between you and Ms.
[5]   Padellaro, which says to me either that you didn't
[6]   consider it to be privileged or, if it was
[7]   privileged, you were waiving that privilege.
[8]   **A.**  Is that a question or a statement?
[9]   **Q.**  Well, let's make it a question.  Do you
[10]  disagree with that?
[11]      **MR. POWERS:**  Objection.
[12]  **A.**  On April 12, 2000, I can tell you that I
[13]  made the statements and that I wrote the letter and
[14]  that the statements speak for themselves.  I don't
[15]  think I can go beyond that, with my reading of the
[16]  Rules of Professional Conduct.
[17]  **Q.**  Well, I don't know how that answers the
[18]  question I asked.  On April 12, 2000, you wrote a
[19]  letter to a third party revealing the substance of
[20]  your communications with Jennifer Padellaro.  Now,
[21]  it seems to me that in doing that, you either
[22]  believed that it was not privileged or, if you
[23]  believed it was privileged, you were waiving the
[24]  privilege.  Do you disagree with that statement?

Page 51

[1]   **A.**  Yes.
[2]   **Q.**  Where did I go wrong?
[3]      **MR. POWERS:**  Objection.
[4]   **A.**  You said that I waived the privilege.  She
[5]   may have waived the privilege.  She asserts the
[6]   privilege.
[7]   **Q.**  You are asserting it today.  Mr. Powers
[8]   isn't asserting it.
[9]   **A.**  That's true.
[10]  **Q.**  So you apparently think, notwithstanding
[11]  the fact that he has not objected on privilege
[12]  grounds to a single question, that you can
[13]  nonetheless object on privileged grounds to
[14]  approximately 100 questions or however many the
[15]  record is going to reveal, so it seems to me you are
[16]  fully capable of asserting the privilege when you
[17]  feel the privilege should be asserted.
[18]      **MR. POWERS:**  Objection.  I don't think
[19]  that's a question.  But if it is a question, I
[20]  object to it on the basis of form.
[21]      **MR. BUCKING:**  Fine.
[22]  **Q.**  So you agree with me that you have been
[23]  asserting the privilege, not Ms. Padellaro through
[24]  Mr. Powers, correct?

Page 52

[1]   **A.**  I have been asserting the privilege because
[2]   Ms. Padellaro refused to waive the privilege as to
[3]   any communication or documents which dealt with me.
[4]   So she, through her counsel, has communicated to me
[5]   that she is not willing to waive the privilege.  So
[6]   I cannot answer these questions absent a court order
[7]   when she isn't willing to waive the privilege.  She
[8]   is unwilling to waive the privilege.
[9]   **Q.**  So let's go back, then.  April 12, 2000,
[10]  you agree with me that in this letter you were
[11]  revealing communications between you and Ms.
[12]  Padellaro as to events that occurred at the City of
[13]  Lawrence, correct?
[14]  **A.**  I agree that I made the statements that are
[15]  in the letter, yes.
[16]  **Q.**  Is there something about my
[17]  characterization of the statements that is
[18]  incorrect?
[19]  **A.**  The letter speaks for itself.  That's what
[20]  I wrote.
[21]  **Q.**  You are acting as a witness today, not a
[22]  lawyer, so I don't want you to tell me that the
[23]  letter speaks for itself.  I am asking you a
[24]  question and I want you to answer it.  Would you

Richard K. Sullivan
December 1, 2006

---

Page 53

[1] agree with me that Paragraph 2 of this letter
[2] reflects your telling Larry LeFebre about
[3] communications that Jennifer Padellaro made to you?
[4]    **MR. POWERS:** Objection. I think that is
[5] privileged. You are basically asking him, "Did
[6] Jennifer tell you these things?" It is a privileged
[7] communication.
[8]    Q. Sir?
[9]    A. Yes. I have been telling you this. In my
[10] opinion, I cannot answer that question because it is
[11] privileged.
[12]    Q. Wait a minute. You wrote a letter on April
[13] 12, 2000, where you tell Larry LeFebre things that
[14] Jennifer Padellaro told you, right?
[15]    A. Yes.
[16]    Q. Now, it seems to me that for you, a
[17] practicing lawyer representing Jennifer Padellaro
[18] intending to comply with the bar rules at the time,
[19] by doing that you and/or Jennifer, acting together
[20] or separately, believed either that the
[21] communication between you and Jennifer was not
[22] privileged or that you or Jennifer or both were
[23] waiving the privilege. Would you agree with that?
[24]    A. I'm not sure.

---

Page 54

[1]    Q. Can you think of another option? In other
[2] words, the two options I gave you were either it
[3] wasn't privileged or, if it were privileged, it was
[4] being waived. Can you think of a third option that
[5] would explain why you, as a practicing lawyer, a
[6] member in good standing of the bar not intending to
[7] violate any rules of conduct, were willing in April
[8] of 2000 to reveal communications between you and
[9] Jennifer Padellaro?
[10]    A. Not off the top of my head, no.
[11]    Q. Now, with that framework, then, can you
[12] tell me whether today you are willing to answer
[13] questions concerning Paragraph 2 of Exhibit 2?
[14]    **MR. POWERS:** Objection. I'm not sure what
[15] you meant by "that framework." What framework?
[16]    **MR. BUCKING:** Forget the "framework."
[17]    Q. Are you willing today to answer questions
[18] concerning Paragraph 2 of Exhibit 2?
[19]    A. No, I am not.
[20]    Q. On the grounds of privilege?
[21]    A. Yes.
[22]    Q. So can you tell me when this either became
[23] privileged or, if it had been privileged all along,
[24] when the waiver ceased?

---

Page 55

[1]    A. No. I think that's confidential.
[2]    Q. Did you have a source other than Jennifer
[3] Padellaro as to the allegations set forth in
[4] Paragraph 2 of Exhibit 2?
[5]    A. That's privileged.
[6]    Q. How is that privileged?
[7]    A. It's part of my work product, and under
[8] Rule 1.6 it is confidential as well as privileged.
[9]    Q. So if you talked to a third party who you
[10] did not represent and was not an agent of Jennifer
[11] Padellaro, you are telling me the substance of that
[12] communication is privileged?
[13]    A. Yes.
[14]    Q. How?
[15]    A. I am not going to debate you on this. I am
[16] just telling you, my reading of the rules and my
[17] discussions with bar counsel prohibit me from
[18] entering into discussions concerning my
[19] representation of Padellaro, period.
[20]    Q. Again, I don't want to prolong this any
[21] more than any of us have to, so I will try to
[22] shortcut it to some degree. Based upon that answer,
[23] would it be fair to say that you won't answer any
[24] questions that I am going to ask you today

---

Page 56

[1] concerning the substance of your communications with
[2] independent third parties?
[3]    A. Yes.
[4]    Q. So if I ask you whether you had any
[5] conversations with Susan Degoti, you are not going
[6] to tell me?
[7]    A. Correct.
[8]    Q. If I ask you whether you had discussions
[9] with any of the women who worked in the Clerk's
[10] Office other than Jennifer Padellaro, you are not
[11] going to tell me?
[12]    A. That's correct.
[13]    Q. And not only aren't you going to tell me
[14] the substance of those communications, you are not
[15] even going to tell me whether you had those
[16] conversations?
[17]    A. That is correct.
[18]    Q. Did you ever talk to Larry LeFebre?
[19]    A. In my opinion, that's privileged.
[20]    Q. So your communication with essentially the
[21] opposing party is privileged?
[22]    A. The question was did I talk to LeFebre. I
[23] think that information is confidential information
[24] that I can't reveal at this time.

---

Jennifer Padellaro v.
James McGravey and City of Lawrence

Richard K. Sullivan
December 1, 2006

---

**Page 57**

[1] **Q.** So you are saying, again, not just the
[2] substance of the communication with LeFebre but the
[3] fact of whether or not you talked to LeFebre you are
[4] asserting is privileged?

[5] **A.** Is confidential information, yes.

[6] **Q.** I don't know what you mean by
[7] "confidential." But are you saying it is
[8] privileged?

[9] **A.** I am saying it is confidential information
[10] within the meaning of Rule 1.6.

[11] **Q.** You are refusing to answer that question?

[12] **A.** That is correct.

[13] **Q.** And again, just to try to cut through this
[14] to some degree, if I ask you questions about
[15] communications you may or may not have had with
[16] other agents of the City, like somebody from the
[17] City's Attorney's Office, the Mayor, other people in
[18] positions of authority on behalf of the City, Mr.
[19] McGravey, you are going to refuse to answer those
[20] questions as well?

[21] **A.** That's correct.

[22] **Q.** If I were to ask you whether you spoke with
[23] Jennifer Padellaro on particular dates or times, not
[24] what you talked about but whether you spoke to her,

---

**Page 58**

[1] would you take the position that those are
[2] privileged?

[3] **A.** Those are confidential communications, yes.

[4] **Q.** You are going to refuse to answer?

[5] **A.** I am.

[6] **Q.** So if I were to ask you -- let me just ask
[7] you and make it clear. Did you talk with Jennifer
[8] Padellaro in calendar year 2003?

[9] **A.** I would say that I could not answer that
[10] question.

[11] **Q.** I am asking you.

[12] **A.** I can't answer the question.

[13] **Q.** So you are refusing to answer my question
[14] whether you talked with Jennifer Padellaro in
[15] calendar year 2003?

[16] **A.** I am.

[17] **Q.** Take a look at Exhibit 3, please, and in
[18] particular the last paragraph. I would like to
[19] direct your attention to the middle of the paragraph
[20] where it says, "Padellaro has advised me that she
[21] never made any such statement." Do you see that?

[22] **A.** Yes, I see it.

[23] **Q.** Notwithstanding the fact that you were
[24] revealing to Mr. LeFebre in this letter what

---

**Page 59**

[1] Jennifer Padellaro told you, will you be asserting
[2] the privilege if I try to ask you questions about
[3] that?

[4] **A.** I will.

[5] **MR. POWERS:** Objection to form.

[6] **Q.** Now, the last sentence of this letter,
[7] Exhibit 3, I want you to read that to yourself and
[8] tell me when you have read it. It begins, "I will
[9] be checking with Padellaro." Do you see that?

[10] **A.** I do.

[11] **Q.** I want to ask you about what, if anything,
[12] you did to follow up on what you told Mr. LeFebre in
[13] that sentence you were doing. You said to Mr.
[14] LeFebre in this sentence, "I will be checking with
[15] Padellaro on an ongoing basis to ensure that
[16] McGravey behaves in a certain way." Will you tell
[17] me what, if anything, you did as promised in that
[18] sentence?

[19] **A.** I can't answer that question.

[20] **Q.** You are refusing to answer on the grounds
[21] of privilege?

[22] **A.** I am.

[23] **Q.** And even if hypothetically what you did
[24] included talking to Larry LeFebre talking to the

---

**Page 60**

[1] Mayor, talking to someone in the City Attorney's
[2] Office, talking to independent third parties who
[3] were not agents of Padellaro, nonetheless you are
[4] not going to answer those questions?

[5] **A.** Correct.

[6] **Q.** I would like to show you Exhibit 4. This
[7] is another one of the letters that you produced this
[8] morning, correct?

[9] **A.** Yes.

[10] **Q.** Now, in the first paragraph of this letter
[11] you tell the Mayor of the City of Lawrence that you
[12] are representing Jennifer Padellaro, correct?

[13] **A.** That is correct.

[14] **Q.** And just to save us all the time and energy
[15] of asking the same 15 or 20 questions we had before,
[16] notwithstanding the fact that you revealed your
[17] representational status of Padellaro to the Mayor of
[18] the City of Lawrence in June of 2004, you are
[19] unwilling to reveal your representational status of
[20] her to me now?

[21] **A.** Correct.

[22] **Q.** I would like you to look at the bottom of
[23] the second page of Exhibit 4, the last paragraph of
[24] that letter. Just read a couple of those sentences

---

Richard K. Sullivan
December 1, 2006

Jennifer Padellaro v.
James McGravey and City of Lawrence

---

Page 61

[1] to yourself and tell me when you have done that.
[2]    **A.** (Reviewing document) I have finished.
[3]    **Q.** You'd agree with me, just generically
[4] speaking, that you are alleging to Mayor Sullivan
[5] that certain events occurred. Is that a fair
[6] description?
[7]    **A.** Yes.
[8]    **Q.** I take it you will be unwilling to tell me
[9] from whom you learned of these alleged events?
[10]    **A.** Yes.
[11]    **Q.** Whether it is Padellaro or anybody else?
[12]    **A.** Yes.
[13]    **Q.** Did you ever make a public filing on behalf
[14] of Jennifer Padellaro, meaning with an
[15] administrative agency, an arbitrator, any sort of
[16] grievance, any court filing, any sort of public
[17] filing, where you represented her and were making
[18] some sort of claim?
[19]    **A.** I think that's privileged.
[20]    **Q.** Let's take a look at Exhibit 5, please.
[21] That's also a document you produced this morning.
[22] Again, I am trying to be as efficient as possible
[23] here without asking all the exact same questions
[24] again. I take it to the extent I try to inquire of

---

Page 63

[1] revealed circumstances concerning your
[2] representation of her to people other than you or
[3] other of her attorneys?
[4]    **A.** I think that's privileged.
[5]    **Q.** Would it be fair to say that any such
[6] communications that she made to people other than
[7] her attorneys, to the extent you were aware of them,
[8] would not cause you to believe the privilege has
[9] been waived?
[10]    **MR. POWERS:** Objection.
[11]    **A.** Yes, that is correct. As I stated
[12] previously, when I specifically made an inquiry of
[13] Ms. Padellaro as to whether she would waive the
[14] privilege as to any documentation or communications
[15] which I had with her, I was advised that she would
[16] not. So that would certainly not change my mind,
[17] no.
[18]    **MR. BUCKING:** Off the record.
[19]    (Recess taken)
[20] **BY MR BUCKING:**
[21]    **Q.** Sir, at any point in time did you talk with
[22] any member of the media about Ms. Padellaro or her
[23] case?
[24]    **A.** I think that's privileged.

---

Page 62

[1] you as to anything to do with Exhibit 5, you are
[2] going to refuse to answer on the grounds of
[3] privilege?
[4]    **A.** That's correct.
[5]    **Q.** Now, in the amended complaint that Ms.
[6] Padellaro filed in this case, and in particular
[7] Paragraph 61, which I would just like to show you
[8] and have you read to yourself.
[9]    **A.** (Reviewing document)
[10]    **Q.** Have you done that?
[11]    **A.** I have.
[12]    **Q.** Do you see in there that Ms. Padellaro's
[13] allegation includes describing legal advice that you
[14] gave to her?
[15]    **A.** I do.
[16]    **Q.** Based upon that, are you willing to answer
[17] any questions on the ground that that constitutes a
[18] waiver of --
[19]    **A.** No.
[20]    **Q.** -- what you have been asserting?
[21]    **A.** No.
[22]    **Q.** Other than what I just showed you,
[23] Paragraph 61 of the Amended Complaint, are you aware
[24] of any other instances where Ms. Padellaro has

---

Page 64

[1]    **MR. BUCKING:** I have no further questions
[2] at this time. Obviously we are going to court. We
[3] intend to move for sanctions in addition to moving
[4] to compel.
[5]    Anything by you?
[6]    **MR. POWERS:** I have no questions.
[7]    **MR. BUCKING:** Very good. Thank you.
[8]    (Whereupon, the deposition was
[9]    suspended at 11:30 a.m.)
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

---

Page 65

[1]                    C E R T I F I C A T E
[2]        I, Richard K. Sullivan, do hereby certify that I
[3]    have read the foregoing transcript of my testimony,
[4]    and further certify under the pains and penalties of
[5]    perjury that said transcript (with/without)
[6]    suggested corrections is a true and accurate record
[7]    of said testimony.
[8]        Dated at _____, this ____ day of _____,
[9]    2006.
[10]
[11]                    _____
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 66

[1]    COMMONWEALTH OF MASSACHUSETTS)
[2]    SUFFOLK, SS.                 )
[3]        I, Daniel P. Wolfe, Registered Professional
[4]    Reporter and Notary Public in and for the
[5]    Commonwealth of Massachusetts, do certify that there
[6]    came before me on the 1st day of December, 2006, at
[7]    9:45 a.m., the person hereinbefore named, who was by
[8]    me duly sworn to testify to the truth and nothing
[9]    but the truth of his knowledge touching and
[10]   concerning the matters in controversy in this cause;
[11]   that he was thereupon examined upon his oath, and
[12]   his examination reduced to typewriting under my
[13]   direction; and that the deposition is a true record
[14]   of the testimony given by the witness.
[15]       I further certify that I am neither attorney or
[16]   counsel for, nor related to or employed by, any
[17]   attorney or counsel employed by the parties hereto
[18]   or financially interested in the action.
[19]       In witness whereof, I have hereunto set my hand
[20]   and affixed my notarial seal this ____ day of
[21]   December, 2006.
[22]
[23]                    _____
[24]                        Notary Public
       My commission expires  9/18/09

**Attorneys Notes**

Jennifer Padellaro v.
James McGravey and City of Lawrence

Richard K. Sullivan
December 1, 2006

## $

**$1,000** 42:11;43:1,2,20, 21,23
**$1,500** 40:15
**$10,000** 42:11
**$150** 40:12

## 1

**1** 5:9,11,19
**1,500** 44:4
**1.6** 7:2;9:1;14:2;48:19; 49:13;55:8;57:10
**10** 16:18;19:9
**100** 43:8;51:14
**107** 4:1
**11:30** 64:9
**12** 47:14,20,24;49:2;50:3, 12,18;52:9;53:13
**15** 38:2;60:15
**1972** 44:15
**1976** 44:16
**1977** 36:24;44:23;45:12
**1997** 45:12
**1998** 4:8

## 2

**2** 6:6,8,10;8:6,8;15:20,21; 16:7;33:24;47:4;49:16; 53:1;54:13,13,18,18;55:4, 4
**20** 43:8;60:15
**2000** 16:18;17:7,12,14,21; 18:8,18;19:6,9;21:13; 22:14,17,24;23:11;34:12, 15;35:8,16,18,21;36:2; 37:24;38:2;39:19;47:14, 21,24;48:11;49:2;50:3,12, 18;52:9;53:13;54:8
**2000s** 33:8
**2003** 58:8,15
**2004** 60:18
**2006** 43:23
**2009** 37:24

## 3

**3** 17:5;18:6,12;19:15,15; 58:17;59:7
**30** 3:11;34:15;36:23
**300** 4:5
**31** 45:12
**33** 4:16
**378** 12:11,14
**382** 12:16

## 4

**4** 60:6,23
**426** 12:18

## 5

**5** 6:6,8,10;8:7,8;15:20,21; 16:7;33:24;61:20;62:1
**504** 12:17

## 6

**6** 16:10,11,12;17:3,18,24
**61** 62:7,23

## 7

**7** 18:22,23;19:11,13

## 8

**8** 17:7,12,14,21;18:8,17; 19:6;21:9,10;22:4,9;23:10

## 9

**9** 21:17,22;22:3,10
**90s** 33:7
**99** 31:17;32:20

## A

**ABA** 24:14
**absent** 5:2;7:16,20;8:13, 16;9:1;11:21;52:6
**access** 35:15
**accounting** 30:4,7
**acting** 52:21;53:19
**actions** 29:14
**activity** 33:15
**Actually** 37:17
**addition** 27:24;31:24; 32:21;64:3
**additional** 6:22
**address** 3:24;4:4;31:4
**addressed** 16:14
**administrative** 12:3; 61:15
**advance** 9:2
**advice** 8:17;9:3;20:3; 62:13
**advise** 49:23
**advised** 49:18;58:20; 63:15
**affected** 33:13
**again** 30:22;31:5;33:6; 57:1,13;61:24
**Again** 31:2;55:20;61:22
**against** 10:1
**agencies** 12:14
**agency** 61:15
**agent** 55:10
**agents** 57:16;60:3
**ago** 34:20,23;37:5
**agree** 6:21;51:22;52:10, 14;53:1,23;61:3

**agreed** 3:2
**ahead** 31:20;37:24
**aisle** 11:7
**allegation** 62:13
**allegations** 55:3
**alleged** 15:10;61:9
**alleging** 61:4
**allow** 10:14;31:8
**allowing** 42:19
**alluded** 25:21
**along** 9:15;28:16;54:23
**always** 40:5,6;49:9
**amended** 62:5
**Amended** 62:23
**amount** 42:14,20,22
**and/or** 7:11;53:19
**apology** 22:3
**apparently** 47:21;51:10
**appear** 5:11
**appearance** 11:22
**appearances** 12:14
**appears** 19:8,10;23:4
**apply** 31:10
**appropriate** 7:15
**approximate** 11:12
**approximately** 51:14
**April** 47:14,20,24;48:11; 49:2;50:3,12,18;52:9; 53:12;54:7
**arbitrator** 61:15
**area** 12:20,24
**areas** 11:3
**argumentative** 18:2
**arrangement** 15:3;42:9
**assert** 23:12
**asserted** 51:17
**asserting** 19:24;51:7,8, 16,23;52:1;57:4;59:1; 62:20
**assertion** 19:17;48:9
**asserts** 51:5
**Assistant** 7:13
**Association** 45:1
**assume** 14:4;25:10;28:4; 31:5,8;37:3
**attached** 30:8
**attend** 10:14
**attention** 58:19
**attorney** 24:7
**Attorney** 9:18
**attorney-client** 7:8,10, 17,21;14:14,18;46:1,8; 47:13
**attorneys** 63:3,7
**Attorney's** 57:17;60:1
**authority** 57:18
**aware** 9:15,20;10:5; 13:19;62:23;63:7

## B

**back** 33:16;35:16,17; 36:22,24;39:18;52:9

**back-and-forth** 14:4
**background** 23:9
**backward** 26:20
**balance** 30:5
**bar** 4:11;53:18;54:6;55:17
**Bar** 7:12,13;46:2
**bargaining** 13:5
**based** 7:14;8:14;20:1; 39:1;42:6;45:6,7,8
**Based** 8:5;55:22;62:16
**basically** 53:5
**Basically** 24:14
**basis** 14:13;37:18;51:20; 59:15
**Bauer** 7:13
**became** 48:23;49:8;54:22
**become** 48:2
**began** 15:9,17;34:8;45:9
**begin** 13:23
**begins** 17:6;49:18;59:8
**behalf** 11:23;28:18;57:18; 61:13
**behaves** 59:16
**believes** 20:22
**beyond** 9:4;50:15
**bill** 14:24;28:3;39:1; 40:15;42:6,14;43:21;44:3
**billing** 25:18;26:14;28:24; 29:3,8,16,20;39:22;40:4, 16;41:24;42:2,9;43:16,24; 44:7,9
**Billing** 29:4
**billings** 29:12
**bills** 40:8
**bono** 41:6,19
**Boston** 12:23;44:13,15; 45:7
**both** 10:7;20:14;27:20; 34:18;35:15;53:22
**Both** 27:21
**bottom** 60:22
**bound** 8:24;36:17
**Braintree** 45:5
**breakdown** 11:12
**Brotherhood** 12:11,15, 16,17,18
**brothers-in-law** 13:19, 20
**BUCKING** 3:2,7,10,21; 5:7;6:5;18:20;19:20;20:13, 18;21:4,7,15,20;23:22; 45:17,19;51:21;54:16; 63:18,20;64:1,7
**bucks** 44:4
**bunch** 49:19
**Burgin** 45:8
**business** 4:4;35:9

## C

**calendar** 34:13,22;35:14; 36:4,9,17,18;37:4;38:3; 58:8,15

**calendars** 36:22;37:7,14, 16,17
**call** 44:6
**called** 3:14;25:6;46:2
**calling** 31:11
**came** 33:7
**can** 6:24;16:5;17:16;18:3, 23;20:16;21:1;23:20; 24:16;36:6,8;43:14;50:1, 12,15;51:12;54:11,22
**Can** 5:14;14:4;16:2;21:18; 34:12;54:1,4
**capable** 51:16
**carry** 36:10,11
**case** 5:12;7:9;9:17;12:8; 20:19;24:13;25:5,12;27:2, 15;30:22;33:14,17;38:7; 41:1,23;43:6;62:6;63:23
**cases** 39:6,7,7;40:4; 41:24;44:8
**cash-based** 15:4
**cause** 63:8
**ceased** 48:24;49:10; 54:24
**certain** 8:23;43:18;59:16; 61:5
**Certain** 26:14;42:5
**certainly** 63:16
**cetera** 8:21;29:6,14;34:19
**change** 63:16
**changed** 35:22,24
**characterization** 52:17
**charge** 40:12
**chargeable** 28:20
**charges** 27:8;28:15;29:5, 12;40:9,9
**check** 30:1,12
**checking** 59:9,14
**checks** 29:14
**choose** 40:14
**circumstances** 7:14; 42:4;63:1
**City** 3:15;8:23;13:5,15,21; 15:11;16:24;47:8;52:12; 57:16,18;60:1,11,18
**City's** 57:17
**claim** 31:4;61:18
**claiming** 9:13
**clarifying** 21:5
**clear** 6:18;19:24;30:15; 58:7
**Clerk's** 56:9
**client** 7:23;11:23;12:2; 24:9;22,23;25:20;26:2,13, 14,24;27:7,9,11,11,13,22, 23,24;28:1,3,9,12,19,19; 29:1,6,9,11,17,19,20;30:1, 6,16,19;31:12,18,23,24; 32:5,7,8,9,13,19,20;33:6; 39:23;40:5,10,15;41:19; 42:2,19;43:12,13;46:8
**Client** 27:13
**clients** 11:13,15,21;12:4;

13:2,4;27:12;40:7,18;42:5;
43:19
**clipped** 30:13
**closed** 33:14
**collective** 13:5
**College** 44:13
**comment** 7:16
**communicate** 48:12
**communicated** 8:8;
47:24;52:4
**communication** 42:20;
48:16;52:3;53:7,21;55:12;
56:20;57:2
**communications** 7:11;
8:11,13,21;50:4,20;52:11;
53:3;54:8;56:1,14;57:15;
58:3;63:6,14
**compel** 64:4
**complaint** 44:10;62:5
**Complaint** 62:23
**completed** 33:18
**comply** 5:23;9:3;53:18
**computer** 34:17,18,19;
35:14,20,22;39:16
**computer-based** 37:11
**concept** 37:2
**concerning** 54:13,18;
55:18;56:1;63:1
**conclusion** 16:2
**conclusions** 16:5
**conduct** 54:7
**Conduct** 7:1;8:15;50:16
**confidential** 7:23;48:20;
49:13;55:1,8;56:23;57:5,7,
9;58:3
**confines** 26:8;48:11
**confirming** 19:21
**conflict** 29:14
**connection** 10:6;43:17
**consider** 50:6
**considered** 39:2
**constitutes** 62:17
**contact** 26:21;27:2,17;
29:13;32:1,22
**Contact** 26:17
**contacted** 7:5,12
**contingency** 41:23
**contingent** 15:4;40:23;
41:1
**continuously** 33:9
**conversations** 56:5,16
**copies** 27:22
**copy** 5:11,12;17:3;18:7,
16;27:20;30:1,13;36:4,17
**corner** 36:12
**counsel** 3:14;7:6;12:1;
27:18;52:4;55:17
**Counsel** 7:12,13;46:2
**count** 6:2
**couple** 24:6;60:24
**court** 5:3;7:17,20;8:14;
9:1,17;10:5,6,18,23;28:16;
30:2;36:7;52:6;61:16;64:2

**Court** 12:13;30:11
**courtesy** 43:12
**crash** 5:21
**current** 12:7
**currently** 4:17;12:1,19;
13:4;17:3;38:8,17;47:18
**cut** 57:13

**D**

**D'Agostino** 23:19
**Dalton** 4:1
**dated** 17:13,21;18:8,17;
19:6
**dates** 57:23
**day** 14:4;37:20,21;39:4
**days** 3:11
**dealt** 52:3
**debate** 5:1;8:2,4;55:15
**December** 45:12
**decided** 25:1
**decision** 10:17
**Defendant** 3:15
**Degoti** 56:5
**degree** 55:22;57:14
**depending** 26:6
**deposition** 3:11;7:5,15;
10:15;45:21;46:10,14,17;
64:8
**describing** 35:13;42:16;
62:13
**description** 61:6
**destroyed** 37:9
**diary** 36:10;38:18
**dictation** 38:20
**differ** 27:18
**different** 24:3,23;27:15;
29:10,12;38:15
**direct** 58:19
**DIRECT** 3:20
**director** 8:10
**disagree** 50:10,24
**disbursement** 28:6
**disbursements** 29:5;
30:18
**Disbursements** 28:15
**disciplined** 45:15
**disclose** 20:20
**discounts** 40:14
**Discussion** 21:21;23:21
**discussions** 55:17,18;
56:8
**distinction** 20:18,24
**docket** 12:8
**docketing** 34:18
**document** 5:15,16,20;
16:16;18:24;19:8,13;
21:11,24;26:4;61:2,21;
62:9
**Document** 5:8;16:9;
18:21;21:8,16
**documentation** 30:18;
32:8;63:14

**documents** 6:2,10,14,18,
22;7:11;8:12,13,23;9:8,12;
10:9;15:20;23:5;24:12;
25:7;26:12,14;29:8;30:3,8,
16;31:12,17;33:23;46:19,
21,22;47:1,4;52:3
**Documents** 6:7
**done** 33:15;61:1;62:10
**drafted** 33:17
**draw** 16:2,5
**drive** 35:20
**driver's** 3:17
**duly** 3:17
**duplicative** 27:4

**E**

**earlier** 34:16
**Earlier** 15:19
**early** 33:7
**East** 4:5
**Eastern** 12:22
**economic** 15:3
**economics** 43:7
**efficient** 61:22
**either** 8:9;13:20;26:3;
49:4;50:5,21;53:20;54:2,
22
**electronic** 26:22;38:18
**electronically** 27:19;
32:1,22;38:21
**eleven** 4:16
**else** 16:17;25:23;26:16,
18;28:14;31:15;32:23;
44:10;46:16;61:11
**employees** 11:11
**Employees** 45:2
**employees'** 11:9
**employment** 24:24;
25:14
**end** 19:14;36:21;37:7
**energy** 60:14
**engagement** 25:17
**enough** 14:17
**ensure** 59:15
**enter** 39:15
**entered** 11:22;23:19;
34:17
**entering** 55:18
**entries** 27:16;30:9;32:10,
23;35:18;36:4;38:23,24;
39:1,11;41:2,8
**entry** 30:11
**equivalent** 26:22
**essentially** 8:22;56:20
**estate** 25:2
**et** 8:21;29:5,14;34:19
**even** 20:20;42:21;56:15;
59:23
**event** 9:20;37:10
**events** 52:12;61:5,9
**evidentiary** 3:5
**exact** 61:23

**examination** 3:14
**EXAMINATION** 3:20
**examined** 3:18
**example** 27:14;28:9;
30:9;42:7
**except** 3:3
**Except** 44:8
**executed** 33:17
**Exhibit** 5:9,11,19,19;
16:10,11,12;17:3,5,18,24;
18:6,12,22,23;19:11,13,14;
21:9,10,17,22;22:3,4,9,10;
23:10;30:24;31:5;32:19;
33:1;47:4;49:16;54:13,18;
55:4;58:17;59:7;60:6,23;
61:20;62:1
**Exhibits** 6:6,8,10;8:6;
15:20;16:7;33:24
**exist** 31:6;35:19;37:19
**existed** 15:10,11
**existence** 9:12;15:22;
38:5
**exists** 32:14
**expect** 31:16
**expected** 10:9
**explain** 7:3;54:5
**Explain** 27:10
**extensive** 14:3
**extent** 13:11;61:24;63:7

**F**

**fact** 14:7;15:22;16:16;
47:14;51:11;57:3;58:23;
60:16
**factors** 39:2
**fair** 15:23;20:6;28:11;
31:16;33:8;44:7;55:23;
61:5;63:5
**Fair** 14:17
**favor** 41:10,21
**faxed** 16:17;17:13;19:9
**fee** 15:4;30:2,10,18;43:18
**feel** 8:14;51:17
**fees** 28:15,22;30:17
**figure** 8:4;32:13
**file** 10:3;25:6,14,14,14;
26:8,24;27:3,5;29:7,13;
30:14,19;32:5,9,21;33:9,9,
18;34:3,9;36:4,21;44:10;
46:20
**filed** 9:16,18,24;10:7;62:6
**files** 17:3;24:9;25:5,8,13,
16,20,22;26:3,6;27:24;
28:1;29:1;31:16,18,23,24;
32:13,21;33:3;34:3,10
**filing** 28:15;30:2,10,18;
61:13,16,17
**find** 31:22;35:17;36:23
**Fine** 51:17
**finish** 6:17;15:15
**finished** 61:2
**first** 3:17;17:6;18:10,12;

19:15;47:10;60:10
**flat** 42:9
**Flat** 43:18
**focus** 12:21
**folder** 26:9,13
**follow** 14:8;49:23;59:12
**follows** 3:19
**Forget** 54:16
**form** 3:3;18:1;28:17;30:4,
7;31:20;32:3;39:12;49:11;
51:20;59:5
**format** 38:18,19
**formation** 14:18
**forms** 29:4
**forth** 55:3
**four** 6:2;46:20,22
**framework** 54:11,15,15,
16
**full** 3:22
**fully** 51:16
**further** 33:14;64:1

**G**

**gave** 8:5;14:12;54:2;
62:14
**general** 25:15;26:1
**generally** 39:1;44:9
**Generally** 24:12;38:16;
41:3;44:11
**generate** 38:24
**generically** 61:3
**geographic** 12:20
**giving** 9:2
**goes** 18:6;49:19
**good** 4:11;11:2;35:10;
43:7,12;54:6;64:7
**Government** 45:1
**graduate** 44:14
**grievance** 61:16
**ground** 62:17
**grounds** 4:20;14:6;
51:12,13;54:20;59:20;62:2
**guess** 35:12
**guidelines** 24:15

**H**

**handed** 6:2
**handle** 25:1
**happen** 37:7
**happened** 33:12
**happy** 8:12
**hard** 27:19;35:20;36:4,17
**head** 54:10
**hearing** 6:1;34:14
**Holliston** 4:1
**hour** 40:12,13;43:8
**hourly** 15:4;40:8,16;42:1,
13
**hours** 40:15;43:3,4,8,8
**house** 33:21
**husband** 13:14

hypothetical 24:23;
25:10;26:2;27:14,23;31:2,
9;32:19;33:6
**Hypothetical** 36:24
hypothetically 29:24;
31:6;38:1;59:23

**I**

identification 5:9;6:9;
16:10;18:22;21:9,17
identified 3:16
imagine 36:20
included 59:24
includes 62:13
incorrect 52:18
incur 40:8
independent 56:2;60:2
individual 40:3
individuals 29:13
information 7:23;12:5;
26:17,21,23;27:2,4;32:2,
22;43:13;48:20;49:14,20;
56:23,23;57:5,9
informations 27:17
informed 7:9
initially 44:21;45:4,7
**Initially** 39:10
inquire 61:24
inquired 7:7,13;45:24
inquiring 48:6
inquiry 48:18;63:12
inside 27:4
instance 28:16
instances 62:24
intend 9:3;64:3
intending 53:18;54:6
**International** 12:11,15,
16,17,18
into 5:1:8:2,3;39:15;48:7;
55:18
invoice 14:24;30:1,17,18;
42:1,17
invoke 10:16
involve 12:14
involving 27:14
irreplaceable 24:13

**J**

**James** 15:13
**Jennifer** 4:17;7:6,23;
8:22;13:10,12,23;14:19,
21;15:1,5,17;18:8,17;19:4;
24:17;25:6,11;31:18;34:4,
9;38:2;41:18;45:24;47:11,
16;48:13,15,17;49:3,7;
50:20;53:3,6,14,17,19,21,
22;54:9;55:2,10;56:10;
57:23;58:7,14;59:1;60:12;
61:14
**John** 45:5
joined 9:19,22

**June** 60:18

**K**

keep 25:16;26:23;28:17;
31:15;38:14;39:5,8,21;
40:1,3,20;41:1,8,15;42:19;
43:10,14
keeping 30:5;38:11;
42:18
kept 25:7;34:13;38:4
**Kevin** 7:6
kind 11:1;35:3;42:2,17
kinds 29:14
knew 13:17;22:6
known 34:16

**L**

labor 11:6,8
**Larry** 3:21;17:13,17,20;
18:7,16;19:4;47:7;49:2;
53:2,13;56:18;59:24
last 23:24;58:18;59:6;
60:23
late 33:7
law 11:6,8;44:12,17
**Law** 44:13,15
**Lawrence** 3:15;8:24;
13:2,6,15,21;15:11;16:24;
21:12;47:8;52:13;60:1,14
lawyer 4:9,14;11:1;52:22;
53:17;54:5
learned 15:10,16;61:9
leave 32:12
ledger 26:15;27:7,12,15,
22;29:4,6,9,11,17,19,20;
30:7,16;32:7,9,23
LeFebre 8:9;16:24;17:13,
17,20;18:7,16;19:4;21:13;
47:8,15;49:3;53:2,13;
56:18,22;57:2,3;58:24;
59:12,14,24
left 32:18
legal 8:2,3;62:13
less 42:22
**Less** 41:4
letter 16:21,23;17:9,13,
17,20,21,23;18:7,17;19:3;
20:7,9,12,21;21:1,1;22:2,3;
25:18,18;47:7,10;49:22;
50:13,19;52:10,15,19,23;
53:1,12;58:24;59:6;60:10,
24
letters 16:3,6;60:7
license 3:17
**Likewise** 28:6
**Linda** 7:13·
lined 39:9
lines 28:16
listed 29:17
lists 29:13
little 39:10

lived 4:2
**Local** 12:11,14,15,17,18
long 4:7,14;24:8;42:22
longer 24:14
look 5:14;16:11;18:23;
21:10,22;23:16;31:5,14;
46:19;49:15;58:17;60:22;
61:20
looked 19:1;21:23,24;
22:15
looking 18:5;19:14
**Lots** 36:15
**Lotus** 35:4,14;37:11;38:3
**LRC** 34:14

**M**

magistrate 10:13
**Main** 4:5
maintain 24:8;25:4,13;
27:10;28:24;32:24;34:24
maintained 25:8,20,23;
26:5,12;27:19,24;28:1;
32:1;33:3,10;35:14;37:18;
44:22
maintaining 36:3
makes 8:6;28:19;48:8
making 20:23;61:17
many 26:6;51:14
mark 5:7;6:5
**Mark** 18:20;21:7,15
marked 5:8,10;6:7;16:9;
18:21;21:8,16;47:3
**Massachusetts** 4:1,6,
15;7:1;8:15;12:22
master's 44:16
material 27:3
materially 21:3
matter 12:6,12;24:17,24;
25:1,3,9,19;27:9,13,16,17;
33:15;39:22;42:21
matters 7:8;20:19;24:18,
23;25:7,12;26:3,6;27:14;
38:15;40:1
may 10:8;9:13;11:20:18;
35:19;40:14;51:5;57:15,15
**May** 16:17;17:7,12,13,21;
18:8,17;19:6,9;21:13;
22:14,17,24;23:10;34:15;
38:2;43:23
maybe 24:24
**Mayor** 8:10;57:17;60:1,
11,17;61:4
**McGravey** 15:13;57:19;
59:16
mean 7:3;19;11:2,4;
26:20;29:3;36:10;46:6;
57:6
meaning 57:10;61:14
meant 20:11;54:15
media 63:22
meeting 15:7;38:1,3,6,9
member 4:11;54:6;63:22

mentioned 28:8
met 13:11;14:22
**Michael** 8:10
mid-'90s 31:13
middle 58:19
might 29:24;31:15;32:1;
33:12;36:20;44:3
**Milford** 4:5;12:24;33:4,
10;45:10,13
million 43:3
mind 63:16
minute 53:12
**Mm-hmm** 38:13
modified 40:6
month 37:20,20;42:11,
11;43:2,3,20,22
months 4:16;36:8,9
more 8:3;25:20;30:4,7;
31:18,23;36:2;42:13,21;
55:21
**More** 41:13
morning 6:11,15,19;
33:24;46:10;47:5,17;60:8;
61:21
most 39:7
motion 9:16,20,22,24;
10:1,3,6,14;36:7
motions 3:7
**Motions** 3:6
move 64:3
moving 64:3
much 30:6
multiple 24:18

**N**

name 3:22;31:18;34:4
narrow 35:11
**National** 45:1
nature 10:7,8;39:22;44:6
necessarily 41:9
need 3:12
next 36:8,9
nonetheless 51:13;60:3
notary 3:9,12
**Notary** 3:18
notes 39:5,8
notice 9:2
notwithstanding 51:10;
60:16
**Notwithstanding** 58:23
number 12:8,8,13;38:24

**O**

object 51:13,20
objected 51:11
**Objection** 18:1;23:15;
31:20;32:3,15;49:11;
50:11;51:3,18;53:4;54:14;
59:5;63:10
objections 3:3
**Obviously** 64:2

occasionally 41:10
**Occasionally** 41:7
occurred 52:12;61:5
off 21:18,21;23:21;33:19;
36:6,9,9;39:10;54:10
**Off** 45:17;63:18
office 31:15;33:4,10;34:2
**Office** 7:12;46:2;56:10;
57:17;60:2
officer 13:15
officers 13:21
**Officers** 12:12,15,16,18,
19
off-site 33:22
old-fashioned 36:18
once 15:19
**Once** 38:23
one 4:16;8:16;11:2;12:9;
14:12;22:20,24;23:10;
25:20;26:2,3,6;27:11;
29:24;31:17,23;38:4;
42:18;43:8;47:4;60:7
ones 12:10;15:22,23
ongoing 59:15
online 3:17
only 28:12;31:9,22;56:13
opened 33:8
opinion 16:22;17:4;
19:16;21:6,14;22:2;49:13;
53:10;56:19
opposing 27:18;56:21
opposite 11:9
option 54:1,4
options 54:2
order 5:3,22;7:17,20;
8:14;9:1,16;52:6
**Organizer** 35:4
otherwise 14:13;15:5;
38:19
ought 39:2
out 8:4;32:12,13,18;
36:23;42:1,17;43:16,21;
44:17;46:21
outset 25:19
outside 26:5,8,13;27:3;
28:1;29:1,6;48:12
over 37:15
owe 43:21
owes 30:6

**P**

**Padellaro** 4:18;7:6,24;
8:22;9:16;13:11,12,24;
14:19,21;15:1,5,7;18:8,17;
19:4;24:17;25:6,11;31:7;
34:9;38:2;41:18;45:24;
47:11,16;48:5,13,15,18;
49:3,7,18,23;50:5,20;
51:23;52:2,12;53:3,14,17;
54:9;55:3,11,19;56:10;
57:23;58:8,14,20;59:1,9,
15;60:3,12,17;61:11,14;

Richard K. Sullivan
December 1, 2006

62:6,24;63:13,22
**Padellaro's** 31:18;34:4;
62:12
**page** 5:14;17:6;60:23
**paid** 30:10
**Palm** 35:1
**paper** 34:22;38:18
**Paper** 38:20
**papers** 32:20
**paperwork** 42:2,17;
43:16
**paragraph** 17:6;18:12;
47:10;49:15,24;58:18,19;
60:10,23
**Paragraph** 19:15;53:1;
54:13,18;55:4;62:7,23
**Parkway** 45:8
**part** 5:20;29:24;30:4;55:7
**particular** 17:5;27:9;
33:15;36:5;39:4,6;40:4;
57:23;58:18;62:6
**parties** 3:2;8:11;16:4,7;
56:2;60:2
**parts** 29:23
**party** 8:9;20:7,8;27:18;
48:17;50:19;55:9;56:21
**pass** 40:9
**pause** 23:20
**pay** 28:3
**paying** 28:18;42:21;43:1,
2
**payments** 27:8;28:8,12,
19
**peel-off** 39:11
**pending** 12:12
**people** 36:15;57:17;63:2,
6
**per** 27:13
**percent** 31:17;32:20
**period** 37:8;55:19
**periodic** 42:6
**permissible** 11:20
**person** 8:18
**personal** 24:24
**personnel** 8:9
**photocopy** 30:10
**physical** 30:8
**physically** 26:13;33:3
**Physically** 26:8;38:23
**planning** 10:3
**please** 3:22;5:7,15;6:6;
14:10;16:11;18:20;21:7,
10,15,22;58:17;61:20
**point** 10:16;33:18;34:8;
36:2;37:3,10;48:2;49:8;
63:21
**police** 13:14,20
**Police** 12:12,15,16,17,19
**policy** 24:8,11;25:4,15,
18;36:1,3;38:11
**position** 7:20;58:1
**positions** 57:18
**possess** 16:3,6

**possessed** 9:7
**possession** 6:22
**possible** 44:5;61:22
**possibly** 20:16;21:1
**Powers** 7:7;9:18;10:20;
19:18,20;20:3;46:3;51:7,
24
**POWERS** 3:6,8;18:1;
19:23;20:11,15,23;21:5,
18;23:15,20;31:20;32:3,
15;35:10;37:16;49:11;
50:11;51:3,18;53:4;54:14;
59:5;63:10;64:6
**practice** 3:24;7,8,11;
25:4,16;29:22;36:1,3,23;
37:6;38:10;44:23;45:9
**practicing** 4:9,14;53:17;
54:5
**practitioner** 44:20;45:3
**pre-docketed** 37:24
**predominantly** 11:14
**prepare** 45:20;46:16
**preparing** 46:6
**preprinted** 39:12
**presence** 3:12
**present** 10:12
**previously** 24:4;63:12
**primarily** 11:6;42:8
**print** 36:6,9
**Prior** 7:5;15:7;46:10
**private** 44:22
**privilege** 4:20;5:3;7:9,10,
17,21;8:11;10:16;14:7,14;
19:18;20:1,2;31:4,6,7,9;
32:14;46:1,9;47:22;48:9,
24;49:5;50:7,24;51:4,5,6,
11,16,17,23;52:1,2,5,7,8;
53:23;54:20;59:2,21;62:3;
63:8,14
**privileged** 4:24;9:13;
12:5;14:19;15:2,6,21,23;
16:22,24;17:4,19,22;18:4;
19:12,16;20:8,9,12,22;
21:14;22:2,7,8;23:4,13;
24:20;34:5;41:20,22;
47:14,18,21,23;48:2,6,7,
23;49:4,8,9;50:6,7,22,23;
51:13;53:5,6,11,22;54:3,3,
23,23;55:5,6,8,12;56:19,
21;57:4,8;58:2;61:19;63:4,
24
**pro** 41:6,19
**proceeding** 11:23;20:3
**produce** 10:9
**produced** 6:11,14,19;
8:6;15:19;33:24;46:23;
47:5;60:7;61:21
**product** 55:7
**production** 3:16
**Professional** 7:1;8:15;
50:16
**program** 34:18,18;35:24
**prohibit** 55:17

**prohibited** 49:12
**prolong** 55:20
**promised** 59:17
**protect** 10:1
**protected** 7:22
**protective** 9:16
**provide** 8:12
**public** 11:6,8,23;12:6;
61:13,16
**Public** 3:18
**purports** 19:3
**purpose** 14:22;15:8;
39:13
**pursuant** 6:11,15,19
**put** 7:20

**Q**

**Quincy** 45:8

**R**

**rarely** 40:24
**rate** 42:14
**rather** 10:13
**read** 3:10;46:22;47:1;
59:7,8;60:24;62:8
**reading** 18:11;50:15;
55:16
**reason** 14:11
**recall** 12:7,19;22:16
**receipt** 20:12
**receipts** 29:5,12
**receive** 5:4;21:12
**received** 5:12,19;16:23;
17:13,18,23;18:6;20:17,
20;21:2;22:9,17;23:2,16,
24
**receiving** 16:20;18:16
**Recess** 45:18;63:19
**recognize** 16:12;19:11;
22:1;23:9,12;36:13
**recognized** 23:2
**recollection** 16:20;
23:23;24:2
**record** 6:18;12:1,6;21:6,
18,21;23:21;38:5,9;45:17;
51:15;63:18
**records** 5:22;27:11;29:1,
3,4;32:20,24;35:7,12
**refer** 29:6
**reference** 18:15,19
**referenced** 19:13;22:4
**referring** 18:10
**reflect** 16:17;27:8;28:12,
22;29:5
**reflected** 5:20;28:4
**reflects** 29:11;30:12;53:2
**refuse** 57:19;58:4;62:2
**refused** 52:2
**refusing** 9:10;14:7,15;
57:11;58:13;59:20
**regard** 7:9

**regardless** 39:22
**regularly** 22:22,24
**relates** 44:8
**relating** 25:7;26:4;35:12
**Relating** 35:9
**relation** 45:5;46:7
**relations** 43:13
**relationship** 14:19;39:23
**relationships** 13:5
**relatives** 13:10
**remembered** 34:15
**rephrase** 23:6
**replacing** 23:23;24:2
**represent** 4:17,22;11:15,
16,19;19:21;47:11,18;
48:15,17;49:3,6;55:10
**representation** 25:19;
26:5;47:15;55:19;63:2
**representational** 48:4;
60:17,19
**represented** 8:22;19:18;
24:17,22;47:16;48:13;
61:17
**representing** 13:12,23;
14:22;15:8,10,17;20:2;
34:9;53:17;60:12
**requires** 48:19
**reserved** 3:4,8
**residential** 3:24
**respect** 26:2;38:11
**respond** 7:15,18;48:21
**responsive** 6:23;9:8;
32:24
**retain** 24:13
**retained** 42:5,22
**retainer** 42:6,9;43:2,17
**retainers** 43:18
**retrieve** 34:6
**retrieved** 33:23
**reveal** 47:11;51:15;54:8;
56:24;60:19
**revealed** 49:2;60:16;63:1
**revealing** 50:4,19;52:11;
58:24
**reviewed** 46:20
**Reviewing** 5:16;18:24;
21:11,24;61:2;62:9
**Richard** 3:23
**RICHARD** 3:13
**right** 6:3;16:14;17:10;
29:1;36:18;37:11;43:4,8,
14;47:22;53:14
**Right** 3:10;36:24;44:19
**Road** 4:1
**rolling** 37:18
**Rolodex** 26:21
**Rule** 7:1;9:1;14:2;48:19;
49:13;55:8;57:10
**ruled** 10:5
**rules** 53:18;54:7;55:16
**Rules** 8:15;50:16

**S**

**same** 18:5,11;29:9;35:5;
39:18;50:2;60:15;61:23
**sanctions** 64:3
**satisfactorily** 3:16
**save** 60:14
**saw** 33:14
**saying** 8:5;21:3;23:7;
57:1,7,9
**schedule** 34:13;36:8
**school** 44:12,17
**School** 44:13,15
**scope** 35:11
**scrupulously** 40:21;41:4
**searched** 5:22
**second** 21:19;23:20;
49:15;60:23
**secretary** 35:15;39:15
**secretary's** 34:19
**sector** 11:6,8
**seems** 16:16;20:21;21:2;
50:21;51:15;53:16
**send** 20:7;25:17;40:8,15;
42:1,6,14;43:13,16,20
**sending** 42:17;43:17
**sends** 20:8
**sense** 20:2;48:8,10
**sent** 8:23;14:24;17:20;
20:16;21:1;30:1;47:7;48:7
**sentence** 18:5,10,11,12,
13,15;19:14,15;59:6,13,14,
18
**sentences** 60:24
**separate** 25:8,13;27:17;
29:23;30:3
**separately** 29:17;53:20
**set** 50:2;55:3
**sheet** 38:18
**sheets** 38:16
**shipped** 33:19
**shortcut** 55:22
**show** 17:5;47:3;60:6;62:7
**showed** 62:22
**showing** 5:10
**Shrewsbury** 12:23
**side** 11:7,9,9,10
**sign** 3:11
**simple** 33:16
**simply** 8:16
**single** 24:17;51:12
**sit** 35:17
**situation** 15:9;42:18
**six** 23:24;34:20,22
**Smith** 25:12,13,22;26:2;
27:15,23;33:16;38:7
**sole** 44:20
**somebody** 16:17;19:9;
41:11;44:3;57:16
**someone** 43:1;60:1
**sometime** 33:7
**somewhere** 25:23;31:13,

15

**sort** 30:3,4;32:12;39:12;
61:15,16,18
**source** 55:2
**South** 45:7
**speak** 46:11;50:14
**speaking** 61:4
**speaks** 52:19,23
**specific** 40:7;44:8
**specifically** 63:12
**Specifically** 25:17
**spend** 38:15;39:21;40:13,
14;42:12;43:3
**spending** 39:5;43:8
**spent** 42:20
**spoke** 7:12;8:18;46:7;
57:22,24
**stamp** 22:9,14,18;23:2,
10,13,16,24
**standing** 4:12;54:6
**started** 6:1;9:7
**starting** 39:10
**state** 3:22;8:21
**stated** 63:11
**statement** 26:15;27:7;
28:4;29:9,11,18,19,20;
30:17;32:7;50:8,24;58:21
**statements** 27:23;50:13,
14;52:14,17
**stating** 21:6
**status** 48:4;60:17,19
**still** 35:19,21;38:5
**storage** 33:19,20,21,21;
34:6,10
**stored** 32:22
**Street** 4:5
**strike** 3:6,7;31:23;37:17;
41:24
**strips** 39:11
**subdivisions** 45:2
**subject** 40:13
**subpoena** 5:4,12,23;
6:12,19,23;9:8;10:1;30:21;
31:11,11,17
**subsequent** 10:17
**substance** 50:19;55:11;
56:1,14;57:2
**substantive** 8:20
**Sullivan** 3:23;5:8;6:7;
8:10;16:9;18:21;21:8,16;
45:5;61:4
**SULLIVAN** 3:13
**Superior** 12:12;30:11
**sure** 22:13;23:7;35:19,21;
37:8;53:24;54:14
**Sure** 11:5;21:20;36:16
**surrounding** 20:21
**Susan** 56:5
**suspended** 64:9
**switched** 37:10
**sworn** 3:17
**system** 35:1,3,5,14,22;
37:11;39:18;40:16

## T

**table** 36:13
**talk** 46:3,5;56:18,22;58:7;
63:21
**talked** 55:9;57:3,24;58:14
**talking** 38:7;59:24,24;
60:1,2
**task-based** 43:24;44:7,9
**taxation** 44:16
**telling** 17:22;29:8;53:2,9;
55:11,16
**ten** 24:12,14;40:15
**tend** 12:20
**terms** 10:7;19:17;37:19,
22;42:16;46:6;48:6
**testified** 3:18;15:19;23:9
**testify** 20:16,24;21:1
**testimony** 10:8
**therefore** 31:9
**thinking** 48:19
**third** 5:14;8:8,11;16:4,6;
17:6;18:12;20:7,8;25:2;
48:16;50:19;54:4;55:9;
56:2;60:2
**though** 42:21
**thought** 29:16;37:14
**three** 24:23;25:12,13;
26:3,3,6;27:14,15,16;
34:16;44:22
**Throw** 35:19
**ticket** 25:3,14
**till** 3:8
**timeframe** 31:13;36:2
**times** 57:23
**today** 5:5;6:1;31:14;35:5,
17;48:14,18,20;49:5,12;
51:7;52:21;54:12,17;55:24
**today's** 45:21
**together** 53:19
**told** 17:23;47:17;53:14;
59:1,12
**took** 46:20
**top** 16:16;19:8;54:10
**towards** 12:23
**track** 28:18;30:5;34:13;
38:11,14;39:21;40:1,3,20;
41:2,8,15;42:18,19;43:10,
14
**traffic** 25:3,14
**trial** 3:4,9
**true** 51:9
**trust** 25:1,13;33:17,17
**truthful** 49:22
**try** 8:1,4;55:21;57:13;
59:2;61:24
**trying** 32:12;48:10;61:22
**two** 8:16;13:20;23:5;
29:23;35:20;36:8,9;44:21;
54:2
**type** 29:13;44:4
**Typical** 40:16

## U

**uncooperative** 7:19
**under** 14:2;42:4;49:13;
55:7
**underlying** 30:3,16;32:8
**union** 11:23;12:2;13:2;
44:21,24;45:6
**unions** 11:12,14,16,19
**unions'** 11:10
**University** 44:15
**unless** 14:13;24:12
**unlimited** 37:22
**unwilling** 52:8;60:19;
61:8
**up** 14:8;59:12
**upon** 7:14;8:14;20:1;
39:1;55:22;62:16
**use** 3:5;22:22,24;23:17;
35:5
**used** 23:10;24:3;36:20;
39:18
**usually** 34:17;41:17;44:1

## V

**violate** 48:19;54:7

## W

**Wait** 53:12
**waive** 7:8,10;46:1,8;52:2,
5,7,8;63:13
**waived** 31:7;51:4,5;54:4;
63:9
**waiver** 7:16,20;8:14;9:1;
11:21;48:23;49:10;54:24;
62:18
**waiving** 5:3;47:22;49:5,9;
50:7,23;53:23
**way** 38:4;42:10,13;48:18;
59:16
**week** 4:16;37:20,20
**weeks** 34:16
**Wellesley** 45:11
**what's** 5:10;47:3
**whereabouts** 35:8
**whereby** 28:17
**Whereupon** 64:8
**whole** 49:19
**willing** 20:20;48:12,14,
22;49:6;52:5;54:7,12,17;
62:16
**withholding** 9:9
**within** 3:11;57:10
**without** 61:23
**witness** 3:10,14;19:21;
20:15;52:21
**women** 56:9
**Worcester** 12:23,24
**words** 14:8;29:24;34:14;
42:10;43:1;54:2

**work** 27:12;35:9,12;
40:23;41:6,10,21;44:6,20,
21;55:7
**worked** 45:3;56:9
**world** 48:13
**write** 44:2,3
**writeoffs** 40:13
**wrong** 51:2
**wrote** 17:10;30:2;50:13,
18;52:20;53:12

## Y

**year** 36:5,21;37:7,15;
58:8,15
**years** 4:16;23:24;24:12,
14;34:20,23;36:23;37:19;
44:21,22
**Years** 37:5

## Z

**zero** 43:3

Exhibit 13

RICHARD K. SULLIVAN
ATTORNEY AT LAW
300 EAST MAIN STREET
MILFORD. MASSACHUSETTS 01757

TELEPHONE (508) 482-9777
FAX (508) 482-9888

April 12, 2000
By Facsimile Transmission
and First Class Mail

Lawrence P. LeFebre
Personnel Director
City of Lawrence
City Hall - Room 302
200 Common Street
Boston, MA 01840



RE: Jennifer F. Padellaro

Dear Mr. LeFebre:

Please be advised that the undersigned represents Jennifer F. Padellaro (hereafter "Padellaro"), an employee of the City of Lawrence (hereafter "City") employed in the capacity of Assistant City Clerk. As you know, Padellaro's immediate supervisor is the City Clerk, James McGravey (hereafter "McGravey").

Padellaro has advised me that, for a period of time, she has been subjected to a hostile work environment. More specifically, Padellaro has advised me that McGravey has utilized Padellaro's computer at work to visit pornographic web sites, arrange for meetings with "call girls" and "escort services," download sexually explicit jokes, etc. In addition, McGravey has utilized computers of other employees in the City Clerk's office - of which Padellaro has a clear view - to visit pornographic web sites. Padellaro further advised me that recently a computer in her office displayed a screen with the words "the Best F. . . Transsexuals On The Net." When the screen appeared, McGravey responded: "Oh, that shouldn't be there." Accordingly to Padellaro, McGravey has also shown pictures of naked women to employees in the City Clerk's office (including Padellaro), told "off color" jokes to those employees, made a variety of inappropriate sexual comments, etc. Indeed, Padellaro advised me that recently McGravey showed a computer picture of a very well endowed male to a female office employee.

The conduct which Padellaro has described to me is a clear violation of the City's Work Environment Policy as well as the provisions of Massachusetts General Laws Chapter 151B. In

Lawrence P. LeFebre
April 12, 2000
Page Two

addition, the conduct which Padellaro has attributed to McGravey
violates the City's policies concerning "E-Mail/ or Internet
access," violations of which may result in discipline, up to and
including discharge.

Some time ago, Padellaro informed as Assistant City Solicitor of
these problems.  Nonetheless, these problems persist.  Prior to
filing a Charge of Discrimination with the Massachusetts
Commission Against Discrimination, Padellaro wishes to afford the
City one final opportunity to correct these problems.  More
specifically, Padellaro wants her computer secured so that
McGravey cannot use it under any circumstances.  Padellaro wants
a written acknowledgment from the City that she has not violated
the City's "E-Mail/ or Internet access" policy and that contacts
made on her computer to pornographic web sites and the like were
unauthorized.  Padellaro wants an immediate end to the ongoing
hostile work environment with which she has had to contend.
Finally, Padellaro wants assurances from the City that she will
not be the subject of retaliation by McGravey or anyone else.

Kindly respond to the issues raised herein at your earliest
opportunity.  Please direct all future communications concerning
this matter to me as counsel for Padellaro.

                          Very truly yours,

                          Richard K. Sullivan

RKS:ng
cc: Jennifer F. Padellaro

## RICHARD K. SULLIVAN

ATTORNEY AT LAW

300 EAST MAIN STREET
MILFORD, MASSACHUSETTS 01757

TELEPHONE (508) 482-9777
FAX (508) 482-9888

May 15, 2000

Lawrence P. LeFebre
Personnel Director
City of Lawrence
City Hall - Room 302
200 Common Street
Lawrence, MA  01840

RE:  Jennifer E. Padellaro

Dear Mr. LeFebre:

As you know, I represent Jennifer E. Padellaro (hereafter
"Padellaro"), an employee of the City of Lawrence (hereafter
"City") employed in the capacity of Assistant City Clerk.

On April 12, 2000, I wrote to you advising that Padellaro had
been subjected to a hostile work environment as a result of the
actions of her immediate supervisor, City Clerk James McGravey
(hereafter "McGravey").  In that correspondence, I set forth
specific examples of McGravey's conduct which clearly violated
both the City's Work Environment Policy as well as the provisions
of Massachusetts General Laws Chapter 151B.  In addition, conduct
attributed by Padellaro to McGravey violated the City's policies
concerning "E-Mail/or Internet access."

On May 8, 2000, I received your fax letter to me of that date
together with a copy of a letter from you to Padellaro, dated May
8, 2000.  In your May 8, 2000 letter to me, you indicated that,
after an investigation, you informed McGravey that you " . . .
agreed with the charges and allegations made against him."  In
your May 8, 2000 letter to me, you also outlined the actions
which you had taken in response to my letter of April 12, 2000.
One of the actions which you took was to order " . . . Mr.
McGravey to write a letter of apology to your client."  Since I
have never been provided with a copy of McGravey's letter of
apology, I would appreciate your providing the same to me at your
earliest opportunity.

On May 9, 2000, Padellaro attended counseling with the City's EAP
provider, the same EAP provider to whom McGravey was sent.
Padellaro believes that the potential for a conflict of interest
should strongly militate against such a practice.  Accordingly,

Lawrence P. LeFebre
May 15, 2000
Page Two

should Padellaro seek EAP assistance in the future, she would
request that she be permitted to utilize another EAP provider.

Lastly, in your letter of May 8, 2000 to me, you state: "Your
client has indicated to me that she considers the matter closed
and feels she can work in her office with Mr. McGravey without
worrying about a continued hostile work environment." Padellaro
has advised me that she never made any such statement. The mere
fact that McGravey's behavior has improved temporarily does not
mean that this matter is "closed." I will be checking with
Padellaro on an ongoing basis to insure that McGravey's conduct
continues to comport with the requirements of the City's Work
Environment Policy and Massachusetts General Laws Chapter 151B.

Very truly yours,

Richard K. Sullivan

RKS:ng
cc: Jennifer E. Padellaro

# RICHARD K. SULLIVAN

### ATTORNEY AT LAW

**300 EAST MAIN STREET**
**MILFORD, MASSACHUSETTS 01757**

TELEPHONE (508) 482-9777
FAX (508) 482-9888

June 29, 2004

Michael J. Sullivan, Mayor
City Hall
200 Common Street
Lawrence, MA 01840

RE:  Jennifer E. Padellaro

Dear Mayor Sullivan:

Please be advised that the undersigned represents Jennifer E.
Padellaro (hereafter "Padellaro"), an employee of the City of
Lawrence (hereafter "City") employed in the capacity of Assistant
City Clerk.  As you know, Padellaro's immediate supervisor is
City Clerk James McGravey (hereafter "McGravey").

On April 12, 2000, I wrote to Lawrence P. LeFebre (hereafter
"LeFebre"), the then Personnel Director of the City.  In that
correspondence, I advised LeFebre that Padellaro had been
subjected to a hostile work environment for a considerable period
of time.  More specifically, at that time, Padellaro advised me
that McGravey had utilized her computer in the City Clerk's
office to visit pornographic web sites, arrange for meetings with
"call girls" and "escort services," download sexually explicit
jokes, etc.  In addition, Padellaro advised me that McGravey had
utilized computers of other employees in the City Clerk's office
- of which Padellaro had a clear view - to visit pornographic web
sites.  Padellaro further advised me that a computer in her
office displayed a screen with the words "the Best F . . .
Transsexuals on the Net."  Finally, Padellaro informed me that
McGravey had shown pictures of naked women to employees in the
City Clerk's office (including Padellaro), told off-color jokes
to those employees and made a variety of inappropriate sexual
comments.

The conduct which Padellaro described to me in early 2000 was a
clear violation of the City's Work Environment Policy as well as
the provisions of Massachusetts General Laws Chapter 151B.

Michael J. Sullivan, Mayor
June 29, 2004
Page Two

Moreover, the conduct which Padellaro had attributed to McGravey
violated the City's policies concerning "E-Mail/or Internet
access," violations of which could result in discipline, up to
and including discharge.  In April, 2000, I offered the City an
opportunity to correct this problem prior to Padellaro filing a
Charge of Discrimination with the Massachusetts Commission
Against Discrimination (hereafter "MCAD").

After multiple discussions with LeFebre, he provided me
assurances that McGravey's inappropriate conduct would not occur
again.  By letter dated May 8, 2000, LeFebre wrote to me and
stated:

> I again met with Jennifer's (Padellaro's) department
> head, Mr. McGravey, informing him that I agreed with
> the charges and allegations made against him.
>
> I then took the following steps:
>
> . I have ordered Mr. McGravey to write a letter of
>   apology to your client.
>
> . I have ordered him to be enrolled in a course
>   offered by our EAP provider that will consist of one
>   on one counseling about sexual harassment and what
>   constituted a hostile work environment.
>
> . I also stated that his subordinates have a right to
>   work in an environment free from harassment, and the
>   right to legal protection against retaliation for
>   this complaint.

Padellaro had hoped McGravey's conduct would not be repeated
again.  Unfortunately, recently, McGravey has reverted to
his prior pattern of behavior.

More specifically, McGravey has advised female employees of
the City Clerk's office that they should visit a web site on
which he and his mistress performed pornographic sexually
explicit acts.  Indeed, McGravey actually logged onto that
web site so that employees of the City Clerk's office could
view these acts.  McGravey also informed Padellaro of the
existence of this web site.  The employees in the City
Clerk's office who were advised by McGravey of the web site
informed Padellaro of McGravey's actions.

Michael J. Sullivan, Mayor
June 29, 2004
Page Three

Padellaro cannot and will not continue her employment with
the City in this hostile work environment, nor can the other
female employees in her office.  Since June 21, 2004,
Padellaro has either called in sick or requested to be
placed on vacation leave because of the actions of McGravey.

Padellaro has requested that I write to you concerning
McGravey's continued and outrageous conduct in the
workplace.  Quite frankly, it is time for the City to take
all actions appropriate against McGravey, since it is  clear
that this individual cannot function in a workplace with
female employees.  Moreover, since Padellaro is fearful of
retaliation by McGravey, she has requested that, at the
present time, you keep her involvement in this matter
confidential.

Prior to filing an action against the City with the MCAD, I
will afford the City a final opportunity to deal with
McGravey.  Until the City does so, Padellaro will not be
able to return to work in her capacity as Assistant City
Clerk.  In the interim, Padellaro requests that you recredit
her sick leave and vacation leave accounts with all leave
utilized by her on or after June 21, 2004.  (I would suggest
that Padellaro be granted administrative leave with pay
pending her return to work.)  If, in the very near future, I
have not been advised by Padellaro that the City has taken
all appropriate actions against McGravey, I will have no
alternative other than to file a Charge of Discrimination
with the MCAD.

                    Very truly yours,


                    Richard K. Sullivan

RKS/em
cc: Jennifer E. Padellaro

# RICHARD K. SULLIVAN

### ATTORNEY AT LAW

#### 300 EAST MAIN STREET
#### MILFORD, MASSACHUSETTS 01757

TELEPHONE (508) 482-9777
FAX (508) 482-9888

July 9, 2004

Michael J. Sullivan, Mayor
City Hall
200 Common Street
Lawrence, MA 01840

RE: Jennifer E. Padellaro

Dear Mayor Sullivan:

Please be advised that I represent Jennifer E. Padellaro
(hereafter "Padellaro"), an employee of the City of Lawrence
employed in the capacity of Assistant City Clerk.

On June 29, 2004, I drafted a letter to send to you relative to
the outrageous and unlawful conduct of Padellaro's immediate
supervisor, City Clerk James McGravey.  It is my understanding
that, at a meeting between you and Padellaro, she read you this
letter but, at your request, did not provide you with a copy of
that letter.  Pursuant to a recent telephone discussion which
you had with Padellaro, you requested that she contact me to
have that letter forwarded to you.

In accordance with the instructions which you gave Padellaro,
enclosed please find the original of my June 29, 2004 letter to
you.  Should you have any questions concerning the above, do not
hesitate to contact me.

Very truly yours,

Richard K. Sullivan

RKS/em
Encl.
cc: Jennifer E. Padellaro